1

2

3

4

5

6

7

8

THE HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9 | HIDDEN HILLS MANAGEMENT, LLC,
and 334TH PLACE 2001, LLC,

10 |             Plaintiffs,

11

12 |     v.

13 | AMTAX HOLDINGS 114, LLC, and
AMTAX HOLDINGS 169, LLC,

14 |             Defendants.

15

16 | AMTAX HOLDINGS 114, LLC, AMTAX
HOLDINGS 169, LLC, and PARKWAY
APARTMENTS, LP

17

18 |             Counter-Plaintiffs,

19 |     v.

20 | HIDDEN HILLS MANAGEMENT, LLC,
and 334TH PLACE 2001, LLC,

21 |             Counter-Defendants.

No. 3:17-cv-06048-RBL

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

22

23

24

25

26

     THIS MATTER came before the Court for a five-day bench trial beginning on June 3, 2019.  The parties called five witnesses for live testimony and three witnesses by video deposition.  The witnesses who were called and testified at the trial and the exhibits that were

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 1
(Case No. 17-cv-06048-RBL)

1   offered, admitted into evidence, and considered by the Court are identified in the witness and

2   exhibit lists entered by the Court on June 11, 2019.  *See* Dkt. ##106-07.

3       David Goodnight, Rita Latsinova, and Scott Pritchard of Stoel Rives LLP appeared on

4   behalf of Plaintiffs and Counter-Defendants Hidden Hills Management, LLC ("**HHM**") and

5   334th Place 2001, LLC ("**334th Place**") (collectively, the "**GPs**").  Eric Pettit, Craig Bessinger,

6   Grayce Zelphin, and Steven Merriman appeared on behalf of Defendants and Counter-Plaintiffs

7   AMTAX Holdings 114, LLC ("**AMTAX 114**") and AMTAX Holdings 169, LLC ("**AMTAX**

8   **169**") (collectively, the "**LPs**" or "**AMTAX**").

9       Based on the evidence and testimony presented at trial, the Court makes the following

10  findings of fact and conclusions of law.

11  ## I.  FINDINGS OF FACT

12  **A.     Background**

13      1.      This case involves two related Washington limited partnerships that own and

14  operate low-income apartment complexes:  Hidden Hills 2001, LP ("**Hidden Hills**") and

15  Parkway Apartments LP ("**Parkway**").  Hidden Hills owns the Hidden Hills apartment complex

16  located at 3313 72nd Ct. W, University Place, WA.  Parkway owns the Parkway apartment

17  complex located at 2206 SW 334th Place, Federal Way, WA.

18      2.      Plaintiffs HHM and 334th Place are the general partners of Hidden Hills and

19  Parkway, respectively.  Catherine Tamaro is the principal of each GP and has managed the

20  partnerships for 17 years.  Ms. Tamaro first purchased a low-income housing property in 1996,

21  the Westside Estates Apartments, a 448-unit property located on N. Pearl Street in Tacoma.

22  6/3/19 Trial Tr. at 71 (Tamaro).  She currently owns and manages nine complexes totaling over

23  1,300 affordable housing units in south King County and in Pierce County.  *Id.* at 72.  Ms.

24  Tamaro has served as a general partner with limited partner investors in 15 properties since 1996

25  and has worked in the low-income housing tax credit ("**LIHTC**") industry for 23 years.  *Id.* at

26  71.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 2
(Case No. 17-cv-06048-RBL)

3.      As LIHTC properties, Hidden Hills and Parkway are regulated by a number of federal and state agencies. *Id.* at 75.  Ms. Tamaro has never been accused of a breach of any duties by any regulatory agency in connection with her work as a general partner in the LIHTC industry. *Id.* at 88.

4.      Defendants AMTAX 114 and AMTAX 169 are the LPs of Hidden Hills and Parkway.  AMTAX's principal is Alden Torch Financial LLC ("**Alden Torch**"), a manager of limited partner investments in LIHTC funds.  The firm is based in Denver, and it is the largest affordable housing asset management firm in the industry, with between 800 and 900 partnership interests under management.  6/5/19 Trial Tr. at 134 (Blake).  Alden Torch purchased the right to manage the interests of the LPs of Parkway and Hidden Hills in the secondary market in 2011 and was not involved in the original structuring or financing of these projects.  6/3/19 Trial Tr. at 100-01 (Tamaro).  AMTAX's management changed frequently throughout the years.  6/6/19 Trial Tr. at 29 (Blake).

5.      Ms. Tamaro had a good working relationship with the pre-Alden Torch managers of AMTAX's interests in the partnerships.  6/3/19 Trial Tr. at 101 (Tamaro).  She has worked as a general partner with a number of limited partners during her 23 years in the LIHTC industry, and this litigation is the first time a limited partner has ever sought her removal as general partner or accused her of breaching any contract or duty to the partnership or limited partner. *Id.* at 88-89.  The Court finds that Ms. Tamaro was a credible witness in her testimony during trial regarding the GPs' actions in both Hidden Hills and Parkway and the other matters to which she testified.

6.      AMTAX invested in these partnerships in 2002 to harvest tax credits provided by the federal government to encourage private investment in low-income housing programs.  6/3/19 Trial Tr. at 73 (Tamaro) ("They are all structured so the investor has a large ownership share in order to maximize the amount of tax credits and depreciation that flow to that investor.").  Each partnership has what is known as a 15-year "Compliance Period," during

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3
(Case No. 17-cv-06048-RBL)

1   which the tax credits are earned and retained.  Trial Exs. 2 and 3 § 7.4.J; 6/3/19 Trial Tr. at 74

2   (Tamaro).  For Hidden Hills, the Compliance Period ended on December 31, 2016.  6/5/19 Trial

3   Tr. at 138 (Blake).  For Parkway, the Compliance Period ended on December 31, 2017.  6/4/19

4   Trial Tr. at 4 (Tamaro).

5         7.     A central responsibility of the GPs under Hidden Hills and Parkway's limited

6   partnership agreements ("**LPAs**") is to ensure that the underlying properties remained in

7   compliance with the federal tax code so that AMTAX could continue to reap the tax benefits

8   during the Compliance Period.  6/3/19 Trial Tr. at 74 (Tamaro).  Ms. Tamaro has always kept ~~of~~

9   all her projects in compliance such that the tax credits were fully delivered and were never

10   subject to recapture.  *Id.* at 81.  There is no dispute that the GPs delivered all of the tax credits to

11   which the LPs were entitled.  *Id.* at 89 ("The amount that was promised and the schedule that

12   was promised were delivered.").

13         8.     In Hidden Hills, over the 15-year Compliance Period, AMTAX 114 received over

14   $8.1 million in federal tax credits and write-offs, in exchange for an upfront investment of $3.6

15   million.  *Id.* at 90-93.  In Parkway, AMTAX 169 contributed $2.8 million in equity and received

16   over $7.2 million in federal tax credits and write-offs over during the 15-year Compliance

17   Period.  *Id.*  Ms. Tamaro calculated these credit deliveries and write-offs based on the

18   partnerships' tax returns, and the contributions provided by the LPs are set forth in the respective

19   LPAs.  6/4/19 Trial Tr. at 52-53 (Tamaro).

20   **B.**    **The Options**

21         9.     For a two-year period after the Compliance Period ends, the GPs have a right to

22   purchase the LPs' interest in the partnerships pursuant to Section 7.4.J. of each LPA.  Trial Exs.

23   2, 3 § 7.4.J.  The LPs have no such right to purchase the GPs' interest.  6/5/19 Trial Tr. at 143

24   (Blake).  The provision in each LPA states:

25
26           Subject to compliance with Section 42 of the Code and the rules of the agency,
             upon completion of the Compliance Period, the Managing General Partner shall

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 4
(Case No. 17-cv-06048-RBL)

1
2
3
4
5

> have the option (the "Option") to purchase the interest of the Investor Limited partner in the real estate, fixtures and personal property of the Partnership (the "Interest") for a period of twenty-four (24) months.  The Managing General Partner may exercise the Option upon written notice to the Investor Limited Partner at any time after the end of the Compliance Period (the "Option Period").  In the event the Managing General Partner exercises the Option, it must pay to the Investor Limited Partner the Option Price (as defined herein) in cash.

6

Trial Exs. 2 and 3.

7
8

      10.     These options are common in LIHTC partnerships.  6/3/19 Trial Tr. at 93-94

9

(Tamaro).  Ms. Tamaro has exercised similar options as the general partner in three Washington

10

partnerships and five Nevada partnerships, without incident.  *Id.* at 94 (Tamaro).  Two of her

11

Nevada LIHTC partnerships had AMTAX entities as limited partners.  The AMTAX limited

12

partners there did not resist the option exercise.  *Id.* at 79-80.  The purchase option in Hidden

13

Hills and Parkway was a key component of each deal, and for Ms. Tamaro, "one of the reasons

14

[she] did business with AMTAX."  *Id.* at 94-95.  Ms. Tamaro wants to continue owning the

15

Hidden Hills and Parkway apartment complexes and continue running them as low-income

16

housing properties after AMTAX's exit.  *Id.*

17

      11.     According to Chris Blake, Alden Torch's Director of Capital Transactions and

18

AMTAX's designated representative, AMTAX had no interest in owning the properties, and

19

instead wanted to sell the properties on the market.  6/5/19 Trial Tr. at 151 (Blake).  Under

20

Section 7.4.K of the LPAs, AMTAX has a right to sell its *interest* in the partnerships on the

21

market, but it has no right to sell the properties.  Trial Exs. 2 and 3 § 7.4.K.  The only method by

22

which AMTAX could sell the properties would be to remove the GP under Section 4.5 of the

23

LPAs.  6/3/19 Trial Tr. at 116 (Tamaro).  The record contains multiple examples of AMTAX's

24

efforts to force the GP to sell the Hidden Hills property on the market prior to AMTAX's

25

purported removal of the GP.  *See, e.g.*, Trial Exs. 176, A-110, and A-212.  Ms. Tamaro resisted

26

these efforts, and instead exercised her contractual option right to purchase the LPs interest in

both Hidden Hills and Parkway.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 5
(Case No. 17-cv-06048-RBL)

1    12.    The Option Price under the LPAs is calculated pursuant to an appraisal process

2  used to determine the underlying properties' fair market value ("**FMV**").  First, under Section

3  7.4.J of the LPAs, "Fair Market Value shall be determined by two independent MAI appraisers:

4  one selected by the Managing General Partner and one by the Investor Limited Partner.  If such

5  appraisers are unable to agree on the value, they shall jointly appoint a third independent MAI

6  appraiser whose determination shall be final and binding."  Trial Exs. 2-3 § 7.4.J.

7    13.    Second, after FMV has been determined, the parties utilize a formula they call a

8  distribution "waterfall" under Section 6.2.B of the LPAs to determine the Option Price.  Trial

9  Exs. 2 and 3 § 6.2.B.  The waterfall models a hypothetical sale, starting with FMV and then

10  proceeding to subtract outstanding bills, debts, and liabilities of the partnerships; asset

11  management fees to the LP; a priority distribution to the LP; any outstanding deferred developer

12  fee; subordinated loans to the GP; a capital account adjustment; another priority distribution to

13  the LP, and lastly the parties split any outstanding balance.  6/3/19 Trial Tr. at 96-97 (Tamaro).

14  **C.    2018 Audited Financial Statements**

15    14.    Another role of the general partners in LIHTC partnerships is to provide

16  information regarding the partnerships and the projects to the limited partners.  The general

17  partners keep the partnerships' books and records, arrange for audits of the partnership's

18  financial statements on a yearly basis, and comply with any reporting requirements by HUD or

19  other regulatory agencies.  *Id.* at 86.  Ms. Tamaro provided audited financial statements to

20  AMTAX for both Hidden Hills and Parkway every year from the partnerships' inception in 2002

21  until 2019, when testimony by AMTAX's expert in this case caused the auditor for Hidden Hills

22  and Parkway, Laura Lindal, to disengage.  Trial Exs. 153 and 154; Trial Tr. 6/3/19 at 86-87

23  (Tamaro); 6/5/19 Trial Tr. at 103-04 (Lindal).

24    15.    Ms. Lindal is a sole proprietor CPA who served as the independent auditor for

25  Parkway and Hidden Hills since 2016.  6/5/19 Trial Tr. at 64 (Lindal).  She has written and

26  taught courses on a variety of audit-related subjects, including audits of HUD programs, and has

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 6
(Case No. 17-cv-06048-RBL)

1    been auditing LIHTC properties since 2001.  *Id.* at 65-66.  She testified as to the partnerships'

2    audit process and her opinion that the audited financial statements fairly and accurately present

3    the financial picture of the partnerships in all respects.  *Id.* at 68.

4         16.    According to Ms. Lindal, none of the fees or expenses incurred by the GP in

5    Parkway were improper.  *Id.* at 84-87.  She also testified that Ms. Tamaro helped gather all the

6    information needed to conduct the audits, was cooperative in all respects, and never refused to

7    provide her with information; Ms. Lindal never had a feeling that Ms. Tamaro was withholding

8    any information from her.  *Id.* at 78-79.  Ms. Lindal never had any prior relationship with Ms.

9    Tamaro before being retained as the auditor for both Parkway and Hidden Hills.  *Id.*  at 79-80.

10        17.    In 2019, for the first time, Ms. Tamaro was unable to deliver timely finalized

11   audited financial statements to AMTAX.  AMTAX contends that because the audited financial

12   statements were overdue under Section 12.1 of each LPA, it was entitled to remove Ms. Tamaro

13   from each partnership, and provided notice to that effect during trial.  Trial Exs. A-311 and A-

14   312.  After an amendment to Parkway's LPA in 2007, the audited financial statements were due

15   to AMTAX on February 15 of each year.  *See* Trial Ex. 31.  Hidden Hills' audited financial

16   statements were due on March 15 of each year.  Trial Ex. 2 § 12.1.  AMTAX never previously

17   enforced either deadline, until seeking the GPs' removal after the option was exercised.  *See,*

18   *e.g.*, Trial Ex. 166 (stating that Parkway's audited financial statements were due on March 17,

19   2019); 6/5/19 Trial Tr. at 131 (Blake testifying that he could not point to a single document or

20   instance over the 15-year Compliance Period in which the LP complained about the timeliness of

21   the audited financial statements).

22        18.    Ms. Lindal disengaged as the partnerships' auditor in May 2019, shortly before

23   trial in this case.  *See* Trial Exs. 153 and 154.  She disengaged because AMTAX's expert, Jon

24   Krabbenschmidt, testified during his deposition that he believed Parkway's audited financial

25   statements were "materially misstated."  6/5/19 Trial Tr. at 80 (Lindal).  Ms. Lindal believed that

26   Mr. Krabbenschmidt's allegations impaired the appearance of her independence under AICPA

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 7
(Case No. 17-cv-06048-RBL)

1   rules because she may reasonably be perceived as defending her work in prior years through the

2   2018 audits.  *Id.* at 103-04; *see also* Trial Ex. A-307.  Ms. Tamaro never asked Ms. Lindal to

3   withdraw.  *See* 6/5/19 Trial Tr. at 81 (Lindal); 6/3/19 Trial Tr. at 117-18 (Tamaro).

4       19.     In all of the years Ms. Lindal has been an auditor, she has never had her

5   independence questioned or had reason to disengage as the auditor for a partnership.  6/5/19 Trial

6   Tr. at 70 (Lindal).  She stands by her audits of both partnerships and would not have disengaged

7   if Mr. Krabbenschmidt had not testified as he did in his deposition.  *Id.* at 87-88.

8       20.     Although the 2018 audited financial statements were not finalized at the time of

9   trial, Ms. Lindal had prepared drafts that Ms. Tamaro shared with AMTAX.  AMTAX had all of

10  the pertinent financial information for each partnership as of May 2019.  *See, e.g.*, Trial Exs.

11  140-43, 147, 148, 151, 152; *see also* 6/3/19 Trial Tr. at 118 (Tamaro).  The required HUD

12  submission for Parkway was also completed before Ms. Lindal's disengagement and provided to

13  AMTAX.  Trial Exs. 151 and 152; 6/5/19 Trial Tr. at 106-08 (Lindal).

14  **D.     Hidden Hills**

15      21.     The Hidden Hills property is located in University Place.  It was built in 1984 and

16  has 216 units.  It was in the plume of the ASARCO smelter.  In 1998, Tacoma Water Utility

17  selected the property as one of its test sites, and the soil tested for high levels of arsenic and lead.

18  6/3/19 Trial Tr. at 97 (Tamaro).  Shortly thereafter, the Washington Department of Ecology

19  listed the property on its "Confirmed and Suspected Contaminated Sites List," where it remains

20  to date.  Trial Ex. A-241-0007 (RFA 10).

21      22.     Ms. Tamaro put the Hidden Hills deal together beginning in 1999 and learned of

22  the contamination at that time.  6/3/19 Trial Tr. at 97 (Tamaro); 6/5/19 Trial Tr. at 49 (Tamaro).

23  She found the property and placed it under contract, but had a difficult time closing the deal.

24  6/3/19 Trial Tr. at 97 (Tamaro).  According to Ms. Tamaro, the contamination on the property

25  site made lenders uncertain as to how to finance the purchase.  *Id.* at 97-98.  Two lenders

26  dropped out, and the seller ultimately cut the price by approximately 9%.  *Id.*  The final lender

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8
(Case No. 17-cv-06048-RBL)

1    agreed to finance the property on the condition that an approximately $1.25 million escrow

2    account was established to handle any potential remediation costs.  *Id.* at 99.  Ms. Tamaro loaned

3    the partnership approximately $700,000 to fund the escrow, which has yet to be repaid.  *Id.*

4         23.    Based on this history, Ms. Tamaro believed that the environmental contamination

5    should be taken into account by the appraisers in valuing the property under Section 7.4.J of the

6    Hidden Hills LPA.  *Id.* at 104 ("I based this on my experience in closing the original loan.  And I

7    recognize that the world may have changed, but I had had a certain experience when I purchased

8    that property, with the lenders.  And so based on that experience, I had thought that the property

9    needed to be -- the value needed to be offset by the remediation cost.").  Ms. Tamaro obtained

10   during the appraisal process updated remediation cost estimates from EPI, the environmental

11   firm that had worked with the seller in 2001.  6/4/19 Trial Tr. at 73-74 (Tamaro).

12        24.    HHM exercised its option pursuant to Section 7.4.J of the Hidden Hills LPA on

13   March 14, 2017, and selected CBRE as its appraiser to determine the FMV of the Hidden Hills

14   apartment complex.  Trial Ex. 120.  After taking into account the estimated costs of remediating

15   the environmental contamination, CBRE valued the property at $14,050,000.  Trial Ex. A-132.

16        25.    AMTAX 114 selected Cushman & Wakefield ("C&W") as its appraiser to

17   determine the FMV.  6/5/19 Trial Tr. at 145 (Blake).  C&W did not discount the value of the

18   property based on any costs associated with the environmental contamination on the property

19   site.  *Id.*  It valued the property at $19.7 million.  *Id.*

20        26.    A third appraisal was issued by Colliers International Valuation & Advisory

21   Services ("Colliers") on October 23, 2017.  Trial Ex. A-210.  After taking into account the

22   estimated costs of remediating the environmental contamination, Colliers valued the property at

23   $13.5 million.  *Id.*

24        27.    HHM brought suit in state court in November 2017 seeking a declaration that

25   Colliers appraisal was "final and binding" under the LPA and that AMTAX must proceed with a

26   buyout based on the fair market value from the Colliers appraisal report.  AMTAX removed the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 9
(Case No. 17-cv-06048-RBL)

1  case to this Court and counterclaimed, seeking, among other things, a declaration that HHM was

2  validly removed from the partnership and the third appraisal is not "final and binding" under the

3  LPA.

4      28.    Prior to trial, this Court granted AMTAX's motion for summary judgment on

5  Hidden Hills to the extent the Colliers appraisal could not be considered "final and binding"

6  under the LPA, and that HHM was required to bear the risk of any environmental contamination

7  pursuant to a separate indemnity agreement entered into by the parties.  Dkt. #89 ("**MSJ**

8  **Order**").  The Court concluded that the appraisal process had been "tainted" by HHM in

9  connection with the contamination issues, but the issue of HHM's removal as GP was left for

10  trial. *Id.*

11      29.    After review and consideration of the Court's summary judgment order, HHM

12  sent a letter to AMTAX dated May 7, 2019, accepting in writing the C&W appraisal as the basis

13  for calculating the FMV of AMTAX's interest.  6/3/19 Trial Tr. at 106-09 (Tamaro); Trial Ex.

14  155.  AMTAX proceeded to trial on the issue of whether HHM should be removed. *See, e.g.*,

15  6/3/19 Trial Tr. at 110-13; Trial Exs. 158, 159, A-293, 165.

16      30.    AMTAX's only claims of wrongdoing against the GP in Hidden Hills pertain to

17  actions by Ms. Tamaro during the appraisal process after the option had been exercised.  6/5/19

18  Trial Tr. at 150-51 (Blake).  AMTAX has never asserted derivative claims on behalf of the

19  partnership and dropped the LP's damage claims for breach of contract and breach of fiduciary

20  duty before trial.  Dkt. #89 (Joint Pretrial Order); Trial Ex. A-241 (Interrogatory Ans. No. 4).

21  **E.     Parkway**

22          **1)  Parkway's Background and Management**

23      31.    Parkway Apartments is located in Federal Way.  Built in 1975, it is a 208-unit

24  multifamily community consisting of 19 two-story buildings, one community building, and one

25  maintenance/laundry building.  6/3/19 Trial Tr. at 121-22 (Tamaro).

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 10
(Case No. 17-cv-06048-RBL)

32.     In 2002, the property was acquired by Parkway and after renovation was placed in the LIHTC program, which requires that the units be rented to individuals and families below a certain income level. *Id.* at 141.  Ms. Tamaro participated in the acquisition and conversion of Parkway to the LIHTC program and has served as the principal of 334th Place, Parkway's GP, since the partnership's inception. *Id.* at 123.  Parkway is an older property with significant deferred maintenance and a high need for repairs.  The partnership spent $1.6 million on the initial repairs and renovations upon entry into the LIHTC program, but this did not address all of the repairs that needed to be done. *Id.* at 124.

33.     Under Section 7.3 of LPA, the GP has sole responsibility and the "exclusive right" to manage Parkway's business.  Trial Ex. 3 § 7.3.  The GP's primary duties include maintaining the partnership's regulatory compliance and delivering tax credits to the LP.  There is no dispute that 334th Place has maintained compliance and delivered full tax credits to AMTAX 169 during the 15-year Compliance Period.

34.     The GP's other duties are enumerated at length in Section 7.4.A of the LPA, and require the GP to exercise its "best efforts" in carrying out those duties.  Trial Ex. 3.[1]  Under Section 7.7.A of the LPA, the GPs are insulated from any liability to Parkway or the LP for any loss suffered by Parkway that "arises out of any action or inaction of such General Partner . . . if that General Partner . . . in good faith, determined that such course of conduct was in the best interests of the Partnership and such course of conduct did not constitute negligence or misconduct."  With respect to the setting of rents, the GP must use "reasonable efforts consistent with sound management practice" to maximize income by "implementing[] appropriate adjustments in the rent schedule of the Property."  Trial Ex. 3 § 7.4.B.

---

[1] The duties include supervising the activities of the Management Agent; inspecting the property to determine if it is being properly maintained and all necessary repairs are being made; preparing or causing to be prepared reports to be furnished to the partners, any lenders, or other agencies; and all other things that may be reasonably necessary to manage the affairs and business of the partnership.  Trial Ex. 3 § 7.4(A).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 11
(Case No. 17-cv-06048-RBL)

1  35.   Under the LPA, the LP's oversight role is limited to specified consent rights not

2  relevant here, as well as the review and acceptance of the annual audited financial statements that

3  the partnership provides to AMTAX.  The GP caused the partnership's audited financial

4  statements to be submitted to the regulator and to AMTAX every year during the Compliance

5  Period.  6/3/19 Trial Tr. at 168 (Tamaro).

6  36.   AMTAX 169's present claims involve matters within the discretion of a

7  managing partner, including:

8  - The GP's setting of rents;

9

10  - The GP's decision to replace rotting decks;

11  - The GP's decision to replace certain windows;

12  - The GP's efforts to comply with HUD and other agency requirements, and

13  - The way in which the GP dealt with extermination of bed bugs.

14  37.   AMTAX 169's asset manager, Gary Newbold, was Alden Torch's primary point

15  of contact for 334th Place and Ms. Tamaro.  6/3/19 Trial Tr. at 152 (Tamaro).  Mr. Newbold

16  served as AMTAX's asset manager for Parkway from 2013 until he left Alden Torch in 2016.

17  6/5/19 Trial Tr. at 126 (Blake).  His role was to monitor AMTAX's investment and the work

18  done by the GP.  *Id.*  He received, reviewed, and accepted Parkway's annual audited financial

19  statements every year, as well as additional financial reports, such as monthly rent rolls, and

20  financial statements, and yearly budgets.  6/3/19 Trial Tr. at 151-59 (Tamaro); 6/5/19 Trial Tr. at

21  126 (Blake).  Whenever the asset manager had questions, Ms. Tamaro would answer promptly,

22  either by phone or information provided through email.  6/3/19 Trial Tr. at 151 (Tamaro).

23  38.   Mr. Newbold visited Parkway several times in connection with his asset

24  management function and was well aware of its condition and the ongoing repairs.  6/6/19 Trial

25  Tr. at 27 (Blake); 6/3/19 Trial Tr. at 151 (Tamaro).  Whenever Mr. Newbold questioned a

26  particular fee or expense, Ms. Tamaro provided a full explanation to his satisfaction.  Trial Exs.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 12
(Case No. 17-cv-06048-RBL)

102493460.5 0009368-00002

1   70, 77, 78, and 87.  Mr. Newbold did not testify on AMTAX's behalf, and its sole fact witness,

2   Mr. Blake, visited the Parkway property site for the first time approximately a month before trial.

3   6/6/19 Trial Tr. at 27 (Blake).

4

5
       **2)   AMTAX Scrutinizes the Audited Financial Statements in Connection with a Refinance and Potential Voluntary Buyout of Its Interests in 2014**

6

7       39.   Parkway is financed by a HUD-insured loan, which was entered into in 2002 and

8   refinanced in 2015.  6/3/19 Trial Tr. at 123-25 (Tamaro).  Under Section 13.11 of the LPA, the

9   HUD project documents are senior to the LPA.  Trial Ex. 3 § 13.11; 6/3/19 Trial Tr. at 127-28

10   (Tamaro).  Parkway is subject to federal regulations governing the condition of properties

11   financed through HUD-insured loans, known as the Uniform Physical Condition Standards.

12   6/3/19 Trial Tr. at 125 (Tamaro).  These collectively require that HUD-insured properties are

13   kept in "good repair."  24 C.F.R. § 5.703; *see also* 6/3/19 Trial Tr. at 131 (Tamaro).  HUD

14   ensures compliance through its Real Estate Inspection Center (REAC), which inspects projects

15   every one, two, or three years depending on how well they score.  6/3/19 Trial Tr. at 125-26

16   (Tamaro).  HUD also requires a capital needs assessment to be submitted every 10 years.  Trial

17   Ex. 81.

18       40.   A number of reports presented as evidence during trial, including reports

19   commissioned by AMTAX's prior asset management company, demonstrate that the property

20   required substantial repair and replacement work, which was undertaken by the GP in

21   accordance with the issues identified in the reports.  *E.g.*, Trial Exs. 50 (Hunt Companies

22   Report), 52 (Novogradac Report), 23 (2006 Paramount Report), and 81 (HUD PCNA Report);

23   *see also* 6/3/19 Trial Tr. at 133, 136-43 (Tamaro).  The needed projects included replacement of

24   Parkway's siding, decks, sliding doors and windows, roofs, and trash compactor, and repaving its

25   parking lots and walkways.  6/3/19 Trial Tr. at 133-41 (Tamaro).  There is no dispute that the GP

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13
(Case No. 17-cv-06048-RBL)

1    did all this work on the property.  6/6/19 Trial Tr. at 29 (Blake).  Mr. Newbold was provided

2    with a copy of HUD's capital needs assessment, which outlined the needed repairs.  Trial Ex. 85.

3         41.    Parkway operated at a loss for many years, which is not unusual for LIHTC

4    properties.  6/5/19 Trial Tr. at 77 (Lindal); *see also* Trial Ex. 90 (AMTAX funding request).  To

5    make up for the insufficient cash flow, the GP advanced funds and deferred payment on

6    management fees during the Compliance Period.  6/3/19 Trial Tr. at 135 (Tamaro).  This is also

7    not unusual for LIHTC properties.  6/5/19 Trial Tr. at 77-78 (Lindal).  Parkway's LPA requires

8    the GP to advance up to $600,000 to the partnership if needed.  6/3/19 Trial Tr. at 135 (Tamaro).

9         42.    Ms. Tamaro advanced much more over the years.  *Id.*  To keep the partnership

10   solvent and continue delivering tax credits to the LP, the GP loaned Parkway over $1.3 million

11   and deferred payment on almost $1.1 million of reimbursable payroll expenditures and

12   management fees; these loans and deferred payments, totaling approximately $2.4 million, have

13   been carried on Parkway's books as accounts payable to the GP.  *See* Trial Ex. 126 (2017

14   Parkway audited financial statement at 14).  These advances and deferred fees benefitted

15   Parkway – and AMTAX.  In seeking approval for the refinance from its investor Morgan

16   Stanley, AMTAX 169 acknowledged:  "The GP has not been able to raise rents to improve cash

17   flow and has been funding the deficits by deferring payroll from the affiliated management

18   company."  Trial Ex. 90 at AMTAXHH00023022; *see also* 6/3/19 Trial Tr. at 173-74 (Tamaro).

19   AMTAX viewed these loans and deferred fees as "advantageous from a dispositions

20   perspective."  Trial Ex. 90 at AMTAXHH00023022.  AMTAX stated in the same document that

21   the GP was not in default under the LPA.  *Id.* at AMTAXHH00023026.

22        43.    The GP's advances and deferred payment on fees became partnership obligations

23   owed to the GP and reflected on Parkway's audited financial statements every year.  6/3/19 Trial

24   Tr. at 136 (Tamaro).  Parkway's audited financial statements included what is known as a "going

25   concern" note, which stated that the GP's infusion of funds into the partnership enabled it to

26   continue as a going concern.  Trial Ex. 126 at AMTAXHH00027656.  Prior to this litigation,

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 14
(Case No. 17-cv-06048-RBL)

1   AMTAX never demanded that the GP give up any accounts payable reflected on the audited

2   financial statements or amounts loaned to the partnership to meet payroll and other expenses.

3   6/3/19 Trial Tr. at 176 (Tamaro).  Nor did AMTAX ever communicate to Ms. Tamaro that it

4   believed the GP was in default.  *Id.* at 175.

5        44.    In 2014, to free up cash for needed repairs, HUD encouraged Parkway to

6   refinance its loan at a lower rate.  *Id.* at 157-58.  The HUD Project Manager emailed AMTAX

7   representatives to encourage them to agree to the refinancing, stating:  "though the property has

8   been plagued by certain financial performance issues, I believe Catherine [Tamaro] has made

9   drastic improvements to its physical condition and management."  Trial Ex. 87.  AMTAX

10   ultimately agreed, and the refinance closed on February 24, 2015.  6/10/19 Trial Tr. at 40-41

11   (Tamaro).  As a condition of the new loan, guaranteed by HUD, the partnership set aside

12   approximately $500,000 in reserves for the repairs, and had to deposit approximately $100,000

13   annually towards repairs; the new loan allowed the partnership to save $20,000 per month in

14   interest payments.  6/3/19 Trial Tr. at 142, 144 (Tamaro).

15        45.    Around the same time, Ms. Tamaro proposed buying out the LP's interest.  Both

16   the refinance and the proposed buyout triggered Mr. Blake's involvement in negotiations as a

17   member of Alden Torch's Capital Transactions group.  6/5/19 Trial Tr. at 175-76 (Blake).  The

18   buyout proposal in particular prompted AMTAX to scrutinize the Parkway audited financial

19   statements; the setting of rents, fees, and expenses; and the work being done on the property.  *Id.*

20   at 176-77.  Mr. Newbold and Mr. Blake conducted the due diligence and negotiated a potential

21   buyout with Ms. Tamaro.  *Id.*  In the spring of 2014, Mr. Newbold and Mr. Blake instructed John

22   Thomas, an Alden Torch CPA, to give "priority" to reviewing the partnership's 2013 audited

23   financial statements.  Trial Ex. 73.

24        46.    After that review, and after asking Ms. Tamaro a series of pointed questions

25   regarding the same fees that are at issue in this case, the same repairs, and the setting of rental

26   rates (all of which Ms. Tamaro answered), Mr. Blake informed her that AMTAX 169 was "on

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 15
(Case No. 17-cv-06048-RBL)

1  the same page with respect to the [2013] audit" and authorized proceeding with the buyout using

2  the same waterfall formula the parties would use in 2018 had AMTAX participated in the

3  appraisal process.  Trial Ex. 78; 6/5/19 Trial Tr. at 176-77 (Blake).  The 2014 voluntary buyout

4  ultimately fell through because the partners could not come to terms on price.  6/3/19 Trial Tr. at

5  157 (Tamaro).

6      47.      There is substantial evidence in the record demonstrating that every one of the

7  fees and expenses challenged by AMTAX's counterclaims, as well as the issues AMTAX has

8  raised regarding the setting of rents and repairs, were disclosed by the GP to the LP, through

9  audited financial statements, emails, rent rolls, budgets, third-party reports of Parkway, or

10  conversations between the partners.  Examples of these disclosures by the GP include Trial

11  Exhibits 12, 13, 17, 21, 23, 26, 33, 35, 38, 45-47, 50-52, 54, 55, 58-62, 64-67, 69, 70-77, 79-86,

12  90-93, 95, 97, 99, 102, 105, 106, 109, 111, 112, 114, 115, 117, 122, 123, 130, 134, and 137.

13  ~~More are in the record in this case.~~

14      48.      Mr. Blake also testified that most, if not all, of the fees AMTAX put at issue in its

15  counterclaims were disclosed in Parkway's audited financial statements every year.  6/5/19 Trial

16  Tr. at 128 (Blake); *see also* 6/5/19 Trial Tr. at 60 (Tamaro) ("In every financial statement, there

17  is disclosure of every amount that was charged by an affiliate.  It is all in the notes to the

18  financials.").  AMTAX is not claiming that any of the audited financial statements are

19  inaccurate, and acknowledged that AMTAX developed its counterclaims by instructing its CPAs

20  to review the audited financial statements going back to 2002.  6/5/19 Trial Tr. at 129, 130, 160,

21  163 (Blake).  Prior to this litigation, AMTAX never contended that any of these fees or expenses

22  constituted a breach of fiduciary duty or a default by the GP.  6/6/19 Trial Tr. at 41 (Blake)

23      49.      Faced with the significant evidence of his and Mr. Newbold's knowledge of and

24  discussion of the fees at issue in the 2013 and 2014 timeframe, Mr. Blake testified at trial for the

25  first time that all of the fees, advances, and other matters prior to the refinance, which AMTAX

26  claimed in this litigation to be defaults by the GP that warranted Ms. Tamaro's removal under

1   the Parkway LPA, were "immaterial."  6/6/19 Trial Tr. at 25-26 (Blake); *see also id.* at 41.

2   Instead, Mr. Blake contended that the real issue from AMTAX's perspective was that after the

3   refinance, the GP used "massive advances" in the millions of dollars to fund unnecessary repairs

4   at Parkway, thereby reducing AMTAX's return on a buyout of its interest pursuant to the

5   waterfall.  *Id.* at 25-26 (Blake).

6       50.     This new contention by AMTAX was not supported by evidence in the record.

7   Ms. Tamaro reviewed the advances to Parkway between 2014 and 2018, as reflected on the

8   audited financial statements, and prepared a demonstrative showing to the Court the GP

9   advances, deposits into replacement reserves, and HUD-approved disbursements, and testified

10  about them during trial.  *See* 6/10/19 Trial Tr. at 41-44 (Tamaro).  In 2014, the year before the

11  refinance, the advances were $284,955; in the next four years combined the advances totaled

12  $400,403.  *Id.*

13      **3)  In Response to the Hidden Hills Litigation, AMTAX 169 Scrutinizes the
14          Same Audited Financial Statements Again and Concludes the Mandatory
            Buyout Cannot Proceed**

15      51.     In December 2017, in response to the Hidden Hills litigation, Mr. Blake put into

16  practice Alden Torch's policy of scrutinizing any other entities that share common principals

17  with a general partner against whom Alden Torch is litigating.  6/5/19 Trial Tr. at 151-52, 159-

18  60 (Blake); Trial Ex. 125.  He instructed two Alden Torch forensic accountants to do a "deep

19  dive" into Parkway's audited financial statements dating back to 2002, nine years before Alden

20  Torch had any involvement in Parkway.  6/5/19 Trial Tr. at 160 (Blake).  He pointed out as

21  "problematic," audit notes similar to those as to which he was "on the same page" when

22  negotiating the voluntary buyout in 2014.  Trial Exs. 78, 125.

23      52.     One of the two forensic accountants was John Thomas, the same CPA who

24  conducted AMTAX's due diligence and audited financial statement review in 2014.  6/5/19 Trial

25  Tr. at 160, 178 (Blake); 6/3/19 at 154-55 (Tamaro).  This time, the Alden Torch accountants

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 17
(Case No. 17-cv-06048-RBL)

1   were not "on the same page" with the audits and instead generated a list of "unauthorized" fees

2   and expenses – based on their review of the same audited financial statements.  6/5/19 Trial Tr.

3   at 163 (Blake); Trial Ex. 144 (Alden Torch CPA list of "write-downs").  This list of allegedly

4   "unauthorized" fees and expenses covered 14 categories and totaled approximately $1.7 million,

5   and formed the primary basis for AMTAX's counterclaims in Parkway.  6/5/19 Trial Tr. at 172

6   (Blake); Trial Ex. 161.

7       53.      The GP's buyout option matured on January 1, 2018, while this litigation was

8   pending.  334th Place exercised its option two days later.  Trial Ex. 128.  334th Place obtained a

9   February 5, 2018 appraisal from CBRE valuing the Parkway property as of January 1, 2018 in

10   the amount of $16,975,000.  Trial Ex. 129.  Alden Torch did not respond until March 6, 2018.

11   Trial Ex. 132; 6/5/19 Trial Tr. at 152 (Blake).  It stated it was in the "process of evaluating

12   questionable activity by 334th Place" and that it would address the "request" to move forward

13   with the appraisal process once it completed the review.  Trial Ex. 132.  Ms. Tamaro responded

14   the next day, providing the CBRE appraisal and stating that the GP was ready to provide any

15   additional financial information AMTAX may request.  Trial Ex. 133.  AMTAX 169 again went

16   silent for months.

17       54.      During this period, unbeknownst to the GP, AMTAX's outside counsel obtained

18   an appraisal of Parkway from Novogradac, the same firm that employs AMTAX's expert, Mr.

19   Krabbenschmidt.  *See* Trial Ex. 136; 6/5/19 Trial Tr. at 155 (Blake).  The Novogradac appraisal

20   was dated May 10, 2018, and valued the Parkway property at $20.3 million.  Trial Ex. 136.  Mr.

21   Blake claimed that this appraisal was obtained for the purposes of Section 7.4.J of the LPA, but

22   his testimony was not credible.  He had never spoken to any of the appraisers at Novogradac

23   about Parkway, outside counsel was Novogradac's client, and the stated purpose of the appraisal

24   was to provide legal advice to Alden Torch in connection with this litigation.  *See* 6/5/19 Trial

25   Tr. at 157 (Blake).  The Novogradac appraisal was not provided to Ms. Tamaro until she

26   received it through discovery.  6/4/19 Trial Tr. at 8-9 (Tamaro).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 18
(Case No. 17-cv-06048-RBL)

1    55.    On May 8, 2018, having heard nothing from AMTAX, the GP sought to

2    supplement the complaint seeking declaratory relief requiring AMTAX 169 to participate in

3    good faith in the Parkway option appraisal process.  In response, AMTAX 169 accused 334th

4    Place of mismanagement and contended that unspecified fees owed to 334th Place were

5    "unauthorized."  Trial Ex. 135.  The letter stated AMTAX would not move forward with the

6    process unless the general partner gave up all accounts payable, estimated as $2.7 million.[2]  *Id.*

7    This Court granted HHM's motion to amend and supplement the complaint by adding the

8    Parkway dispute to the case.  Dkt. #32.

9        **4)  AMTAX's Counterclaims**

10    56.    AMTAX 169 counterclaimed in July 2018 for damages and removal.  Dkt. #37.

11    AMTAX 169 also sent 334th Place a second letter, purporting to remove it as the GP pursuant to

12    Section 4.5(A)(iv)(2) of the LPA.  Trial Ex. A-253.  The counterclaims assert six causes of

13    action:  (1) breach of contract, (2) breach of fiduciary duty, (3) a declaratory judgment that 334th

14    Place should be removed as the general partner, (4) conversion, (5) unjust enrichment, and (6) a

15    declaratory judgment that 334th Place has no buyout option pursuant to Section 7.4.J of the LPA.

16    All of these claims are different labels for the same theories of liability:  AMTAX challenges the

17    general partner's managerial decisions with respect to (1) the setting of rents; (2) certain fees and

18    expenses accrued in connection with the management of the partnerships and the properties; and

19    (3) "unnecessary" repair work throughout the years, and contends that these issues entitle

20    AMTAX to refuse to proceed with the appraisal process called for under Section 7.4.J of the

21    LPA.

22        **a.  The Rents**

23

24    _____

25    [2] As set forth above, the $2.7 million represented funds that 334th Place, through Ms. Tamaro, had advanced to Parkway over the 15-year Compliance Period.  These advances kept Parkway operating and ensured that AMTAX 169 continued to receive the tax credits, and were reflected in the annual audited financial statements as amounts due and owing to the GP.

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 19
(Case No. 17-cv-06048-RBL)

57.     AMTAX contends it and/or Parkway was damaged because the GP did not sufficiently raise rents at the Parkway apartments in 2016 and 2017.  The GP demonstrated at trial, however, through rent rolls in the record which were submitted to AMTAX monthly, that the rents were in fact raised consistently every year from 2012.  *See*, *e.g.*, Trial Exs. 39,46, 51, 55, 58, 62, 65, 69, 83, 86, 97, 99, 105, 106, 111, 112, 114, 117, 122, 123, 134, and 137.  Ms. Tamaro balanced a number of factors in setting rents based on her understanding of the property's location, its low-income tenants, its multiple regulatory agreements, and the rents Parkway could reasonably command.  6/3/19 Trial Tr. at 161 (Tamaro); 6/10/19 Trial Tr. at 43 (Tamaro).  Mr. Newbold understood this balance, and did not challenge Ms. Tamaro's decision not to increase the rents at certain points after she provided an explanation.  Trial Ex. 60; 6/6/19 Trial Tr. at 158 (Blake).

### b.  The Fees

58.     AMTAX challenged 14 categories of fees and expenses incurred by the GP since 2002 and created an associated "damages" schedule marked as Trial Exhibit 161.  The Court considered each of these fees in detail during the trial.  Most relate generally to fees paid to the GP's affiliates for work done in connection with the management of the Parkway apartment complex.  For example, Ms. Tamaro handles the management of the apartment complex (as opposed to the partnership) through an affiliated entity, Trieste Holdings, LLC ("**Trieste**").  Trieste employs approximately six carpenters who did much of the repair and replacement work on Parkway throughout the years.  6/3/19 Trial Tr. at 148 (Tamaro.)

59.     The LPA permits the GP to appoint the Management Agent (Trieste), which may be an affiliate.  Trial Ex. 3 (Article XI).  Under the LPA, Trieste is entitled to a fee of 4% of net rental income, known as a Project Management Fee.  There is also a Management Agreement between Parkway and Trieste.  *See* Trial Exs. 29 and 40.  That agreement calls for a higher

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 20
(Case No. 17-cv-06048-RBL)

1    Project Management Fee, but it is limited to 4% under the LPA.  6/4/19 Trial Tr. at 161-62

2    (Tamaro).

3           60.     The Project Management Fees were disclosed through the audited financial

4    statements and by other communications between the partners every year.  *See* Trial Exs. 17, 26,

5    33, 35, 38, 45, 47, 54, 60, 67, 72, 73, 77, 95, 109, 115, and 130; *see also* 6/5/19 Trial Tr. at 60

6    (Tamaro).  There were certain overcharges (as well as some undercharges) between 2002 and

7    2017.  Certain overcharges were corrected after Mr. Newbold identified them as an issue.  *See id.*

8    at 162-63 (Tamaro).  AMTAX claims damage with respect to the Project Management Fee going

9    back to 2004.

10          61.     Since 2010, Trieste Holdings was also paid a "repair supervision" fee for certain

11   major construction work that occurred at Parkway.  Trieste utilized its Washington general

12   contractor license and its journeyman carpenters to supervise, plan, and perform capital repairs at

13   Parkway Apartments.  6/4/19 Trial Tr. at 14-15 (Tamaro).  Trieste Holdings was responsible for

14   obtaining the required building permits, and the work undertaken went beyond carpentry.  *Id.*;

15   *see also* Trial Ex. 171.  Trieste Holdings' carpenters rebuilt 104 second-story balconies, re-

16   roofed and insulated five buildings, replaced the single-pane windows and doors in 190 units,

17   and continue replacing siding on remaining buildings.  *Id.*

18          62.     AMTAX contends that planning for and supervising this work, hiring an architect,

19   and taking out building permits under its general contractor license should have been included in

20   the 4% Property Management Fee.  If Trieste did not do this work, the partnership would have

21   had to hire an outside general contractor, which would have charged a repair supervision fee

22   based on a percentage of labor plus materials.  6/3/19 Trial Tr. at 149 (Tamaro); 6/4/19 Trial Tr.

23   at 16 (Tamaro); *see also* Trial Ex. 75 (Mr. Newbold stating "if I was to play devils [sic] advocate

24   and say she hired a 3rd party GC to do the work[,] they would have [been] entitled to their

25   fee/profit for the job."). Trieste Holdings is licensed and bonded and its repair supervision fees

26   were fair and reasonable.  6/3/19 Trial Tr. at 149 (Tamaro); *see also* Trial Ex. 43.  AMTAX

1   presented no evidence to show that these fees would have been lower had an entity other than

2   Trieste done this work.  The fees were also disclosed through the audited financial statements

3   and by other communications between the partners every year.  Trial Exs. 45, 47, 54, 59, 67, 73-

4   77, 95, 109, 115, and 130; *see also* 6/3/19 Trial Tr. at 155-56 (Tamaro); 6/5/19 Trial Tr. at 60

5   (Tamaro).[3]

6                    **c.  Property Repairs**

7          63.      In 2014, Parkway replaced all its remaining single-pane windows and sliders with

8   double-pane glass and received a $120,000 energy conservation rebate from Puget Sound

9   Energy.  6/3/19 Trial Tr. at 144-50 (Tamaro).  In that same year, Parkway replaced five failed

10  roofs and its obsolete trash compactor to comply with Federal Way's surface water management

11  regulations.  *Id.*  In 2015-2016, Parkway replaced all 104 sets of second-story wooden balcony

12  railings, which were not up to code and exhibited signs of dry rot, with safer and more weather-

13  resistant aluminum railings.  *Id.*  In 2016, Parkway resurfaced all its asphalt and rebuilt its

14  hazardous broken sidewalks.  *Id.*  In 2017, Parkway began replacing its dry-rotted T-111

15  building siding with a pre-painted, weather-resistant product, a project that is about halfway to

16  completion.  *Id.*

17         64.      AMTAX 169 claims that all of these repairs were "unnecessary" and have

18  "damaged" the partnership.

19         65.      Excluding the trash compactor, all of these repairs and replacements were

20  identified in HUD's 2014 capital needs assessment as needing repair or replacement.  Trial Ex.

21  81.  HUD adjusted the property's reserve deposit so that renovation funds would be available,

22  and Parkway's refinance of its HUD loan resulted in interest savings of over $20,000 per month.

23  6/3/19 Trial Tr. at 158 (Tamaro).  The monthly reserve deposits and interest savings provided the

24

25         [3] The remaining categories of fees challenged by AMTAX and set forth in Trial Exhibit 161 need not be
    addressed here given the clear application of the statute of limitations, estoppel, the business judgment rule, and the

26  parties' course of dealing.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 22
(Case No. 17-cv-06048-RBL)

1   primary sources of funds for the renovation work.  *Id.*  All of the repairs and work on Parkway

2   were contemporaneously disclosed to AMTAX, through annual budgets, emails, site visits, and

3   conversations.  *See, e.g.*, Trial Exs. 23, 50, 60, 66, 70, 73, 79, 81, 82, 84, 85, 90, 91, and 92;

4   6/6/19 Trial Tr. at 31-32 (Blake).

5   ### d.  AMTAX's Expert Testimony

6   66.     The only evidence AMTAX presented at trial to support its counterclaims and

7   alleged damages was the testimony of its expert, Jon Krabbenschmidt, whose analyses were not

8   well developed and whose testimony was ~~generally not credible~~ not fully reliable.

9   67.     With respect to the rents, Mr. Krabbenschmidt's testimony was riddled with

10  errors and miscalculations, several of which he admitted on the stand.  In his report, he identified

11  "lost" income as a result of insufficiently high rents to be $750,000, but did not precisely identify

12  the years to which his damages calculations applied.  Trial Ex. A-282.  For the first time at trial,

13  he identified 2016 and 2017 as the years for which AMTAX was seeking rental rate damages,

14  and reduced the claimed damages to $706,000 to correct for a "drafting error."  6/6/19 Trial Tr.

15  at 103 (Krabbenschmidt); 6/10/19 Trial Tr. at 7-10 (Krabbenschmidt).  On cross examination, he

16  reduced the damages figure even further, by more than $300,000, because he had left out a

17  "critical item" – a utilities allowance – in his computation.  6/10/19 Trial Tr. at 8

18  (Krabbenschmidt).

19  68.     Mr. Krabbenschmidt failed to account for the evidence in the record

20  demonstrating that the GP provided rent rolls to AMTAX every month, which were reviewed by

21  the asset manager, Gary Newbold.  *See, e.g.*, Trial Ex. 58.  Mr. Krabbenschmidt did not know

22  who Mr. Newbold was, although Mr. Newbold is disclosed in numerous AMTAX exhibits, and

23  did not review reports prepared by his own consulting firm, Novogradac, which stated that the

24  rents were reasonable.  6/10/19 Trial Tr. at 5-6, 21 (Krabbenschmidt); Trial Ex. 52.  Nor had Mr.

25  Krabbenschmidt reviewed the emails in which Ms. Tamaro explained the reasons why she

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 23
(Case No. 17-cv-06048-RBL)

1    decided not to raise the rents to LIHTC maximums, to which Mr. Newbold responded:

2    "Understood."  Trial Ex. 60; 6/6/19 Trial Tr. at 158 (Krabbenschmidt).

3         69.    With respect to fees, Mr. Krabbenschmidt testified without conducting his own

4    audit that Parkway's audited financial statements were "materially misstated," contrary to

5    AMTAX's own designated representative's trial testimony.  *Compare* 6/6/19 Trial Tr. at 124

6    ("had the financial statements not been materially misstated, the limited partner would have had

7    more information by which they could have potentially intervened sooner") (Krabbenschmidt)

8    *with* 6/5/19 Trial Tr. at 130 (Blake) ("We are not questioning the accuracy of the audits.");

9    6/6/19 Trial Tr. at 25-26 (Blake) ("We have these small little fees that are being incurred every

10   year.  We questioned those.  I would say they are immaterial.").

11        70.    Mr. Krabbenschmidt made no effort to exclude any fees that went beyond a six-

12   year statute of limitations, and thus included in his calculation fees that are barred under

13   applicable law.  6/6/19 Trial Tr. at 124 (Krabbenschmidt).  Like Alden Torch's CPAs, he

14   reviewed the audited financial statements going back to 2002 looking for "unauthorized" fees

15   and expenses.  *Id.* at 123.  But again, he did not take into account any communications between

16   Ms. Tamaro and AMTAX on these issues, and appeared to be largely unaware of these important

17   communications.  *Id.* at 133 (Krabbenschmidt).

18        71.    With respect to repairs, Mr. Krabbenschmidt has no experience as the general

19   partner of an operating partnership.  *Id.* at 144 (Krabbenschmidt).  He visited Parkway for the

20   first time after he had issued his expert report.  *Id.*  He testified that it was the GP's duty to keep

21   the property only in "habitable" condition during the 15-year Compliance Period, the "minimum

22   standard under state law."  *Id.* at 145-46.  As a result, he contended that all of the repair work

23   done on the property was not necessary, and in fact should not have been done.  *Id.* at 148.  Mr.

24   Krabbenschmidt did not identify any support for these statements as to the "standard of care,"

25   and he had not reviewed many of the internal reports noting various issues with Parkway's

26   infrastructure and needed repairs.  6/10/19 Trial Tr. at 15-18 (Krabbenschmidt).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 24
(Case No. 17-cv-06048-RBL)

1    72.    Mr. Krabbenschmidt was the sole witness AMTAX relied on at trial to prove its

2 claimed damages and claim for removal.

3    73.    Any finding of fact herein more properly characterized as a conclusion of law

4 shall be deemed so.

5                                **II.  CONCLUSIONS OF LAW**

6 **A.    Removal Is Not Appropriate for Failure to Provide the 2018 Audited Financial
         Statements**

7

8    1.    The GP should not be removed under Sections 4.5(A)(iv)(6) and 12.1 of the LPAs

9 for failure to provide timely 2018 audited financial statements given the facts developed at trial.

10 *See* 6/10/19 Trial Tr. at 142 (the Court) ("That's a bridge too far.").  The GPs delivered audited

11 financial statements and otherwise complied with all reporting requirements to the LPs for 17

12 years.  During that 17-year period, AMTAX never complained about untimely audited financial

13 statements, although there are a number of examples in the record of the audited financial

14 statements having been delivered past the deadlines imposed by the LPAs.  The audited financial

15 statements were not delivered timely in 2019 because the partnerships' auditor, Laura Lindal,

16 disengaged as the result of statements made by AMTAX's expert witness challenging the

17 partnership's audits in this case.

18    2.    The Court concludes that the GPs cannot be removed for a failure to provide an

19 independent auditor's opinion of the 2018 financial statements when it was AMTAX's actions

20 that caused Ms. Lindal's disengagement prior to the completion of the audit.  *See Refrigeration*

21 *Eng'g Co. v. McKay*, 4 Wn. App. 963, 969-70, 486 P.2d 304 (1971) ("It is a principle of

22 fundamental justice that if a promisor is himself the cause of the failure of performance, either of

23 an obligation due him or of a condition upon which his own liability depends, he cannot take

24 advantage of the failure."); *Esmieu v. Hsieh*, 20 Wn. App. 455, 461, 580 P.2d 1105 (1978)

25 ("Esmieus' activities affirmatively caused Hsieh's failure to perform his contractual obligations.

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 25
(Case No. 17-cv-06048-RBL)

1  Esmieus consequently have no cause of action based on Hsieh's nonperformance."), *aff'd*, 92

2  Wn.2d 530, 598 P.2d 1369 (1979).[4]

3      3.      Ms. Lindal's testimony was credible as to all the issues to which she testified, and

4  the Court accepts her opinion that the audited financial statements fairly and accurately present

5  the financial picture of the partnerships in all respects.  The Court concludes that the

6  partnerships' audited financial statements were not materially misstated, and AMTAX should be

7  held to its designated representative's unequivocal testimony that the audited financial

8  statements for both Parkway and Hidden Hills were accurate.  Were it not for Mr.

9  Krabbenschmidt's unsupported allegations to the contrary, Ms. Lindal would continue to be the

10  auditor for both partnerships.  *See* 6/10/19 Trial Tr. at 142 (the Court) ("This world and this

11  lawsuit would be a lot better without the experts. . . And we have Ms. Lindal.  She would be on

12  the job doing it.").  Removal of the GPs on these facts would be inappropriate.

13  **B.    Hidden Hills**

14      4.      AMTAX 114 did not pursue its First and Second Counterclaims for Relief:

15  Breach of Contract and Breach of Fiduciary Duty at trial.  AMTAX 114 has not asserted any

16  derivative claims for damages on behalf of the Hidden Hills partnership.  As a result, AMTAX

17  114's First and Second Counterclaims are dismissed with prejudice.

18      5.      HHM has a right under Section 7.4.J of the Hidden Hills LPA to buy out AMTAX

19  114's interest in the partnership through the exercise of its option.  AMTAX does not have a

20  right to sell the Hidden Hills property.  AMTAX can sell its ***interest in the partnership*** to HHM

21  under Section 7.4.J, or, if the option is not completed, it can sell its interest on the market under

22  Section 7.4.K, subject to the GP's right of first refusal.

23      6.       All conditions precedent for HHM's exercise of the option have been met, and

24  the option was validly exercised by the GP on March 14, 2017 under Section 7.4.J as a matter of

25  ───────────────

26          [4] This conclusion is further supported by the fact that even though the audited financial statements were not complete, the GPs provided all of the underlying financial data, as well as the draft audited financial statements, to AMTAX.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 26
(Case No. 17-cv-06048-RBL)

1    law.  After the option is exercised, Section 7.4.J sets forth an appraisal process that is used to

2    determine the "Option Price."

3         7.    AMTAX seeks to defeat the option by removing the GP under Section 4.5(A)(iv)

4    of the Hidden Hills LPA for actions taken in connection with the appraisal process.

5         8.    The Court finds that AMTAX failed to present evidence at trial that would

6    warrant removal of the GP for actions taken in connection with the appraisal process.  The Court

7    considers the tainted process to have been a "foot fault" by Ms. Tamaro in setting the Option

8    Price.  6/10/19 Trial Tr. at 102 (the Court).  The remedy for that "foot fault" is not removal, but

9    reaching a fair Option Price at which AMTAX can be made whole for its interest while the GP's

10   option right is preserved.

11        9.    AMTAX also lacks any derivative claims on behalf of Hidden Hills and is not

12   pursuing damages claims.  HHM has agreed to repay to the partnership the costs of obtaining

13   remediation cost estimates.  AMTAX has therefore failed to establish any reasonable expectation

14   of an "economic detriment to the partnership or the Project," as required under Section 4.5(iv) of

15   the Hidden Hills LPA, that would provide grounds for HHM's removal.  *See Senior Hous.*

16   *Assistance Grp. v. AMTAX Holdings 260, LLC*, No. C17-1115RSM, 2019 WL 687837, at *10

17   (W.D. Wash. Feb. 19, 2019) (finding in similar case interpreting similar LPA that removal

18   requires actual proof of damages).  In these circumstances, HHM's option right to purchase

19   AMTAX 114's interest in Hidden Hills should be honored.

20        10.   HHM is entitled to a declaratory judgment that there is no basis for HHM to be

21   removed as the GP of the Hidden Hills partnership, and that HHM has an enforceable right to

22   exercise its buyout option under the Hidden Hills LPA.  As a remedy in setting the Option Price,

23   a new third appraisal must be obtained to determine the property's FMV, which shall not take

24   into account the environmental contamination on the property site.  The date of value for the new

25   third appraisal shall be June 10, 2019, and the waterfall calculations shall be run from May 31,

26   2019, the last day of the month closest to June 10.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 27
(Case No. 17-cv-06048-RBL)

C.      **Parkway**

1)    **The Option Was Validly Exercised, AMTAX Must Proceed with the Appraisal Process to Complete the Buyout, and 334th Place Should Not Be Removed**

11.      Under well-settled principles of Washington law, "the optioner may not withdraw the option or make its exercise more difficult during the agreed term of the option." *Barnett v. Buchan Baking Co.*, 45 Wn. App. 152, 160, 724 P.2d 1077 (1986).  For its value to be preserved, the option must be protected from interference.  Thus, "[d]uring the agreed term of [the] option, [the optionee] has a right that the option giver shall not repudiate or make performance impossible or more difficult . . . ." *McFerran v. Heroux*, 44 Wn.2d 631, 638, 269 P.2d 815 (1954) (emphasis omitted).

12.      334th Place has a right under Section 7.4.J of the Parkway LPA to buy out AMTAX 169's interest in the partnership through the exercise of its option.  All conditions precedent for the exercise of the option have been met, and the option has been validly exercised as a matter of law.  As this Court previously ruled in its summary judgment order, "AMTAX's claimed 'defaults' do not preclude it from exercising the option and initiating the appraisal process."  MSJ Order at 23.

13.      AMTAX 169 failed to demonstrate at trial that removal would be warranted "based on breaches 334th Place committed after its notice, or which AMTAX discovered before the buyout was complete."  MSJ Order at 23; *see also* 6/10/19 Trial Tr. at 99 (the Court) ("I do not believe, on this record, that I can or should remove Ms. Tamaro.").  Prior to the exercise of the option and the Hidden Hills litigation, AMTAX 169 had never sought removal or accused the GP of a breach of duty.  The evidence at trial demonstrated that in response to the "foot fault" by the GP in setting the Option Price in Hidden Hills, AMTAX "used more force than was necessary" on Parkway.  6/10/19 Trial Tr. at 102 (the Court); *see also id.* at 143 ("And with a tack hammer, you could have gotten as much as what you've gotten with a sledge hammer.").

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 28
(Case No. 17-cv-06048-RBL)

14.     The reasons offered by AMTAX for removal after the option had been exercised were based on conduct by the GP that AMTAX 169 had known about and accepted for many years.  *Id.* at 104 (the Court) ("There was clear communications between both sides."); *id.* at 124 ("[Ms. Tamaro] sends a lot of information to your representative.  And your representatives are trained professionals in their own right.").  Those reasons therefore provided no basis for AMTAX to have simply refused to participate in the appraisal process, as it did here.

15.     Even without an exercised option and an established course of dealing between the partners, such as the one here, the standard for removal is high.  *See, e.g.*, *Bickler v. Parkview Vill. Assocs.*, 596 N.W.2d 501 (Wis. Ct. App. 1999) (removal improper despite use of partnership funds to purchase a personal boat, in part because partners did not seek removal for over 12 years); *Garber v. Stevens*, No. 601917/05, 2012 WL 2091186 (N.Y. Sup. Ct. June 6, 2012) (finding removal proper under extreme circumstances, including failure to pay taxes); *Drucker v. Mige Assocs. II*, 639 N.Y.S.2d 365, 367 (App. Div. 1996) ("[T]he court ordered removal of a partner . . . [is a] rarely invoked remed[y.]").  AMTAX failed to present evidence at trial that meets this standard.

16.     In this case, there are no allegations that 334th Place diverted partnership funds for personal use.  To the contrary, 334th Place infused millions of its own funds to keep the partnership afloat and delivering tax credits to the LP during the Compliance Period, while maintaining the property in good repair as required by HUD.  Ms. Tamaro has earned the right to exercise the buyout option, after fully complying with the central bargain under the LPA during the 15-year Compliance Period.  6/10/19 Trial Tr. at 117 (the Court) ("She wants her right inviolate.  And I'm going to give that to her.").  Removal would provide AMTAX with a windfall in obtaining the property, which it cannot otherwise obtain under the LPA.

17.     After examining the totality of the circumstances, the Court finds that AMTAX 169's decision to seek removal in these circumstances was an effort to make performance of the option impossible, contrary to the LPA and Washington law.  AMTAX 169 had a contractual

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 29
(Case No. 17-cv-06048-RBL)

1  duty under the LPA to provide an appraisal for the purposes of proceeding with the option

2  process called for under Section 7.4.J.  It failed to meet that duty.  Instead, AMTAX sought to

3  manufacture a reason to remove the GP by "looking for the belly -- navel lint."  6/10/19 Trial Tr.

4  at 125 (the Court).

5       18.     As a remedy for AMTAX's refusal to participate in the contractually mandated

6  appraisal process, the Court concludes that AMTAX shall utilize the Novogradac appraisal as its

7  appraisal for the purposes of Section 7.4.J of the LPA.  If the Novogradac and CBRE appraisers

8  are unable to agree on the Parkway property's value, a third appraisal shall be promptly obtained

9  pursuant to Section 7.4.J of the LPA.  The parties shall engage the third appraiser, if necessary,

10  by no later than 30 days from the entry of this Order.  The date of value for the third appraisal

11  shall be January 3, 2018, the date of 334th Place's exercise of the option, and the waterfall

12  calculations shall be run from December 31, 2017, the date of the 2017 audit.

13       19.     In addition, for the following reasons, the Court concludes that AMTAX has

14  established no basis to reduce the GP's subordinated loans, or any other amounts owed to the GP

15  by the partnership, in connection with the waterfall calculations given AMTAX's failure to

16  establish any viable damages claims during trial.  As a result, the Court adopts the Parkway

17  waterfall formula presented and described by the GP during trial, as set forth in Trial Exhibit

18  168, except that the starting point for the FMV shall be changed in accordance with the third

19  appraisal in the event Novogradac and CBRE are unable to agree on a value.  *See also* 6/4/19

20  Trial Tr. at 21-23 (Tamaro).

21       20.     Once the third appraisal is obtained, the GP shall present to AMTAX the revised

22  waterfall, following the calculation methods reflected in Trial Exhibit 168, after which the GP

23  shall have the option to purchase AMTAX's interest at the Option Price reflected in the revised

24  waterfall presented by the GP.  The Court reserves jurisdiction to address any further disputes in

25  setting the Option Price in accordance with this Order.

26

### 2) The Vast Majority of AMTAX's Counterclaims and Alleged Damages Are Barred by the Statute of Limitations

21.     AMTAX 169's challenges to 334th Place's setting of rents, fees and expenses, and repair work form the basis for all of its damage counterclaims, including breach of contract, breach of fiduciary duty, conversion, and unjust enrichment.  AMTAX 169 has not specifically identified which theories of liability are based in tort or in breach of contract.

22.     To the extent AMTAX 169's claims sound in alleged breaches of the LPA, they are governed by a six-year statute of limitations.  *See* RCW 4.16.040(1) (six-year limitation for the commencement of actions "upon a contract in writing, or liability express or implied arising out of a written agreement").  In Washington, a contract action accrues on breach and the discovery rule does not apply except in limited circumstances not present here.  *1000 Va. Ltd. P'ship v. Vertecs Corp.*, 158 Wn.2d 566, 576, 146 P.3d 423 (2006).  Nor does Washington law recognize the concept of a "continuing breach," *i.e.*, a "'breach of contract that endures for a considerable time or is repeated at short intervals'" as a basis to extend the applicable limitations period.  *Schreiner Farms, Inc. v. Am. Tower, Inc.*, 173 Wn. App. 154, 161, 293 P.3d 407 (2013) (citation omitted).  Thus, for the purposes of AMTAX 169's claimed breaches of the LPA, the claim accrues on the date that any breach began:  "subsequent damages [are] not severable from it."  *Id.*[5]

23.     Tort claims have a three-year statute of limitations.  RCW 4.16.080; *Hudson v. Condon*, 101 Wn. App. 866, 873, 6 P.3d 615 (2000).  Where a claim for breach of contract is not grounded on a breach of a specific term under the LPA, it is treated as a claim arising under a breach of fiduciary duty theory and the three-year statute of limitations period applies.  *Hudson*, 101 Wn. App. at 873.  Thus, to the extent any of AMTAX 169's damages claims sound in tort,

---

[5] AMTAX seeks to avoid the statute of limitations by calling the LPA a contract for "continuous services." The unpublished case AMTAX cites did not involve a partnership agreement and does not support its argument.  By its terms, the LPA that AMTAX claims the GP breached is a partnership agreement, not an agreement for any party's services.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 31
(Case No. 17-cv-06048-RBL)

1    *e.g.*, the breach of fiduciary duty claim, the conversion claim, or the unjust enrichment claim, the

2    applicable statute of limitations is three years.[6]

3         24.     Under these principles, the only categories of fees that could serve as a basis for a

4    potentially viable damages claim are those in which fees were first incurred either after July 2,

5    2012 (for LPA breaches) or after July 2, 2015 (for tort claims).  With respect to AMTAX 169's

6    tort claims, the Court concludes that the discovery rule does not apply, because, as set forth in

7    this Court's findings, AMTAX 169 knew of the factual basis for the claims it brought as of at

8    least 2013.  *See Clare v. Saberhagen Holdings, Inc.*, 129 Wn. App. 599, 603, 123 P.3d 465

9    (2005).  All of AMTAX 169's tort claims, which are all predicated on alleged misconduct

10   beginning prior to July 2, 2015, are therefore barred by the statute of limitations.  With respect to

11   AMTAX 169's breach of contract claims, the Court finds that $1,634,456 of AMTAX 169's

12   alleged damages are barred as a matter of law, including all of the Project Management Fees and

13   the Repair Supervision Fees.

14              **3)  All of AMTAX 169's Counterclaims Are Barred by Estoppel**

15        25.     Under Washington law, "'a party should be held to a representation made or

16   position assumed where inequitable consequences would otherwise result to another party who

17   has justifiably and in good faith relied thereon.'"  *Kramarevcky v. Dep't of Soc. & Health Servs.*,

18   122 Wn.2d 738, 743, 863 P.2d 535 (1993) (quoting *Wilson v. Westinghouse Elec. Corp.*, 85

19   Wn.2d 78, 81, 530 P.2d 298 (1975)).  Equitable estoppel has three elements:  (1) an admission,

20   statement, or act inconsistent with a later-asserted claim; (2) action by another person in reliance

21   upon that admission, statement, or act; and (3) injury to the relying person from allowing the first

22   party to contradict or repudiate the earlier admission, statement, or act.  *Bd. of Regents of Univ.*

23

24

---

25        [6] The unjust enrichment claim is dismissed for the independent reason that the LPA governs the
     relationship between the parties.  "A party to a valid express contract is bound by the provisions of that contract, and
26   may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention
     of the express contract."  *Chandler v. Wash. Toll Bridge Auth.*, 17 Wn.2d 591, 604, 137 P.2d 97 (1943).

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 32
(Case No. 17-cv-06048-RBL)

1   *of Wash. v. City of Seattle*, 108 Wn.2d 545, 551, 741 P.2d 11 (1987).  "'[E]stoppel may arise . . .

2   from silence or inaction as well as from words or actions.'"  *Id*. at 553-54 (citation omitted).

3          26.     The Court finds that all of AMTAX's counterclaims in this case with respect to

4   fees were based on Alden Torch's accountants' 2018 review of Parkway's annual audited

5   financial statements dating back to 2002.  All of the fees at issue were disclosed in those audits,

6   and AMTAX 169 previously received, reviewed, and accepted the audits every year.  Thus,

7   every year for 17 years AMTAX 169 made an admission or statement or performed an act that is

8   inconsistent with the litigation-driven position it adopted in 2018.

9          27.     334th Place has also demonstrated that AMTAX representatives accepted many of

10  the specific fees at issue, the capital repairs that Parkway required, and the rental rates set by the

11  GP.  For example, AMTAX 169 reported to its investor in 2014 that 334th Place was not in

12  default and was instead advancing money to Parkway well in excess of its obligation to fund

13  some operating deficits.  Earlier that year, Mr. Newbold and Mr. Blake made Parkway's audit

14  review a "priority" in connection with the potential voluntary buyout of the LP's interest and

15  found nothing that they believed should impede moving forward with a sale of the LP's interest.

16  In its counterclaims, AMTAX 169 contended that the very same categories of fees and the issues

17  addressed in 2014 are "major defaults" that should prevent a buyout of the LP's interest in 2018.[7]

18         28.     The last two elements necessary to find an estoppel are also present.  334th Place

19  relied upon AMTAX 169's acceptances of the audited financial statements and the fees disclosed

20  therein, and continued to advance significant sums to Parkway throughout the years, deferring

21  payment on almost all of the fees that AMTAX 169 is now challenging.  *See, e.g.*, 6/3/19 Trial

22  Tr. at 158-59 (Tamaro).  334th Place did so to maintain Parkway's financial stability and

23  regulatory compliance – and AMTAX's entitlement to tax credits – with the expectation that

24  those advances and fees would ultimately be paid.

25

26  _____

[7] Mr. Blake retreated from this position during trial, calling the claimed defaults "immaterial" after he was
faced with the long record demonstrating that the partners had previously discussed and addressed all these issues.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 33
(Case No. 17-cv-06048-RBL)

1    29.    In 2018, however, AMTAX 169 held up the contractually mandated buyout

2    process unless 334th Place would agree to cancel $2.7 million in accounts payable, effectively

3    attempting to erase all of the advances and fees that had accrued and were owed to 334th Place

4    over the past 17 years, according to the financial statements AMTAX itself repeatedly accepted.

5    The Court therefore concludes that 334th Place would be injured if AMTAX 169 is now

6    permitted to repudiate its earlier acceptances.  Estoppel applies to bar all of AMTAX 169's

7    counterclaims.

8
     **4)  All of AMTAX 169's Counterclaims Are Barred by the Business Judgment
9        Rule**

10    30.    Parkway's LPA states that "the General Partner shall have the exclusive right to

11    manage the business of the Partnership.  No Limited Partner . . . shall (i) have any authority or

12    right to act for or bind the Partnership, or (ii) except as required by law, participate in or have

13    any control over the Partnership business."  LPA § 7.3.  Under Section 7.4.A of the LPA, 334th

14    Place is required to use its "best efforts" in carrying out its duties under the LPA.

15    31.    Collectively, these provisions are an expression of the business judgment rule.

16    "The 'business judgment rule' in Washington immunizes" a party for "management decisions,

17    which were undertaken within the power and authority of management . . . and which were made

18    in good faith."  *Para-Med. Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 393, 739 P.2d 717 (1987)

19    (citation omitted); *see also Martin v. Monumental Life Ins. Co*., 240 F.3d 223, 234 (3d Cir. 2001)

20    ("Precedent treats 'best efforts' as a form of good faith and sound business judgment.").  Thus,

21    Washington courts will not second-guess or interfere with managerial decisions, including the

22    payment of management fees or other fringe benefits, unless the accuser can prove the decisions

23    were made in bad faith or were the product of fraud.  *Nursing Home Bldg. Corp. v. DeHart*, 13

24    Wn. App. 489, 500, 535 P.2d 137 (1975).  That is, mere negligence is not enough to disturb what

25    is otherwise a valid business judgment.  *See Duffy v. Piazza Constr., Inc.*, 62 Wn. App. 19, 22,

26    815 P.2d 267 (1991) ("'[W]e hold as a matter of law that negligence in the management of the

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 34
(Case No. 17-cv-06048-RBL)

1   affairs of a general partnership or joint venture does not create any right of action against that

2   partner by other members of the partnership.'" (brackets in original; citation omitted)).

3       32.     AMTAX 169 has failed to demonstrate at trial that any of the fees at issue were

4   incurred in bad faith.  The evidence showed that the claims regarding "unauthorized fees" were

5   developed by scrutinizing audits in which all of those fees were fully disclosed by the GP.  There

6   is no evidence that 334th Place ever acted with intent to conceal anything or enrich itself at the

7   expense of the partnership.  *See J & J Celcom v. AT & T Wireless Servs. Inc.*, 162 Wn.2d 102,

8   113, 169 P.3d 823 (2007) (no breach of fiduciary duty in connection with affiliate transactions

9   when partner acts in good faith on full disclosure of material information).  To the contrary, as

10  recorded in every annual Parkway audit, 334th Place has advanced millions to the partnership

11  and deferred payment on fees owed to it in order to keep Parkway a going concern, with

12  AMTAX's full knowledge and to its benefit.  As a result, the business judgment rule applies to

13  all of the fees incurred.

14      33.     With respect to the non-fee-related theories of liability, it was the GP's duty to

15  keep the property in good repair.  Parkway's HUD-insured loan came with duties to the federal

16  government that preceded any duty of 334th Place to maximize AMTAX 169's return.  As

17  HUD's approved Management Agent, Ms. Tamaro was required to ensure compliance with

18  HUD's mission to provide quality affordable housing to low-income tenants.  In fact, both 334th

19  Place and AMTAX have duties to HUD that stem from the LPA, as the HUD project documents

20  are senior to the LPA (Section 13.11(C)(i)).  Clause 11 in the HUD Deed of Trust requires the

21  partnership "[t]o keep said property in good condition and repair" and "not to commit or permit

22  waste thereof."  Clause 7 in the HUD Regulatory Agreement requires that "Owners shall

23  maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant

24  thereto, in good repair and condition."

25      34.     The Court rejects AMTAX's contention that Ms. Tamaro breached her duty as a

26  GP by doing the repair work she did during the Compliance Period.  Mr. Krabbenschmidt

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 35
(Case No. 17-cv-06048-RBL)

1    offered no basis for his proposition that a general partner in a LIHTC partnership has a duty to

2    refrain from significant repairs, and keep the property only in a "habitable" condition until after

3    the Compliance Period ends in order to maximize the limited partner's return.  *See, e.g.*, 6/3/19

4    Trial Tr. at 144 (Tamaro); 6/10/19 Trial Tr. at 69-70 (Barrick); Trial Ex. A-282

5    (Krabbenschmidt's expert report, providing no support for argument that repairs should not have

6    been completed).  Under the LPA, Parkway's lifespan as a partnership is 50 years.  Trial Ex. 3 §

7    2.5.A.  The GP's fiduciary duty to the partnership is over that entire lifespan, not just the 15-year

8    Compliance Period before the LP exits.  The Court finds that the repair work on the property was

9    done in good faith and was in the best interests of the partnership.

10        35.     AMTAX also failed to demonstrate that the GP's setting of rents at Parkway was

11    anything other than a good-faith business judgment in full compliance with the GP's duties under

12    Section 7.4.B of the LPA.  AMTAX's expert testimony regarding the alleged failure to maximize

13    rents was, like the court's finding in the *Sunnyslope* decision, "almost useless."  *See In re*

14    *Sunnyslope Hous. Ltd. P'ship*, No. 2:11-BK-02441-RJH, 2012 WL 6479735, at *3 (Bankr. D.

15    Ariz. Dec. 12, 2012).  The evidence was clear that Ms. Tamaro had a firm understanding of the

16    property's market, its low-income tenants, its multiple regulatory agreements, and the rents

17    Parkway could reasonably command.  She balanced those factors ably and in accordance with

18    her business judgment.

19        36.     In sum, the evidence established at trial demonstrated that Ms. Tamaro used her

20    "best efforts" since Parkway's inception to manage Parkway in accordance with the GP's duties

21    under the LPA, including with respect to the setting of rents, repairs, payments to third parties

22    (including affiliates), financial reporting, and fees incurred by the GP.  The GP's managerial

23    decisions were reasonable, fully disclosed, and made in good faith.  As a result, 334th Place is

24    insulated under the business judgment rule and the LPA from any liability or damages in

25    connection with AMTAX's counterclaims.  *See* Trial Ex. § 7.7.A.

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 36
(Case No. 17-cv-06048-RBL)

**5) AMTAX 169's Counterclaims Also Fail for Failure to Establish a Breach of Contract or Damage**

37.      LPA Section 2.4(v) expressly permits affiliates to provide services to the partnership.  LPA § 7.10.E affirms that affiliates may be paid for providing services to the partnership.  The only condition placed on paying for the services of affiliates is that the transaction "shall not be less favorable to the Partnership than would be arrived at by unaffiliated parties dealing at arms' length."  LPA § 2.4(v).  The evidence at trial demonstrated that the work completed by 334th Place's affiliates was both necessary and reasonable, and consistent with market rates.  As a result, there was no breach of the LPA for any affiliate work.

38.      The only fee issues that AMTAX raised that are even "debatable" on the merits in the Court's view are the Project Management Fees and the Repair Supervision Fees.  6/10/19 Trial Tr. at 97 (the Court); *id*. at 109 ("I had looked at the agreements, and they were not as definitive as Mr. Pettit and Mr. Blake advocated.").[8]  But with respect to the Repair Supervision Fees, AMTAX does not dispute that had a third party general contractor completed the work at issue, it would have been entitled to a fee for the supervision services it provided.  6/6/19 Trial Tr. at 10 (Blake) ("I am saying if the general partner or the management company wanted to hire a third party to provide these services, they could have made a proposal, we would have considered it, and if it was reasonable we may have accepted it….").  All of the repair supervision fees incurred by the GP here related to major capital repair work that the partnership would have had to pay a third party general contractor to complete in any event.  *See* 6/10/19 Trial Tr. at 122 (the Court) ("There are always independent contractor fees, contractors always have fees. And how do they square with this?").  AMTAX never demonstrated at trial that any such third-party fees would have been lower than those charged by the GP.  As a result, AMTAX has failed to prove that the partnership suffered any damages from the repair supervision fees paid to Trieste for its supervision work.

[8] The vast majority of AMTAX's claimed historical Project Management Fee overcharges by the GP occurred between 2004 and 2011, well outside the statute of limitations for any claim under the LPA.

1    39.    Separately, even if AMTAX's fee-related counterclaims were not otherwise

2  barred by the statute of limitations, estoppel, or the business judgment rule, the fees are not

3  recoverable, nor should the GP's outstanding subordinated loan be reduced, for the independent

4  reason that 334th Place established during trial a clear course of dealing between the parties

5  demonstrating that these fees were authorized.

6    40.    "Trade usage and course of dealing are relevant to interpreting a contract and

7  determining the contract's terms." *Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 146 Wn.2d 428,

8  434, 47 P.3d 940 (2002).  "A 'course of dealing' is a sequence of conduct concerning previous

9  transactions between the parties . . . that is fairly to be regarded as establishing a common basis

10  of understanding for interpreting their expressions and other conduct."  RCW 62A.1-303(b)*; see

11  also Puget Sound Fin.*, 146 Wn.2d at 436 (party's acceptance of invoices, including liability

12  limitation provision, constituted course of dealing and, thus, incorporated liability limitation

13  provision into the party's contract).  "Ambiguity is not required before evidence of trade usage or

14  course of dealing can be used to ascertain the terms of a contract," although here the Court has

15  determined that there were in fact contractual ambiguities with respect to the fees at issue in this

16  case.  *Puget Sound Fin.*, 146 Wn.2d at 434; *see also* 6/10/19 Trial Tr. at 110 (Court referencing

17  the "inherent ambiguities with the agreement").

18    41.    The Court concludes that these course of dealing principles under Washington

19  law apply squarely in the Court's interpretation of the contracts at issue in this case.  Ms. Tamaro

20  consistently provided information to the LP regarding the fees, rents, and repairs over a number

21  of years, and clearly stated her position as to why she made the decisions that she did.  For many

22  years, AMTAX accepted her position and did not challenge any of the GP's decisions.  It was

23  only after the option had been exercised that AMTAX "reinvent[ed] the relationship.  And it's

24  problematic."  6/10/19 Trial Tr. at 124 (the Court); *id.* at 125 ("Everything was copacetic.  And

25  then because of the appraisal process, [AMTAX] got into the, you know, looking for the belly --

26  navel lint.").  As a result of the parties' clear course of dealing demonstrated at trial, the Court

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 38
(Case No. 17-cv-06048-RBL)

1    finds that the contracts at issue authorized all of the fees that 334th Place incurred, and which

2    AMTAX challenged in its counterclaims.

3    **D.    Judgment**

4          42.    The Court hereby enters a declaratory judgment that AMTAX 114's removal of

5    the general partner in Hidden Hills was ineffective and HHM has an enforceable right to exercise

6    its buyout option under the Hidden Hills LPA, in accordance with the Court's directions set forth

7    in these findings of fact and conclusions of law.

8          43.    Judgment is entered in favor of HHM and against AMTAX 114 on its remaining

9    counterclaims.

10         44.    The Court hereby enters a declaratory judgment that AMTAX 169's removal of

11   the general partner in Parkway was ineffective and 334th Place has an enforceable right to

12   exercise its buyout option under the Parkway LPA, in accordance with the Court's directions set

13   forth in these findings of fact and conclusions of law.

14         45.    Judgment is entered in favor of 334th Place and against AMTAX 169 on all of its

15   counterclaims.

16         46.    The Court shall reserve jurisdiction to address any potential future disputes

17   regarding the waterfall calculations or the setting of the Option Price for Hidden Hills and

18   Parkway.

19         47.    Any conclusion of law herein more properly characterized as a finding of fact

20   shall be deemed so.

21         SO ORDERED this 23rd day of July, 2019.

22

23

24   _____
     Ronald B. Leighton
25   United States District Judge

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 39
(Case No. 17-cv-06048-RBL)

1

Presented by:

2

**Stoel Rives LLP**

3

By: */s/David R. Goodnight*

4

David R. Goodnight, WSBA #20286
Rita V. Latsinova, WSBA #24447

5

J. Scott Pritchard, WSBA #50761

6

600 University Street, Suite 3600
Seattle, WA  98101

7

Telephone:  (206) 624-0900
Email: david.goodnight@stoel.com

8

rita.latsinova@stoel.com
scott.pritchard@stoel.com

9

10

*Attorneys for Plaintiffs and Counter-Defendants Hidden Hills Management LLC and 334th Place 2001, LLC*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 40
(Case No. 17-cv-06048-RBL)