UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
SAUGATUCK, LLC, *a Delaware limited*
*liability company*,

                                    Plaintiff,

          -against-

ST. MARY'S COMMONS ASSOCIATES,
L.L.C., *a Delaware limited liability*
*company*,

                                    Defendant.
----------------------------------------------------------x

**REPORT AND**
**RECOMMENDATION**

19-CV-217 (SJF)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

By way of Complaint dated January 11, 2019, Plaintiff Saugatuck, LLC, a

Delaware limited liability company ("Plaintiff" or "Saugatuck") commenced this

diversity action against Defendant St. Mary's Commons Associated, L.L.C., a

Delaware limited liability company ("Defendant" or "St. Mary's"), seeking, *inter alia*,

a declaratory judgment as to whether Defendant is entitled to exercise a contractual

option to purchase Plaintiff's interest in a partnership formed to own and operate an

affordable housing development in in Williamsville, New York (the "Apartment

Complex" or "Property").  *See* Complaint ("Compl."), Docket Entry ("DE") [1].[1]  St.

---

[1] The pleadings adequately allege that diversity jurisdiction exists because the dispute is between citizens of different states and the amount in controversy exceeds $75,000.  *See* 28 U.S.C. § 1332; Compl. ¶¶ 14, 15, 18.  Specifically, Plaintiff is a citizen of Colorado and Massachusetts, *see* Compl. ¶ 14, and Defendant is *not* a citizen of either of those states.  *Compare* Compl. ¶ 17 (alleging that St. Mary's is a citizen of New York) *with* Counterclaim ¶ 18 (asserting that Defendant is a citizen of New York and Florida).  The fact that both parties are Delaware limited liability companies, unlike if they were both Delaware corporations, has no bearing on whether their citizenship is diverse.  *See, e.g.,* *ICON MW, LLC v. Hofmeister,* 950 F. Supp. 2d 544, 546 (S.D.N.Y. 2013) ("With the exception of corporations, the citizenship of business entities is derived from the citizenship of all members of the entity.") (citing *Carden v. Arkoma Assocs.,* 494 U.S. 185, 189, 110 S. Ct. 1015 (1990)).

Mary's counterclaimed, asserting that Saugatuck is in breach of contract for refusing to participate in the option process, and also seeking a declaratory judgment clarifying the parties' rights under their various agreements.  *See* Defendant's Answer and Amended Counterclaim ("Counterclaim"), DE [20].  Presently before the Court, on referral from the Honorable Sandra J. Feuerstein for Report and Recommendation, are Plaintiff's:  (i) motion for partial summary judgment declaring that certain of its rights under the parties' contracts are superior to Defendant's, *see* DE [34]; and (ii) letter motion to strike various portions of St. Mary's opposition to the summary judgment motion, *see* DE [35].  For the reasons set forth below, the Court respectfully recommends denying both motions.

I.    **Background**

    A.    **Relevant Facts**

    The following facts are taken from the parties' pleadings, declarations, exhibits, and respective Local Rule 56.1 statements.  Unless otherwise noted, these facts are not in dispute.

        i.    The Low Income Housing Tax Credit Program

    In 1987, Congress enacted the Low Income Housing Tax Credit program ("LIHTC") to promote the development of affordable housing.  *See generally* 26 U.S.C. 42 ("Section 42").  LIHTC enables companies to invest in and operate affordable housing developments in exchange for, among other things, tax credits and deductions arising out of reductions in capital accounts.  *See* Plaintiff's Reply to Defendant's Rule 56.1 Response ("Reply 56.1"), DE [34-52], ¶ 21.  The owners of

LIHTC properties, such as the Apartment Complex at issue in this litigation, can claim tax credits offsetting various liabilities over a ten-year period, but must comply with Section 42's affordability restrictions for a period of 15 years (the "Compliance Period") to avoid recapture of those credits. *See* 26 U.S.C. § 42(a), (c)(2), (f)(1), (i)(1), (j); Reply 56.1 ¶ 22. In an effort to attract capital, developers of affordable housing projects often "sell" the tax credits to private investors who have significant, predicable tax liability, in exchange for equity in the venture. *See* Jill Khadduri et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?* at 2 (U.S. Dep't of Housing & Urban Dev. 2012) ("Khadduri").

Since 1990, Section 42 has required LIHTC projects to remain affordable for an additional 15-year extended-use period (the "Extended Period") before affordability requirements are lifted. *See* Khadduri at 6; Reply 56.1 ¶ 24. The statute, however, permits disposal of the asset during this time through a mechanism whereby the property owner can request that the applicable state agency – in this case, the New York State Division of Homes and Community Renewal ("NYSHCR") – attempt to locate a buyer who will purchase the property and continue operating it as affordable housing for the remainder of the Extended Period (the "Qualified Contract Process"). *See* Reply 56.1 ¶¶ 26-27. If NYSHCR fails to find a suitable purchaser for the development after one year of searching, the Qualified Contract Process ceases and the Extended Period terminates, permitting the property owner

to raise rents to market levels for units that are vacated thereafter. *See id*. ¶¶ 27, 32.[2]

Pursuant to Section 42, the Qualified Contract Process can be commenced at any time following the fourteenth year of the Compliance Period. *See id*. ¶ 27. NYSHCR, however, does not accept applications unless they include 15 years of Audited Financial Statements. *See* Declaration of Thomas G. Granville ("Granville") in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Granville Decl."), DE [34-32], Ex. G. Although NYSHCR's implementing regulations provide that a request to initiate the Qualified Contract Process constitutes an "irrevocable offer to sell" the development, the agency nevertheless permits an owner to reject a viable offer or withdraw its application entirely with the caveat that doing so forecloses any future opportunities to sell the property through this mechanism and, in turn, requires the developer to comply with Section 42's affordability requirements for the remainder of the Extended Period. *See* Reply 56.1 ¶ 34; New York Comp. Codes R. & Regs. tit. 9 § 2040.5(c) (2019); Granville Decl., Ex. G.

### ii.   The Partnership and its Agreements

Saugatuck and St. Mary's are partners in St. Mary's Commons, L.P. (the "Partnership"), which owns the Apartment Complex and was formed in 2003 to provide affordable housing while generating LIHTC credits pursuant to Section 42.

---

[2] The Qualified Contract Process contains a formula that requires the selling price of an eligible property to equal, ""(i) the sum of (I) the outstanding indebtedness secured by, or with respect to, the building, (II) the adjusted investor equity in the building, plus (III) other capital contributions not reflected in the amounts described in subclause (I) or (II), reduced by (ii) cash distributions from (or available for distribution from) the project." 26 U.S.C. § 42(h)(6(F).

*See* Reply 56.1 ¶¶ 1, 3, 4. The Partnership is governed by an Amended and Restated Agreement of Limited Partnership, date May 22, 2003 (the "LPA"), and is comprised of a General Partner, St. Mary's, and an Investor Limited Partner and Special Limited Partner, both Saugatuck.[3] *See id*. ¶¶ 2, 5-6; the LPA, Declaration of Christopher G. Caldwell in Support of Plaintiff's Motion for Partial Summary Judgment ("Caldwell Decl."), DE [34-3], ¶ 4, Ex. C. In its role as Investor Limited Partner, Plaintiff made initial capital contributions to the Partnership totaling $5,729,974, and devoted significantly more funds thereafter. *See* Reply 56.1 ¶¶ 7-9. This money was invested in exchange for equity and the right to realize the allotted tax credits. *See id*. ¶ 10. As Special Limited Partner and General Partner, respectively, Saugatuck and St. Mary's each contributed $1 of the initial capital to the Partnership. *See id*. ¶¶ 12, 14-15. Pursuant to the LPA, St. Mary's is responsible for operating and maintaining the Apartment Complex such that it qualifies for the tax credits afforded by Section 42. *See id*. ¶ 19. Defendant earns substantial fees for its management of the Property. *See id*.

The LPA permits Saugatuck to compel St. Mary's to initiate the Qualified Contract Process (and, if applicable, accept a qualifying offer) at any time following the fourteenth year of the Compliance Period (*i.e.*, January 1, 2018). *See id*. ¶¶ 37-39. Specifically, the LPA dictates that:

---

[3] Plaintiff is the successor-in-interest to both RCC Credit Facility, L.L.C. (the original Investor Limited Partner) and Related Direct SLP LLC (the original Special Limited Partner) (together, the "Original Investment Partners"). *See* Compl. ¶ 1. Saugatuck purchased the Original Investment Partners' interest in the Partnership on January 10, 2019. Reply 56.1 ¶ 6. Plaintiff is used interchangeably with the Original Investment Partners herein.

5

> Notwithstanding any provision of this Agreement to the contrary, the Special Limited Partner shall have the right at any time after the fourteenth year of the Compliance Period (A) to require, by written notice to the General Partner that the General Partner promptly submit a written request to [NYSHCR] pursuant to … Section 42(h)(6)(I) that [NYSHCR] endeavor to locate within one year from the date of such written request a buyer who will continue to operate the Property as a qualified low-income building at a purchase price that is not less then the debt encumbering the Property plus the Partnership's equity in the Property (adjusted for cost-of-living increases as permitted by … Section 42(h)(6)(G)), and (B) in the event [NYSHCR] locates such a buyer, to compel the General Partner to accept such buyer's offer to purchase the Property.

LPA, Section 5.4(B)(i) (the "QC Clause").  Alternatively, the LPA permits Saugatuck to require St. Mary's to "promptly use its best efforts to obtain a buyer for the Apartment Complex on the most favorite terms then obtainable" at any time after the end of the Compliance Period.  *See id*. Section 5.4(B)(ii); Reply 56.1 ¶ 36.

The Partnership and St. Mary's are also parties to an Option Agreement, dated May 22, 2003 (the "Option Agreement," and together with the LPA, the "Agreements"), and executed concurrently with the LPA.[4]  *See* Reply 56.1 ¶¶ 50-51; Caldwell Decl. ¶ 9, Ex. H.  The Option Agreement grants Defendant the opportunity to either purchase the Apartment Complex for a price determined pursuant to that contract, or to have the Partnership redeem Plaintiff's interest therein at a price that would put Saugatuck in the same economic position as if Defendant bought the

---

[4] The parties agree that the contracts should be read as one document.  *See* Pltf.'s Mem. at 8; Def.'s Mem. at 5; *BWA Corp. v. Alltrans Exp. U.S.A., Inc.*, 112 A.D.2d 850, 852, 493 N.Y.S.2d 1 (1st Dep't 1985) ("instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument.") (internal citation omitted).

Property (the "Option"). *See* Reply 56.1 ¶ 52; Option Agreement, Sections I-II. The Option is subject to a two-year term, commencing following the last day of the Compliance Period (*i.e.*, January 1, 2019 – one year after the QC Clause becomes effective). *See* Reply 56.1 ¶ 53; Option Agreement, Section II. This contract further provides that the closing of any sale of the Apartment Complex to St. Mary's shall occur no more than 180 days after Defendant gives the Partnership written notice that it is exercising the Option. *See* Option Agreement, Section V. The Option Agreement further grants St. Mary's a right to reform the contract to:

> provide for a redemption by the [Partnership] of the limited partnership interests in the [Partnership] of the Limited Partners in lieu of a purchase by [Defendant] of the [Property]; provided, however that the economic, tax, and other material consequences of the transaction for each of the Limited Partners shall not be materially adversely altered thereby and provided further that the redemption price shall equal the amount otherwise payable to the Limited Partners as if the fee title to the [Apartment Complex] had been acquired under Article IV and the mortgages were satisfied or otherwise paid or assumed

*Id.* Section VII.

The Agreements provide that they are to be interpreted under New York law. *See* LPA, Section 14.1; Option Agreement, Section X(f).

On January 10, 2018, Plaintiff exercised its right to compel Defendant to initiate the Qualified Contract Process with NYSHCR. *See* Reply 56.1 ¶¶ 40, 43. The sale price for the Apartment Complex under the Qualified Contract process would be no less than $13,000,000. *See id.* ¶¶ 28-31; 26 U.S.C. § 42(h)(6)(F). In accordance with Saugatuck's instruction, St. Mary's submitted preliminary and formal Qualified Contract applications to NYSHCR on February 2, 2018 and September 4, 2018,

respectively.  *See* Reply 56.1 ¶¶ 44-45.  On September 6, 2018, NYSHCR wrote Defendant, stating that it would need 15 years of Audited Financial Statements (*i.e.*, through December 31, 2018) before considering the submission.  *See* Granville Decl. ¶ 33, Ex. G.  Thus, NYSHCR instructed St. Mary's to "resubmit" its application once it possessed the requisite documents.  *See id*.

On October 2, 2018, *Plaintiff* wrote to NYSHCR asking the agency to reconsider its determination that the Qualified Contract application submitted by Defendant was "premature and inadequate," contending that Section 42's contemplation of the process starting after the fourteenth year of the Compliance Period would be rendered meaningless if the application required 15 years of financials.  *See id*. ¶ 36, Ex. I.  NYSHCR responded on October 4, 2018, referencing an Internal Revenue Service bulletin, permitting state agencies to establish their own reasonable requirements for commencing the Qualified Contact Process, and reiterating that the agency requires 15 years of Audited Financial Statements before "commenc[ing] the comprehensive review" of the Partnership's application.  *See id*. ¶ 37, Ex. J.

On January 1, 2019, St. Mary's sent a letter to Saugatuck asserting that it was exercising its Option by electing to reform the Option Agreement to provide for a redemption by the Partnership of Plaintiff's interest therein.  *See* Caldwell Decl. ¶ 10, Ex. I.  According to an appraiser hired by St. Mary's, the fair market value of the Apartment Complex is $4,875,000 (*i.e.*, more than $8,000,000 less than the minimum price that the Property would sell for in the Qualified Contract Process).  *See* Reply

56.1 ¶¶ 31, 55.  On January 11, 2019, Saugatuck responded to St. Mary's, stating, *inter alia*, its position that exercising the Option while the Qualified Contract Process is underway is impermissible pursuant to the Agreements, and informing Defendant that the instant lawsuit had been filed in light of the parties' disagreement concerning the interplay between the QC Clause and the Option.  *See* Caldwell Decl. ¶ 12, Ex. K.

> **B.    Procedural History**

Based on the above, Saugatuck commenced this action on January 11, 2019, asserting two causes of action seeking declaratory judgments:  (i) that Defendant is prohibited from exercising the Option while the Qualified Contract is pending; and (ii) clarifying the price St. Mary's must pay if it is permitted to invoke the Option.[5] *See* Compl. ¶¶ 52-67.  Defendant filed its Counterclaim on February 14, 2019, also asserting two causes of action for:  (i) breach of contract in connection with Plaintiff's alleged failure and refusal to perform in accordance with the Option Agreement; and (ii) a declaratory judgment clarifying the parties' rights and obligations with under the Agreements.  *See* Counterclaim ¶¶ 86-99.

On March 22, 2019 St. Mary's served Saugatuck with a motion for a preliminary injunction tolling the period of time to close on the Option.  *See* DEs [25], [29].  On April 10, 2019, Defendant withdrew its motion in light of the parties' stipulating to toll the Option until the earlier of:  (i) a determination by this Court as

---

[5] The instant motion only seeks summary judgment on Plaintiff's first cause of action.

to the validity of St. Mary's exercise thereof; (ii) an agreement by the parties to resolve the instant dispute; or (iii) further order of this Court.  *See* DEs [29] – [30].

The instant motion for partial summary judgment, seeking adjudication of Plaintiff's first cause of action before discovery has commenced, was filed on May 31, 2019 and subsequently referred to this Court.  *See* DE [34]; June 3, 2019 Order Referring Motion.  The motion argues that the language of the Agreements unequivocally dictate that Saugatuck's rights under the QC Clause are superior to St. Mary's Option.  *See generally* Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment ("Pltf.'s Mem."), DE [34-1].  In opposition, Defendant contends that the text of the Agreements does not support Plaintiff's interpretation, and that the contracts instead permit St. Mary's to exercise its Option regardless of the status of the Qualified Contract Process.  *See generally* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def.'s Mem."), DE [34-30].[6]  In its brief, however, Defendant refers not only to the four corners of the documents, but also relies on evidence concerning the parties' intent. *See generally* Def.'s Mem.; Granville Decl.  As a result, on May 31, 2019, Saugatuck moved to strike portions of St. Mary's Opposition arguing that it violates various evidentiary and procedural rules.  *See* DE [35].

---

[6] Since the motion has been fully briefed, Defendant has twice submitted additional authority purporting to support its opposition.  *See* DEs [38], [40].  Plaintiff objects to both filings, arguing that the authority cited is irrelevant.  *See* DEs [39], [41].  The Court has considered St. Mary's submissions but determined that they have no bearing on the resolution of the instant motion.  *See Delgado v. Ocwen Loan Servicing, LLC*, No. 13-cv-4427, 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016) ("it is fairly standard practice for parties to occasionally send letters or to otherwise file supplemental authority after briefing is complete") (internal quotation and citation omitted).

## II.    Discussion

As detailed below, the Court respectfully recommends that Saugatuck's motion for partial summary judgment be denied, and that its motion to strike be denied without prejudice as moot.  The Court addresses each motion in turn.

### A.    Motion for Summary Judgment

#### i.    Legal Standard

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate.  *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2004).  In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").  Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsuhita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

ii.    Contract Interpretation

Consistent with the Agreements' terms, the Court applies New York law.  *See* LPA, Section 14.1; Option Agreement, Section X(f); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.") (internal citation omitted).

Under New York law, a written contract ordinarily "should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990).  Thus, "words and phrases are given their plain meaning" such that an agreement is "construed so as to give full meaning and effect to all of its provisions."  *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (citing *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611 (1991) (internal quotations and brackets omitted).  In this regard, "[t]he 'primary objective' in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language of the agreement at issue." *Quinio v. Aala*, 344

12

F. Supp. 3d 464, 471 (E.D.N.Y. 2018) (quoting *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993)); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.") (citing *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645 (1985)).

Accordingly, "it is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing") (collecting cases)). An agreement's language is unambiguous "if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95 (2d Cir. 2015) (internal quotation and citation omitted).

Conversely, if an agreement's terms *are* ambiguous, courts "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Tr. Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) (internal citation omitted). A contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably

intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal citation omitted); *see also Quinio*, 344 F. Supp. 3d at 471 ("Contractual language is ambiguous if it is susceptible to more than one reasonable interpretation") (citing *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443); *see also Sayers*, 7 F.3d at 1094 ("Ascertaining whether or not a writing is ambiguous is a question of law for the trial court") (internal citations omitted). "When making [the] threshold determination [of whether a contract is ambiguous], the court must read the disputed provision within the context of the entire agreement and must safeguard against adopting an interpretation that renders another provision superfluous." *Quinio*, 344 F. Supp. 3d at 471 (citing *Sayers*, 7 F.3d at 1095). "If the court determines that the provision is ambiguous, it must then determine whether there is extrinsic evidence regarding the parties' intent." *Quinio*, 344 F. Supp. 3d at 471 (citing *Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 884 (2d Cir. 1995)). Thus, "[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate." *Seiden Assocs., Inc.*, 959 F.2d at 428 (internal citations omitted); *see also Bank of Am. Nat. Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985)

("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact.  Summary judgment is therefore inappropriate.") (internal citations omitted).  In other words, a motion for summary judgment in a contract dispute "may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Sayers*, 7 F.3d at 1094.

iii.    <u>Analysis</u>

Applying these principles, the Court finds that the interplay between the QC Clause and the Option, including whether either provision is superior to the other, is ambiguous such that the Agreements cannot be interpreted as a matter of law.  The Court therefore respectfully recommends denying Plaintiff's motion for partial summary judgment.  *See, e.g.*, *Farley v. Davis*, No. 91-cv-5530, 1994 WL 167944, at *4 (S.D.N.Y. May 2, 1994) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous") (internal quotation and citations omitted).

As an initial matter, the Court notes that neither party argues that the clauses themselves are unclear, but, rather, the dispute hinges on whether the QC Clause takes precedence over the Option.  In this regard, there are at least two reasonable interpretations:  (i) that the Option is subordinate to the QC Clause and cannot be exercised while the Qualified Contract Process is ongoing; and (ii) that the Option is exercisable at any time during its two-year term, regardless of the status of the Qualified Contract Process.  Although both interpretations reflect rational readings of the Agreements, neither is unequivocally supported by the text of the documents,

barring judgment as a matter of law for either party. *See Farley*, 1994 WL 167944, at *6 ("where contractual language is ambiguous and subject to various interpretations, intent becomes an issue of fact and summary judgment is inappropriate") (citing *Mycak v. Honeywell Inc.,* 953 F.2d 798, 802 (2d Cir.1992)).

In accordance with Section 42, the LPA entitles Plaintiff to compel Defendant to commence the Qualified Contract Process at any time after the fourteenth year of the Compliance Period (*i.e.*, on or after January 1, 2018). *See* QC Clause; Pltf.'s Mem. at 3. This QC Clause, however, contains no language stating that once the Qualified Contract Process has begun (or while Saugatuck's rights thereunder still exist), Plaintiff's interest in the Partnership cannot be transferred pursuant to the Option or otherwise. Indeed, Saugatuck acquired its interest in the Partnership from the Original Investment Partners *after* the Qualified Contract Process was purportedly underway. *See*, *e.g.*, Pltf.'s Reply, note 6; Reply 56.1 ¶ 6.

Pursuant to the Option Agreement, Defendant has the right to redeem Plaintiff's interest in the Partnership during a two-year term beginning after the last day of the Compliance Period (*i.e.*, on or after January 1, 2019 – one year after the QC Clause is exercisable). *See* Option Agreement, Sections I-II. Similar to the LPA, the Option Agreement is silent as to whether it can be invoked while the Qualified Contract Process is pending or if it can be exercised while Saugatuck still has rights under the QC Clause. *See* Option Agreement.

Additional language in either the LPA or Option Agreement dictating that the invocation of the QC Clause prohibits exercising the Option until the Qualified

Contract Process is complete could have rendered the Agreements unambiguous.  No such language, however, is found and Saugatuck therefore seeks to rely on an otherwise unsupported, albeit plausible, interpretation of the parties' rights.  Indeed, as Plaintiff points out, the documents were drafted and executed by sophisticated parties represented by counsel, *see* Pltf.'s Mem. at 8, who could have drafted the contracts in a manner explicitly delineating whether either party's rights took precedence.

Rather than pointing to *language* in the Agreements dictating that the Option is subordinate to the QC Clause, Plaintiff focuses on the timing, arguing that the Agreements render the Option inferior because the QC Clause became effective one year earlier.  *See* Pltf.'s Mem. at 6, 11-12.  The Court disagrees, as this interpretation, although reasonable, requires inferences with respect to the parties' intent but is not clear from the language of the Agreements.  In furtherance of its position, Saugatuck argues that St. Mary's being permitted to exercise the Option before completion of the Qualified Contract Process would negate Plaintiff's bargained-for right to pursue this sale mechanism.  *See* Pltf.'s Mem. at 11 (citing *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 624 (S.D.N.Y. 2010) ("parties are not free to interpret a contract in a way that frustrates the purpose of that contract or that makes any provision of the contract meaningless")).  This contention is misguided because the QC Clause has meaning even if the Option can be exercised while the Qualified Contract Process is ongoing.  Initially, the Option term only lasts two years after the Compliance Period ends while the Extended Period spans an additional 13 years

thereafter, leaving Saugatuck with the right to initiate the Qualified Contract Process for more than a decade if St. Mary's declines to exercise its Option. Similarly, because the Option is inherently discretionary, the QC Clause gives Plaintiff a mechanism to dispose of its interest in the Apartment Complex – after receiving all of the tax benefits and completing Section 42's 15-year affordability requirements – regardless of whether Defendant wishes to be the purchaser. Finally, although the current market value of the Property pursuant to the Option Agreement appears significantly less than under the Qualified Contract formula, it is conceivable that market conditions could render the Option price higher than under a Qualified Contract, rendering the Option to Plaintiff's benefit even if exercised after the QC Clause.[7] Accordingly, interpreting the Agreements in a manner that permits St. Mary's to exercise the Option while the Qualified Contract Process is underway would not render the QC Clause meaningless.[8]

Plaintiff also focuses on its contribution of virtually all of the Partnership's capital as reason to conclude that the Agreements grant it superior rights to determine the disposition of the Property, and that any other interpretation would

---

[7] Indeed, Plaintiff disputes the valuation of the Property reached by Defendant's appraiser in this lawsuit. *See* Pltf.'s Mem. at note 1.

[8] Notably, Plaintiff does not assert that the Option cannot be exercised merely because the Qualified Contract Process was invoked first, but instead takes the position that its rights are absolutely superior to Defendant's. *See* Pltf.'s Mem. at 9-13. This argument fails because, under this interpretation, Saugatuck could initiate the Qualified Contract Process *after* St. Mary's provides notice of its intent to exercise the Option while the appraisal process in underway, but before the closing of any transaction extinguishing Plaintiff's interest in the Partnership. Thus, Saugatuck effectively argues that it can negate Defendant's Option at any time in light of the QC Clause not being limited in time. This latent ambiguity, apparently not addressed in the Agreements, further precludes summary judgment.

undermine the parties' commercial expectations. *See* Pltf.'s Mem. at 10, 15-17. Moreover, Saugatuck speculates that St. Mary's motivation in exercising the Option is to purchase Plaintiff's interest in the Partnership at a lower valuation than would be applicable if the Qualified Contract process concluded without a buyer (*i.e.*, after Section 42's affordability requirements are lifted). *See id*. at 16. This argument is without merit as it fails to account for the tax benefits that Saugatuck received in exchange for its capital investment, which potentially exceed what it might receive in sale proceeds, and relies on unsubstantiated conjecture concerning Defendant's motives. *See* Def.'s Mem. at 10.[9]   In light of the Agreements' failure to include clear language rendering the Option subordinate to the QC clause, a factual dispute concerning both the parties' intent and the economic realities of the Partnership precludes summary judgment.

The Court similarly rejects Saugatuck's contention that the federal and state laws governing LIHTC render the QC Clause superior to the Option. *See* Pltf.'s Mem. at 13-14. Relying on Section 42's contemplation of eligibility for the Qualified Contract Process beginning after the fourteenth year of the Compliance Period, and New York's regulations indicating that a request to find a buyer represents an irrevocable offer to sell the Property during the applicable one-year period, Plaintiff argues that exercising the Option after the application has been submitted would "thwart the governing regulations." *See* Pltf.'s Mem at 14 (citing N.Y. Comp. Codes

---

[9] Defendant contends that Plaintiff received a return in excess of $10,000,000 as a result of the tax credits and deductions it earned through the Partnership. *See* Def.'s Mem. at 10. Saugatuck disputes this calculation. *See* Plaintiff's Response to Defendant's 56.1, DE [34-53], ¶ 123.

R. & Regs. tit. 9, § 2040.5(c) (2003); Caldwell Decl., Ex. E)).  This contention lacks merit for multiple reasons.  Initially, notwithstanding the irrevocability language, NYSHCR *permits* a seller to renege on the Qualified Contract Process under the condition that doing so forecloses any future right to sell the property through this mechanism.  *See* Granville Decl., Ex. G.  Further, NYSHCR requires 15 years of Audited Financial Statements before considering a Qualified Contract application complete, which is permissible under Section 42 pursuant to the Internal Revenue Service bulletin allowing state agencies to establish their own reasonable requirements for commencing the process.  *See* Granville Decl., Exs. G & J.  Thus, regardless of whether the *Agreements* contemplate commencement of the Qualified Contract Process after 14 years of Section 42 compliance, applicable law *does not* in effect permit such an early trigger.  In other words, NYSHCR policy effectively renders the QC Clause unenforceable in its first year of eligibility.  Finally, even if applying for the process was indeed an irrevocable offer to sell the Property by the *Partnership*, the Option could still realistically be exercised such that Defendant redeems Saugatuck's interest in the Partnership and then continues to sell the property to a qualified purchaser.  Accordingly, permitting the Option to be exercised while the Qualified Contract Process is ongoing does not violate applicable law.[10]

---

[10] The Court notes that the parties dispute whether the Qualified Contract Process was in fact underway when Defendant purported to exercise its Option.  *See* Pltf.'s Mem. at 5; Def.'s Mem. at 12-14.  Specifically, Saugatuck argues that the process has been ongoing ever since the Partnership submitted an application to NYSHCR, *see* Pltf.'s Mem. at 5, whereas St. Mary's contends that NYSHCR's rejection of the submission halted the procedure.  *See* Def.'s Mem. at 12.  This dispute, however, is immaterial for the purposes of the instant motion because, as discussed herein, a reasonable reading of the Agreements permits Defendant to exercise the Option whether or not the Qualified Contract Process is underway.

Finally, Plaintiff argues that the QC Clause's inclusion of "notwithstanding any provisions of this agreement to the contrary" language deems it superior to the Option. *See* Pltf.'s Mem. at 12 (citing *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) ("under New York law, clauses similar to the phrase "notwithstanding any other provision" trump conflicting contract terms.") (collecting cases) (internal brackets omitted)).  This contention is similarly misplaced, as the clauses at issue do not *conflict*. As discussed above, the plain language of the Agreements arguably permits the Option to be exercised regardless of whether the Qualified Contract Process is pending, indicating that the relevant provisions are harmonious rather than contradictory.  Accordingly, Plaintiff has failed to establish that the its rights under the QC Clause are superior to Defendant's Option as a matter of law.

For the sake of completeness, the Court notes that the foregoing ambiguities also preclude interpreting the Agreements in Defendant's favor at this juncture. Notably, although failing to cross-move for summary judgment, St. Mary's opposition argues that it too is entitled to judgment as a matter of law.  *See, e.g.*, Def.'s Mem. at 2; DE [33] ("St. Mary's has not cross-moved for summary judgment…. Instead, St. Mary's has simply argued that, given the facts and law … the Court may appropriately enter summary judgment in St. Mary's favor").  To that end, however, Defendant improperly seeks to introduce a variety of evidence – in the form of ostensible expert opinion and parol evidence – to guide the Court's interpretation of the Agreements.   Indeed, although the ambiguity discussed above permits the

eventual examination of extrinsic evidence, the Court declines to consider such proof before discovery has commenced and in opposition to a motion seeking to interpret the Agreements based solely on their text. As a result, summary judgment in Defendant's favor is equally inappropriate. *See MCC Non Ferrous Trading Inc. v. AGCS Marine Ins. Co.*, No. 14-cv-8302, 2015 WL 3651537, at *3 (S.D.N.Y. June 8, 2015) ("granting summary judgment before the parties have engaged in discovery is disfavored") (internal citations omitted); *see also Cramer v. Devon Grp., Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991) ("Given the … ambiguity … in the … agreement, this Court will not grant [the defendant] summary judgment and prevent [the plaintiff] from proving that the ambiguous contract language was meant to guarantee [the rights it claims to be entitled to]").

As an initial matter, Defendant largely relies on its own manager, Granville, to explain the objectives of typical parties entering LIHTC ventures. *See generally* Granville Decl. ¶¶ 1-10; Def.'s Mem. at 3-5. Granville asserts that his 30 years of experience in the affordable housing industry and 20 years working in LIHTC partnerships renders him qualified to opine on the subject. *See* Granville Decl. ¶ 2. Although the Court takes no position on Granville's qualifications, it reiterates that no discovery – expert or otherwise – has taken place. As such, the Court declines to consider Defendant's interpretation of LIHTC customs without permitting Plaintiff to conduct discovery on this issue.

Moreover, building on its self-serving opinion concerning "typical" goals for entities entering LIHTC partnerships, St. Mary's relies on parol evidence from the

same witness, Granville, in urging the Court to consider the parties' intentions and allowing the Option to be exercised regardless of the status of the Qualified Contract Process. *See generally* Def.'s Mem at 5-6, 14-17; Granville Decl. ¶¶ 11-22. Specifically, rather relying solely on the text of the Agreements, Granville focuses on the parties' negotiations. *See*, *e.g.*, Granville Decl. ¶ 16 ("At the time we negotiated the LPA and Option Agreement, [we] discussed that the investor's primary investment goal was to receive tax benefits…. We also discussed that St. Mary's primary investment goal was to … receive the substantial balance of the residual value of the project and become the sole owner and operator of the [Property] …. We therefore negotiated the terms of the LPA to provide for [Plaintiff] to receive the majority of the tax benefits generated by the Partnership and for [Defendant] to receive the majority of any cash proceeds generated by the project…."); *id*. ¶ 17 (Plaintiff "agreed to be passive investors with limited rights related to the management of the Partnership"). Granville continues by describing how the Agreements were drafted in a manner that purportedly aligned with the parties' intention, but again fails to articulate how the text of the documents supports his interpretation. *See id*. ¶¶ 18-22. This attempt to introduce extrinsic evidence, however, reflects Defendant's implicit concession that the Agreements are ambiguous and will eventually require additional proof to interpret. Accordingly, the Court concludes that neither party is entitled to judgment interpreting the Agreements in their favor as a matter of law, and respectfully recommends denying Plaintiff's motion for partial summary judgment.

### B.  <u>Motion to Strike</u>

The Court further recommends denying Saugatuck's motion to strike portions of St. Mary's opposition without prejudice as moot, in light of the Court's determination that the Agreements are ambiguous absent reliance on the complained-of evidence. *Accord Doe v. Nat'l Bd. of Podiatric Med. Examiners*, No. 03-cv-4034, 2004 WL 912599, at *4 (S.D.N.Y. Apr. 29, 2004) (Rather than striking erroneous portions of an affiant's declaration, "a court may, in considering a motion for summary judgment, simply decline to consider those aspects of a supporting affidavit that do not appear to be based on personal knowledge or are otherwise inadmissible.") (citing *United States v. Private Sanitation Industry Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995); *Gatling v. Atlantic Richfield Co.,* 577 F.2d 185, 188 (2d Cir.1978); *Union Ins. Soc'y of Canton, Ltd. v. William Gluckin & Co.,* 353 F.2d 946, 952 (2d Cir.1965)).  Thus, the Court takes no position on Plaintiff's argument that various portions of the Granville Declaration and 56.1 Counterstatement violate various evidentiary rules, and notes that Saugatuck will have an opportunity to assert any evidentiary objections at the appropriate juncture.

## III.  Conclusion

For the reasons set forth above, the Court respectfully recommends that Plaintiff's motion for partial summary judgment be denied, and that its motion to strike be denied without prejudice as moot.

## IV.    Objections

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report.    Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:        Central Islip, New York
              January 22, 2020          /s/ Steven I. Locke
                                        STEVEN I. LOCKE
                                        United States Magistrate Judge