UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SAUGATUCK, LLC, *a Delaware limited*
*liability company*,

                          Plaintiff,

    -against-

ST. MARY'S COMMONS ASSOCIATES,
L.L.C., *a Delaware limited liability*
*company*,

                          Defendant.
------------------------------------------------------------x

**REPORT AND
RECOMMENDATION**
19-CV-217 (GRB)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

      Presently before the Court in this diversity-breach of contract action, on referral from the Honorable Sandra J. Feuerstein[1] for Report and Recommendation, are: (i) Defendant St. Mary's Commons Associated, L.L.C.'s ("Defendant" or "St. Mary's") motion for summary judgment as to Plaintiff Saugatuck, LLC's ("Plaintiff" or "Saugatuck") two causes of action for declaratory judgment and Defendant's counterclaims for breach of contract and declaratory judgment, *see* Defendant's Motion for Summary Judgment ("Defendant's Motion" or "Def. Mot."), Docket Entry ("DE") [95]; (ii) Plaintiff's partial motion for summary judgment seeking to dismiss both of Defendant's counterclaims, *see* Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims ("Plaintiff's Counterclaim Motion" or "Pl. Counter. Mot."), DE [122]; and (iii) Saugatuck's partial motion for summary judgment as to count two of its Complaint, which seeks a declaration as to how to calculate the purchase price

---

[1] This matter was transferred from Judge Feuerstein to Judge Gary R. Brown on June 3, 2021.

St. Mary's must pay for Plaintiff's interests in St. Mary's Commons Apartments, L.P., a limited partnership in which both parties are the only members ("the Partnership"), in connection with the exercise of the option pursuant to a May 22, 2003 Option Agreement between St. Mary's and the Partnership (the "Option Agreement"). *See* Plaintiff's Motion for Partial Summary Judgment on Count Two of Plaintiff's Complaint ("Plaintiff's Complaint Motion" or "Pl. Comp. Mot."), DE [124] (collectively with Plaintiff's Counterclaim Motion, "Plaintiff's Motions").

By way of Complaint dated January 11, 2019, Saugatuck, a Delaware limited liability company commenced this action against St. Mary's, also a Delaware limited liability company, seeking, *inter alia*, a declaratory judgment as to whether Defendant is entitled to exercise a contractual option to purchase Plaintiff's interest in the Partnership, which was formed to own and operate an affordable housing development in in Williamsville, New York (the "Apartment Complex" or "Property"). *See* Complaint ("Compl."), DE [1].[2]  St. Mary's counterclaimed, asserting that Saugatuck is in breach of contract for refusing to participate in the option process, and also seeking a declaratory judgment clarifying the parties' rights under their various agreements. *See* Defendant's Answer and Amended Counterclaim

---

[2] The pleadings adequately allege that diversity jurisdiction exists because the dispute is between citizens of different states and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332; Compl. ¶¶ 14, 15, 18. Specifically, Plaintiff is a citizen of Colorado and Massachusetts, *see* Compl. ¶ 14, and Defendant is *not* a citizen of either of those states. *Compare* Compl. ¶ 17 (alleging that St. Mary's is a citizen of New York) *with* Counterclaim ¶ 18 (asserting that Defendant is a citizen of New York and Florida). The fact that both parties are Delaware limited liability companies, unlike if they were both Delaware corporations, has no bearing on whether their citizenship is diverse. *See, e.g.*, *ICON MW, LLC v. Hofmeister*, 950 F. Supp. 2d 544, 546 (S.D.N.Y. 2013) ("With the exception of corporations, the citizenship of business entities is derived from the citizenship of all members of the entity.") (citing *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189, 110 S. Ct. 1015, 1018 (1990)).

("Counterclaim"), DE [20].  For the reasons set forth below, the Court respectfully recommends that:  (i) Defendant's Motion be denied; (ii) Plaintiff's Complaint Motion be granted; and (iii) Plaintiff's Counterclaim Motion be granted in part and denied in part.

## I.    BACKGROUND

### A.  <u>Relevant Facts</u>

The following facts are taken from the parties' pleadings, declarations, exhibits, and respective Local Rule 56.1 statements.  Unless otherwise noted, these facts are not in dispute.

#### 1.  **The Low-Income Housing Tax Credit Program**

In 1987, Congress enacted the Low-Income Housing Tax Credit program ("LIHTC") to promote the development of affordable housing.  *See generally* 26 U.S.C. 42 ("Section 42"); Defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("Def. 56.1"), DE [95-2], ¶ 1.  The LIHTC program enables companies to invest in and operate affordable housing developments in exchange for, among other things, tax credits and deductions arising out of reductions in capital accounts.  *See* Def. 56.1 ¶ 1; Plaintiff's Rule 56.1 Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims ("Pl. Counterclaim 56.1"), DE [122-2], ¶ 6.  The owners of LIHTC properties, such as the Apartment Complex at issue in this litigation, can claim tax credits offsetting various liabilities over a ten-year period, but must comply with Section 42's affordability restrictions for a period

of 15 years (the "Compliance Period") to avoid recapture of those credits.  *See* 26 U.S.C. §§ 42(a), (c)(2), (f)(1), (i)(1), (j); Def. 56.1 ¶ 2.  In an effort to attract capital, developers of affordable housing projects often "sell" the tax credits to private investors who have significant, predicable tax liability, in exchange for equity in the venture.  *See* Def. 56.1 ¶ 3 (citing Jill Khadduri, et al., *What Happens to Low-Income Housing Tax Credit Properties at Year 15 and Beyond?* at 2 (U.S. Dep't of Housing & Urban Dev. 2012) ("Khadduri")).

Since 1990, Section 42 has required LIHTC projects to remain affordable for an additional 15-year extended-use period (the "Extended Period") before affordability requirements are lifted.  *See* Khadduri at 6; Def 56.1 ¶¶ 2, 63; Plaintiff's Response to Defendant's Rule 56.1 Statement of Undisputed Material Facts and Statement of Additional Material Facts ("Pl. Opp. 56.1"), DE [116-1], ¶ 2.  Section 42, however, permits disposal of the asset during this time through a mechanism whereby the property owner can request that the applicable state agency – in this case the New York State Division of Homes and Community Renewal ("NYSHCR") – attempt to locate a buyer who will purchase the property and continue operating it as affordable housing for the remainder of the Extended Period (the "Qualified Contract Process").  *See* Def. 56.1 ¶¶ 63-66; Pl. Counterclaim 56.1 ¶ 40.  If the applicable state agency fails to find a suitable purchaser for the development after one year of searching, the Qualified Contract Process ceases and the Extended Period terminates, permitting the property owner to raise rents to market levels for units that are vacated thereafter.  *See* Def. 56.1 ¶ 65; Defendant's Response to Plaintiff's

Local Civil Rule 56.1 Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims ("Def. Counterclaim 56.1 Resp."), DE [122-40], ¶ 42.[3]

Pursuant to Section 42, the Qualified Contract Process can be commenced at any time following the fourteenth year of the Compliance Period. *See* Def. Counterclaim 56.1 Resp. ¶ 43. NYSHCR, however, does not accept applications unless they include 15 years of Audited Financial Statements. *See* November 11, 2020 Declaration of Eric S. Pettit in Support of Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims ("Pettit Dec."), DE [122-3], Exhibits ("Exs.") T, DE [122-23], U, DE [122-24]. Although NYSHCR's implementing regulations provide that a request to initiate the Qualified Contract Process constitutes an "irrevocable offer to sell" the development, the agency nevertheless permits an owner to reject a viable offer or withdraw its application entirely with the caveat that doing so forecloses any future opportunities to sell the property through this mechanism and, in turn, requires the developer to comply with Section 42's affordability requirements for the remainder of the Extended Period. *See* Def. 56.1 ¶ 67; New York Comp. Codes R. & Regs. tit. 9 § 2040.5(c) (2021).

---

[3] The Qualified Contract Process contains a formula that requires the selling price of an eligible property to equal, "(i) the sum of (I) the outstanding indebtedness secured by, or with respect to, the building, (II) the adjusted investor equity in the building, plus (III) other capital contributions not reflected in the amounts described in subclause (I) or (II), reduced by (ii) cash distributions from (or available for distribution from) the project." 26 U.S.C. § 42(h)(6)(F).

2. **The Parties and Their Agreements**

Saugatuck and St. Mary's are partners in the Partnership, which owns the Apartment Complex and was formed in 2003 to provide affordable housing while generating LIHTC credits pursuant to Section 42. *See* Def. 56.1 ¶ 12; Pl. Counterclaim 56.1 ¶¶ 1, 3-4. The Partnership is governed by an Amended and Restated Agreement of Limited Partnership, date May 22, 2003 (the "LPA"), and is comprised of a General Partner, St. Mary's, and an Investor Limited Partner and Special Limited Partner, both Saugatuck (together, the "Limited Partners").[4] *See* Def. 56.1 ¶¶ 24-25; *see also* the LPA, annexed as Ex. 2 to the Declaration of David A. Davenport in Support of Defendant's Motion for Summary Judgment ("Davenport Dec."), DE [96]. Plaintiff maintains that the LPA was drafted to comply with Section 42 and with Title 26 of the Code of Federal Regulations (the "Tax Regulations"), including 26 C.F.R. § 1.704-1(b) ("Section 1.704-1(b)"). *See* Plaintiff's Rule 56.1 Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Partial Summary Judgment on Count Two of Plaintiff's Complaint ("Pl. Compl. 56.1"), DE [124-2], ¶ 11; LPA at Article ("Art.") I. As Investor Limited Partner, Plaintiff's predecessor made initial capital contributions to the Partnership totaling $7,239,724. *See* Pl. Compl. 56.1 ¶ 17. This money was invested in exchange for equity and the right to realize the allotted tax credits. *See id.* at ¶ 15. As General Partner, St. Mary's

---

[4] Plaintiff is the successor-in-interest to both RCC Credit Facility, L.L.C. ("RCC") (the original Investor Limited Partner) and Related Direct SLP, L.L.C. ("Related Capital") (the original Special Limited Partner) (together, the "Original Investment Partners"). *See* Compl. ¶ 1. Saugatuck purchased the Original Investment Partners' interest in the Partnership in January 2019. Pl. Opp. 56.1 ¶ 42. Plaintiff is used interchangeably with the Original Investment Partners herein.

contributed $1 to the Partnership as an initial capital contribution. *See* Pl. Compl. 56.1 ¶ 18.

Pursuant to the LPA, as General Partner, Defendant is responsible for operating and maintaining the Apartment Complex such that it qualifies for the tax credits afforded by Section 42. *See* Pl. Counterclaim 56.1 ¶¶ 4, 11; LPA § 5.2.B. Defendant is compensated for its management of the Property *via* management fees. *See id.* Moreover, the General Partner is required to prepare an accurate audited financial statement for each year of the Compliance Period, as well as maintain complete and accurate books of accounts that list every transaction of the Partnership. *See* LPA §§ 7.3.C, 7.2. The General Partner cannot terminate, amend or modify any Project Document – defined to include any document "related to the financing, development, construction, use or operation of the Apartment Complex" – nor amend or modify the LPA, without the written consent of the Special Limited Partner. *See id.* at Art. I, §§ 5.5.B(v), 14.12.A.

The LPA further provides that the General Partner must "promptly upon transmission or receipt provide the Special Limited Partner with copies of all correspondence, notices and reports sent pursuant to and received under the Project Documents or any Authority with respect to the Apartment Complex," and comply with all governmental agreements." *See id.* at §§ 5.2.A(ix), 5.10. The Partnership and the NYSHCR are parties to a May 22, 2003 Regulatory Agreement, under which the Partnership must submit to NYSHCR three copies of the annual audited financial

statements within 90 days of the end of any fiscal year. *See* Pl. Counterclaim 56.1 ¶¶ 22-23; Pettit Dec. Ex. G, DE [122-10].

### a. The Qualified Contract Process

The LPA permits Saugatuck to compel St. Mary's to initiate the Qualified Contract Process (and, if applicable, accept a qualifying offer) at any time following the fourteenth year of the Compliance Period (*i.e.*, January 1, 2018). *See* Pl. Counterclaim 56.1 ¶¶ 39-40. Specifically, the LPA provides that:

> Notwithstanding any provision of this Agreement to the contrary, the Special Limited Partner shall have the right at any time after the fourteenth year of the Compliance Period (A) to require, by written notice to the General Partner, that the General Partner promptly submit a written request to [NYSHCR] pursuant to . . . Section 42(h)(6)(I) that [NYSHCR] endeavor to locate within one year from the date of such written request a buyer who will continue to operate the Property as a qualified low-income building at a purchase price that is not less than the debt encumbering the Property plus the Partnership's equity in the Property (adjusted for cost-of-living increases as permitted by . . . Section 42(h)(6)(G)), and (B) in the event [NYSHCR] locates such a buyer, to compel the General Partner to accept such buyer's offer to purchase the Property.

LPA § 5.4.B(i) (the "QC Clause"). Alternatively, the LPA permits Saugatuck to require St. Mary's to "promptly use its best efforts to obtain a buyer for the Apartment Complex on the most favorable terms then obtainable" at any time after the end of the Compliance Period. *See id.* at § 5.4.B(ii).

### b. The Option Agreement

The Partnership and St. Mary's are also parties to an Option Agreement, dated May 22, 2003 (the "Option Agreement," and together with the LPA, the

8

"Agreements"), and executed concurrently with the LPA.[5]  *See* Def. 56.1 ¶ 36; the Option Agreement, Pettit Dec. Ex. H, DE [124-11].  The Option Agreement grants Defendant the opportunity to either purchase the Apartment Complex for a price determined pursuant to that contract, or to have the Partnership redeem Plaintiff's interest therein at a price that would put Saugatuck in the same economic position as if Defendant bought the Property (the "Option").  *See* Def. 56.1 ¶ 37; Pl. Compl. 56.1 ¶ 26; Option Agreement Arts. I-II.  The Option is subject to a two-year term, commencing following the last day of the Compliance Period (*i.e.*, January 1, 2019 – one year after the QC Clause becomes effective).  *See* Def. 56.1 ¶ 38; Pl. Compl. 56.1 ¶ 27; Option Agreement Art. II.  The Option Agreement further provides that the closing of any sale of the Apartment Complex to St. Mary's shall occur no more than 180 days after Defendant gives the Partnership written notice that it is exercising the Option.  *See* Option Agreement Art. V.  The Option Agreement further grants St. Mary's a right to reform the contract to:

> provide for a redemption by the [Partnership] of the limited partnership interests in the [Partnership] of the Limited Partners in lieu of a purchase by [Defendant] of the [Property]; <u>provided</u>, <u>however</u> that the economic, tax and other material consequences of the transaction for each of the Limited Partners shall not be materially adversely altered thereby, and provided further that the redemption price shall equal the amount otherwise payable to the

---

[5] Notwithstanding this Court's finding in the 2020 R&R that, "instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument," *see* DE [42] at 6, n. 4 (citing *WA Corp. v. Alltrans Exp. U.S.A., Inc.*, 112 A.D.2d 850, 852, 493 N.Y.S.2d 1, 3 (1st Dep't 1985) (citing *Nau v. Vulcan Rail & Construction Co.*, 286 N.Y. 188, 197, 36 N.E.2d 106, 110 (1941))), the parties no longer agree that the Agreements should be read as a single document. *See* Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def. Mem."), DE [95-1], 17-18; Plaintiff Saugatuck LLC's Opposition to Defendant St. Mary's Commons Associates, L.L.C.'s Motion for Summary Judgment ("Pl. Opp."), DE [116], 3-4.

> Limited Partners as if the fee title to the [Apartment Complex] had been acquired under Article IV and the mortgages were satisfied or otherwise paid or assumed.

*Id*. at Art. VII (emphasis in original).

The Agreements provide that they are to be interpreted under New York law. *See* LPA § 14.1; Option Agreement Art. X(f).

c.  The PILOT Amendment

On or about August 26, 2016, St. Mary's caused the Partnership to execute a First Amendment of Property Tax Exemption Agreement with the Town of Amherst, County of Erie, and Williamsville Central School District (the "PILOT Amendment"). *See* Def. Counterclaim 56.1 Resp. ¶ 29.

The PILOT Amendment provides that, for an additional 15 years following the end of the Compliance Period:

> [R]ental rates charged for the [Apartment Complex] shall not exceed the maximum amount established or allowed by any applicable law, and the Project will be operated in conformance with the provisions of Article V of the [New York Private Housing Finance Law]; and [] the Project will be operated in compliance with any regulatory agreement entered into between the Partnership and New York State Housing Finance Agency in connection with the allocation and use of federal low-income housing tax credits under Section 42 of the Internal Revenue Code of 1986.

Pettit Dec. Ex. I, DE [122-12], at 2-3.

Defendant provided the PILOT Amendment to the Limited Partners on February 3, 2017, and on February 16, 2017, the Limited Partners informed St. Mary's that it had "materially breached its fiduciary duty and the LPA" by entering the PILOT Amendment and requested copies of all correspondence and documents

relating to the PILOT Amendment, which Defendant provided during discovery in this action.  *See* Def. Counterclaim 56.1 Resp. ¶¶ 31-34.  St. Mary's maintains that the Original Investment Partners were on notice of the PILOT Amendment.  *See* Def. Counterclaim 56.1 Resp. ¶¶ 31-34.

### d. The Parties Exercise Their Rights Under the Agreements

On January 10, 2018, Plaintiff exercised its right to compel Defendant to initiate the Qualified Contract Process with NYSHCR.  *See* Pl. Counterclaim 56.1 ¶ 50.  Plaintiff maintains that the Qualified Contract price for the Apartment Complex is $14,162,341, a position which Defendant does not contest.  *See* Pl. Opp. 56.1 ¶ 53; Def. Counterclaim 56.1 Resp. ¶ 53.  At Saugatuck's instruction, St. Mary's submitted preliminary and formal Qualified Contract applications to NYSHCR on February 6, 2018 and September 4, 2018, respectively.  *See* Def. 56.1 ¶¶ 72-73.

Plaintiff maintains that Defendant did not prepare an audited financial statement and did not obtain a written waiver of its obligation to do so from the Limited Partners, nor from NYSHCR.  *See* Pl. Counterclaim 56.1 ¶¶ 25-27.  St. Mary's, on the other hand, contends that it was not required to obtain any written waiver of its obligation to prepare audited financial statements.  *See* Def. Counterclaim 56.1 Resp. ¶¶ 25-27.  Within a month of the formal application, NYSHCR wrote to Defendant, stating that it would need 15 years of Audited Financial Statements (*i.e.*, through December 31, 2018) before considering the submission.  *See* Pl. Counterclaim 56.1 ¶ 60.  Accordingly, NYSHCR instructed St. Mary's to resubmit its application once it possessed the requisite documents.  *See id.*

11

St. Mary's maintains that no members of the Partnership were aware that 15 years of audited financial statements were required for the Qualified Contract application until the NYSHCR informed them in 2018. *See* Def. 56.1 ¶ 78. Defendant submitted the Partnership's 2019 audited financials to NYSHCR on April 16, 2019. *See id.* at ¶ 81.

On April 25, 2019, NYSHCR informed the Partnership that the review of the application could not proceed until a revised Qualified Contract price calculation was submitted, which Plaintiff authorized. *See id.* at ¶¶ 82-84. On October 29, 2019, after compiling additional and revised reports, St. Mary's submitted the revised Qualified Contract application, and on March 2, 2020, NYSHCR informed Defendant that the Qualified Contract Process would commence. *See id.* at ¶¶ 86-88.

On January 1, 2019, St. Mary's sent a letter to Saugatuck asserting that it was exercising its Option by electing to reform the Option Agreement to provide for a redemption by the Partnership of Plaintiff's interest therein. *See* Pettit Dec. Ex. CC, DE [122-32]; Pl. Counterclaim 56.1 ¶ 71. According to an appraiser St. Mary's hired, the fair market value of the Apartment Complex is $4,875,000 (*i.e.*, more than $8,000,000 less than the minimum price that the Property would sell for in the Qualified Contract Process). *See* Def. 56.1 ¶ 92.

      e.   Calculation of the Option Price

LPA Sections 9.2 and 12 govern the calculation of the Option price. Section 9.2, entitled "Distribution and Application of Cash Flow and Proceeds From Sale or Refinancing Transactions," dictates the distribution and application of cash flow and

proceeds from sale or refinancing transactions, which are defined to include proceeds received from a sale of all or substantially all of the Partnership's assets. *See* LPA § 9.2. According to LPA Section 9.2.B, subject to LPA Sections 9.2.D and 12.4, the proceeds of "Sales and Refinancing Transactions" shall be applied in the following order of priority:

    i.   To the payment of all of the expenses of such Sale or Refinancing Transaction, and, with regard to damage recoveries or insurance or condemnation proceeds (other than for temporary loss of use), to the payment of all repairs, replacements or renewals resulting from damage to or partial condemnation of the affected property;

    ii.   To the payment of all debts and obligations of the Partnership due upon the occurrence of such Sale or Refinancing Transaction other than amounts owing to Partners;

    iii.   To establish such reserves as the General Partner in its sole discretion determine[s] to be reasonably necessary for any contingent or foreseeable liability or obligation of the Partnership; provided, however, that the balance of any such reserve remaining at such time as the General Partners shall reasonably determine that such reserve is no longer necessary shall be distributed in accordance with subparagraphs (iv) through (ix) of this Section 9.2.B;

    iv.   To pay the difference, if positive, between any accrued but unpaid Management Fees (described in Section 8.1.B) and an amount equal to any accrued and unpaid Credit Reduction Payments;

    v.   To the Limited Partners, an amount or amounts equal to the unpaid balance of any Voluntary Loan made by them and to the General Partner, to pay the difference, if positive, between an amount or amounts equal to the unpaid balance of any Voluntary Loan made by it and an amount equal to any accrued and unpaid Credit Reduction Payments;

vi.   To the Special Limited Partner, an amount equal to any accrued Annual Local Administrative Fees pursuant to the terms of Section 6.3 hereof;

vii.  To the Guarantor, to pay the difference, if any, between an amount or amounts equal to the unpaid balance of any Operating Loan made by it and an amount equal to any accrued and unpaid Credit Reduction Payments;

viii. To the Developer to pay the difference, if positive, between any accrued and unpaid principal and interest on the Deferred Development Fee and an amount equal to any accrued and unpaid Credit Reduction Payments; and

ix.   The balance, if any, 24.99% to the Investor Limited Partner, .01% to the Special Limited Partner and 75% to the General Partner (reduced by an amount equal to any accrued and unpaid Credit Reduction Payments, which amount shall be distributed 99% to the Investor Limited Partner and 1% to the Special Limited Partner).

LPA § 9.2.B (emphasis in original).

Under the LPA, "Sale or Refinancing Transaction Proceeds" are defined as "all cash receipts of the Partnership arising from a Sale or Refinancing Transaction (including principal and interest received on a debt obligation received as consideration, in whole or in part, on a Sale or Refinancing Transaction) less any deductibles or expenses incurred in connection therewith."  LPA Art I.

Section 12 of the LPA governs the partnership's dissolution and termination, while Section 12.1.D provides that the "sale or other disposition of all or substantially all of the assets of the Partnership" constitutes an "Event[] Which Cause[s] a Dissolution."

Upon dissolution, the actions of the Liquidating Agent, defined as the General Partner, are set forth under Section 12.2, and include:  (a) facilitation and supervision

of the liquidation of the Partnership "in accordance with this Article XII and the Uniform Act [defined as the Uniform Limited Partnership Act, *see* N.Y. P'ship Law § Ch. 39, art. 8]; (b) possession of the "rights in connection with the liquidation and termination of the Partnership that a general partner would have with respect to the assets and liabilities of the Partnership during the term of the Partnership"; (c) express authorization and empowerment "to effectuate the liquidation and termination of the Partnership and the transfer of any assets and liabilities of the Partnership"; (d) a revocable right "to delegate to one or more persons any or all of such rights and powers and the authority and power to execute documents in connection therewith," to "fix the reasonable compensation of each such person"; and (e) express authorization "to distribute the Partnership's property to the Partners subject to liens." LPA § 12.2 (emphasis in original).

According to the LPA, upon a liquidating event, the Liquidating Agent shall "'liquidate the assets of the Partnership as promptly as shall be practicable," and "[t]o the extent the proceeds are sufficient therefor, as the Liquidating Agent shall deem appropriate, the proceeds of such liquidation shall be applied in accordance with the provisions of Section 9.2.B(i) through (viii)" and "the balance of such proceeds shall be distributed by the Liquidating Agent to the Partners pro rata in accordance with their respective Capital Accounts, as such accounts are determined after all adjustments are made as required…for the taxable year of the Partnership during which the liquidation occurs." LPA § 12.4.A.

As of December 31, 2018, the Investor Limited Partner had a positive capital account balance of $3,927,830 and the Special Limited Partner had a negative Capital account balance of $331, for a combined positive capital account balance of $3,927,499, and the General Partner had a negative capital account balance of $331. Pl. Compl. 56.1 ¶¶ 20-23. Subsequently, St. Mary's calculated the Option price as $242,064.39 by applying Section 9.2.B of the LPA to the appraised fair market value. *See* Def. 56.1 ¶ 93. Plaintiff's appraisal calculated the Property's fair market value with affordability restrictions as $3,700,000. *See id.* at ¶ 95.

### B. **Procedural History**

Saugatuck commenced this action against St. Mary's on January 11, 2019. *See* Compl. The Complaint – seeking declaratory, compensatory, punitive and equitable relief – asserts two causes of action seeking declaratory judgments: (i) that Defendant is prohibited from exercising the Option while the Qualified Contract is pending; and (ii) clarifying the price St. Mary's must pay if it is permitted to invoke the Option. *See* Compl. ¶¶ 52-67. Defendant filed its Counterclaim on February 14, 2019, also asserting two causes of action for: (a) breach of contract in connection with Plaintiff's alleged failure and refusal to perform in accordance with the Option Agreement; and (b) a declaratory judgment clarifying the parties' rights and obligations under the Agreements. *See* Counterclaim ¶¶ 86-99.

On March 22, 2019 St. Mary's served Saugatuck with a motion for a preliminary injunction tolling the period of time to exercise the Option. *See* DEs [25], [29]. On April 10, 2019, Defendant withdrew its motion in light of the parties'

stipulating to toll the Option period until the earlier of: (1) a determination by this Court as to the validity of St. Mary's exercise thereof; (2) an agreement by the parties to resolve the instant dispute; or (3) further order of this Court. *See* DEs [29], [30]. On May 31, 2019, Plaintiff filed a motion for partial summary judgment, seeking a pre-discovery adjudication of its first cause of action, which was referred to this Court on June 3, 2019. *See* DE [34]; June 3, 2019 Electronic Referral Order.

In its January 22, 2020 Report and Recommendation (the "2020 R&R"), this Court denied Plaintiff's motion, as well as its May 31, 2019 motion to strike portions of St. Mary's opposition (DE [35]). *See* DE [42]. The Court concluded that the QC Clause does not explicitly state that Plaintiff's interest in the Partnership cannot be transferred pursuant to the Option once the Qualified Contract process commences, and that the Option Agreement is silent as to whether it can be invoked while the Qualified Contract process is pending or while Saugatuck still has rights under the QC Clause. *See id.* at 16. The Court further rejected the parties' opposing interpretations of the agreements as necessitating inferences regarding the parties' intent that are not clear from the language of the agreements. *See id.* at 17. The 2020 R&R concluded that St. Mary's exercise of the Option prior to completion of the Qualified Contract Process would not render the QC Clause meaningless, and that there existed a factual dispute as to the parties' intent and the economic realities of the Partnership under the Agreements. *See id.* at 17-18. Finally, the Court rejected Plaintiff's contention that federal and state laws governing LIHTC render the QC Clause superior to the Option. *See id.* at 19-20.

17

Judge Feuerstein adopted the 2020 R&R on May 19, 2020. *See* DE [47]. Following that decision, the parties conducted discovery. The parties filed the instant motions on December 9, 2020. *See* Def. Mem.; Memorandum of Law in Support of Plaintiff Saugatuck LLC's Motion for Summary Judgment on Defendant St. Mary's Commons Associates, L.L.C.'s Counterclaims ("Pl. Counterclaim Mem."), DE [122-1]; Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment on Count Two of Plaintiff's Complaint ("Pl. Compl. Mem."), DE [124-1]. All three motions are opposed. *See* Pl. Opp.; Defendant St. Mary's Commons Associates, L.L.C.'s Omnibus Memorandum of Law in Opposition to Plaintiff's Motions for Summary Judgment and Partial Summary Judgment ("Def. Opp."), DE [122-39]. Judge Feuerstein referred these motions for report and recommendation on December 9 and 10, 2020. *See* December 19, 2020 Electronic Referral Order; December 10, 2020 Electronic Referral Order.

For the reasons set forth herein, the Court respectfully recommends that: (i) Defendant's Motion be denied; (ii) Plaintiff's Complaint Motion be granted; and (iii) Plaintiff's Counterclaim Motion be granted in part and denied in part.

## II. **LEGAL STANDARD**

Pursuant to Fed. R. Civ. P. 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing that there are no issues of material fact such that summary judgment is appropriate. *See Huminski v. Corsones*, 396 F.3d 53, 69

(2d Cir. 2004). In deciding a motion for summary judgment, the Court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) (holding that a motion for summary judgment should be denied if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the movant has met its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (internal quotation omitted); *see also Maxton v. Underwriter Labs., Inc.*, 4 F. Supp. 3d 534, 542 (E.D.N.Y. 2014) ("An issue of fact is considered 'genuine' when a reasonable finder of fact could render a verdict in favor of the non-moving party").

In determining whether summary judgment is warranted, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986); *see also Artis v. Valls*, No. 9:10-cv-427, 2012 WL 4380921, at *6, n. 10

19

(N.D.N.Y. Sept. 25, 2012) ("It is well established that issues of credibility are almost never to be resolved by a court on a motion for summary judgment").

## III.  DISCUSSION

Applying the standards set forth above, and for the reasons set forth below, the Court respectfully recommends that:  (i) Defendant's Motion be denied; (ii) Plaintiff's Complaint Motion be granted; and (iii) Plaintiff's Counterclaim Motion be granted in part and denied in part.

### A.  Standards for Interpreting the Agreements

As a threshold matter, and consistent with the Agreements' terms, the Court applies New York law to the parties' dispute.  *See* LPA § 14.1; Option Agreement Art. X(f); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000) ("New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.") (internal citation omitted).  Under New York law, a written contract ordinarily "should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 443 (1990).  Thus, "words and phrases are given their plain meaning" such that an agreement is "construed so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (citing *American Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied*, 77 N.Y.2d 807, 569 N.Y.S.2d 611 (1991) (internal

quotations and brackets omitted). In this regard, "[t]he 'primary objective' in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language of the agreement at issue." *Quinio v. Aala*, 344 F. Supp. 3d 464, 471 (E.D.N.Y. 2018) (quoting *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993)); *see also Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use.") (citing *Slatt v. Slatt,* 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645 (1985)).

Accordingly, "it is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443 ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing") (collecting cases)). An agreement's language is unambiguous "if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95 (2d Cir. 2015) (internal quotation and citation omitted).

Conversely, if an agreement's terms *are* ambiguous, courts "may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *Bank of New York Tr. Co. v. Franklin Advisers, Inc.*,

726 F.3d 269, 276 (2d Cir. 2013) (internal citation omitted).  A contract is ambiguous "if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) (internal citation omitted); *see also Quinio*, 344 F. Supp. 3d at 471 ("Contractual language is ambiguous if it is susceptible to more than one reasonable interpretation") (citing *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts."  *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443); *see also Sayers*, 7 F.3d at 1094 ("Ascertaining whether or not a writing is ambiguous is a question of law for the trial court") (internal citations omitted).  "When making [the] threshold determination [of whether a contract is ambiguous], the court must read the disputed provision within the context of the entire agreement and must safeguard against adopting an interpretation that renders another provision superfluous." *Quinio*, 344 F. Supp. 3d at 471 (citing *Sayers*, 7 F.3d at 1095).  "If the court determines that the provision is ambiguous, it must then determine whether there is extrinsic evidence regarding the parties' intent." *Quinio*, 344 F. Supp. 3d at 471 (citing *Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 884 (2d Cir. 1995)).  Thus, "[w]here the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is

inappropriate." *Seiden Assocs., Inc.*, 959 F.2d at 428 (internal citations omitted); *see also Bank of Am. Nat. Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985) ("Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact.   Summary judgment is therefore inappropriate.") (internal citations omitted).   In other words, a motion for summary judgment in a contract dispute "may be granted only where the agreement's language is unambiguous and conveys a definite meaning." *Sayers*, 7 F.3d at 1094.

## B. **Defendant's Motion**

### 1. **Defendant's Exercise of its Purchase Option While the Qualified Contract Process is Pending**

Initially, Defendant moves for summary judgment as to Plaintiff's first cause of action, and argues that it is "entitled to exercise its Option at any time" during the Qualified Contract Process.   Def. Mem. at 13-16.   Notwithstanding St. Mary's assertions, however, it fails to establish the lack of a genuine dispute of material facts necessary to overcome the ambiguities inherent in the Agreements.   Accordingly, summary judgment in St. Mary's favor on Saugatuck's first cause of action is inappropriate, and the Court respectfully recommends that Defendant's motion for summary judgment on this claim be denied.

At the outset, the Court concludes, as it did in the 2020 R&R[6], that the interplay between the QC Clause and the Option, including whether either provision

---

[6] In the 2020 R&R, the Court concluded that: (i) the QC Clause does not explicitly restrict Plaintiff from transferring its interest in the Partnership pursuant to the Option once the Qualified Contract process has begun; (ii) that the Option Agreement is silent as to whether the Option can be invoked while the Qualified Contract process is pending or while Saugatuck still has rights under the

is superior to the other, is ambiguous such that the Agreements cannot be interpreted as a matter of law. This fact alone provides sufficient grounds for the Court to recommend denying St. Mary's motion for summary judgment as to Saugatuck's first cause of action. *See, e.g.*, *Farley v. Davis*, No. 91-cv-5530, 1994 WL 167944, at *4 (S.D.N.Y. May 2, 1994) ("In a contract dispute a motion for summary judgment may be granted only where the agreement's language is unambiguous") (internal quotation and citations omitted).

This conclusion is further supported by the extrinsic evidence proffered by the parties. St. Mary's submits evidence that it maintains "prove[s] that the original parties to the LPA *never* intended for the Option to be subordinate to the QC right." Def. Mem. at 13 (emphasis in original). To this end, Defendant cites the testimony of Eric Trucksess ("Trucksess"), "the representative of RCC Credit and Related Direct (the original limited partners) who, on the limited partners' behalf, negotiated the Agreements with St. Mary's," *id.* at 11, that the Option was a material term to the LPA while the QC Clause is merely a "standard provision" for "[LIHTC] deals done in general" that was "part of the form documents" and never discussed in the parties' negotiations. *See* Davenport Dec. Ex. 63 at ¶¶ 83-84, 113, 157-58, 167-68, 174-77, 183-84. In addition to Trucksess's testimony, Defendant relies on a pre-LPA execution presentation prepared for Related Capital's internal investment committee that references the Option, but fails to explicitly mention the QC Clause. *See*

---

QC Clause; and (iii) that there existed questions of fact as to the parties' intent and the economic realities of the Partnership under the Agreements. *See* 2020 R&R at 16-18.

Davenport Dec. Ex. 4. This evidence, according to St. Mary's, establishes that the parties intended for the Option to be superior in priority to the QC Clause. *See id.*

In opposition, Saugatuck relies on evidence that Thomas Granville, who negotiated the Agreements with Trucksess on St. Mary's behalf, requested the Qualified Contract right be removed from the LPA based upon his (Granville's) recognition that the Qualified Contract provision could be interpreted as impacting St. Mary's Option right, indicating that the term was material to the Agreements. *See* August 19, 2020 Deposition Transcript of Thomas G. Granville, Davenport Dec. Ex. 64, DE [115], at 120-21. Plaintiff also submits the expert report of John Mackey, a Certified Public Accountant with 30 years of LIHTC experience, stating that a Qualified Contract process is "extremely important" to LIHTC limited partners and "contributes to the value" of their investment because the Qualified Contract process results either in: (i) a sale of the property at a statutorily determined price that ensures the return of Partnership equity; or (ii) in the phased removal of affordability restrictions, which can "substantially increase the residual value of the investor limited partner's investment in that property." *See* Pettit Dec. Ex. BB, DE [122-31].

A review of the parties' evidence not only fails to resolve any issues of fact as to the parties' intentions regarding the interaction between the QC Clause and the Option Agreement, but further highlights the Agreements' ambiguity – and issues of fact – as to this interplay. Accordingly, the Court respectfully recommends denying Defendant's motion for summary judgment as to Plaintiff's first cause of action.

### 2. Calculation of the Option Price

Both parties next move for summary judgment as to Plaintiff's second cause of action, through which Saugatuck seeks a declaratory judgment that the price Defendant must pay in connection with the exercise of its Option must be calculated using the liquidation waterfall found under Section 12.4 of the LPA. *See* Pl. Compl. Mem. at 11-19. In opposition, St. Mary's maintains that the Option price should be calculated using the LPA's sale proceeds waterfall under Section 9.2.B. *See* Def. Mem. at 16-23.

Initially, the Court concludes that the relationship between Section 9.2 and Section 12 of the LPA is not ambiguous. Rather, the two provisions reference each other and are to be read together. *See Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002) (even where "two document are contemporaneous and related," the "[g]eneral canons of contract construction require that where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect" (internal quotation marks omitted)); *see also Westminster Sec. Corp. v. Petrocom Energy Ltd.*, 456 F. App'x 42, 43 (2d Cir. 2012) ("The rules of contract construction require us to adopt an interpretation which gives meaning to every provision of the contract." (internal citations omitted)); *Kinek v. Paramount*, 22 F.3d 503, 509 (2d Cir. 1994) (contracts should be read as a "harmonious whole").

The parties do not dispute the priority of the application of points (i) through (viii) of Section 9.2.B to St. Mary's exercise of the Option. The parties' disagreement

centers around the priority of the next steps and subsequent distribution of proceeds. On one hand, Saugatuck argues that the application of Section 9.2.B's first eight steps would effectively result in a sale of the Property from the Partnership to Defendant, thereby triggering an explicit "event of dissolution" under LPA Section 12.1.D and requiring the remaining Partnership proceeds to be distributed to the partners *pro rata*, in accordance with their respected capital accounts, pursuant to Section 12.4. *See* Pl. Opp. at 20-22.  Plaintiff asserts that this calculation applies even when, as here, St. Mary's opts to reform its purchase right, relying on Article VII of the Option Agreement, which states that the Option price is that which the Limited Partners would receive if the Property had been sold, thereby triggering liquidation.  *See id.*

In response, Defendant maintains that while Section 9.2.B is "subject to" Section 12.4, the latter is triggered only upon the happening of an event of dissolution, which an exercise of the Option is not.  St. Mary's contends that while a sale of the Property is an event of dissolution, the sale must be completed, with sale proceeds distributed under Section 9.2.B before an event of dissolution has occurred – in other words, Section 12.4 applies only *after* the Property's sale and dissolution, to ensure the Partnership's remaining assets are liquidated and the proceeds of the liquidation are distributed.  *See* Def. Mem. at 17-18.  Therefore, the balance remaining after applying Section 9.2.B(viii) would be distributed 75 percent to the General Partner (St. Mary's) and 25 percent to the Limited Partners (Saugatuck).  *See id.*

Based on a review of the Agreements, the Court concludes that Section 12.4 governs St. Mary's exercise of its Option, including any reform of the Option's

purchase component.  Were the Court to hold otherwise, it would be ignoring the LPA's explicit text, namely:  (i) Section 9.2.B's preamble that it is to be interpreted and applied "[s]ubject to the provisions of Sections 9.2.D and 12.4"; and (ii) Section 12.1.D, which specifically lists "[t]he sale of other disposition of all or substantially all of the assets of the Partnership" as an event that immediately causes a dissolution of the Partnership.  Moreover, the Court notes that neither party disputes the testimonial evidence proffered by Saugatuck's expert – David Von Tilius – that the Property comprises "substantially all of the assets of the Partnership."  *See* Petit Decl., Ex. L (Expert Report of David Von Tilius), DE [124-15]; Def. Mem. at 17 ("It is undisputed that the Property makes up substantially all of the Partnership's assets.").  Further, the LPA's text and the parties' agreement regarding Von Tilius's opinions do not mean that the Partnership is presently in liquidation, merely that the calculation of St. Mary's price to exercise its purchase or reform rights under the Option should be based on a hypothetical liquidation scenario.

In reaching this conclusion, the Court recognizes, but declines to adopt, Defendant's argument that if Section 12.4 were to apply, Section 9.2.B(ix) would be rendered practically superfluous because it would rarely, if ever, apply to a sale of the Property, even if the Partnership had not yet been dissolved.  *See* Def. Mem. at 21. While Section 9.2.B does not apply to the parties' current dispute, the Court's opinion does not render it superfluous.  In fact, it would apply to the proceeds of a transaction or event not explicitly listed as one of Section 12.1's dissolution-causing events where

"any balance" remained after the completion of such a transaction.  *See* LPA § 9.2.B(ix).

Accordingly, the Court respectfully recommends granting Saugatuck's partial motion for summary judgment, and denying St. Mary's motion for summary judgment, as to Plaintiff's second cause of action.

## C. **Defendant's Counterclaims**

Further, both parties move for summary judgment as to Defendant's counterclaims for:  (i) breach of contract; and (ii) a declaratory judgment that Section 9.2.B should govern the calculation of the price Defendant must pay in connection with the exercise of its Option.  The Court recommends that both parties' motions for summary judgment on Defendant's first counterclaim be denied, because issues of material fact exist such that summary judgment would be inappropriate.  Further, based on the above conclusion that Section 12.4 – and not Section 9.2.B – applies to the cost associated with Defendant's exercise of its Option, the Court finds that summary judgment in Saugatuck's favor as to St. Mary's second counterclaim is appropriate, while Defendant's motion for summary judgment on that counterclaim fails for the same reason.  Accordingly, the Court respectfully recommends granting Plaintiff's partial motion for summary judgment only as to part of Defendant's second counterclaim and denying Defendant's Motion as to its counterclaims.

St. Mary's first counterclaim seeks a finding that the Option was validly and effectively exercised, that Plaintiff was therefore required to transfer the Limited Partner Interests by redemption within 180 days, and that Saugatuck breached its

obligations under the Option Agreement by refusing to participate in the appraisal process and not transferring those interests, and seeks an order for specific performance requiring the Limited Partners to transfer their interests in the Partnership to Defendant. *See* DE [20] at ¶¶ 86-91. While Saugatuck argues that St. Mary's first counterclaim fails because Defendant: (i) breached the LPA when it failed to prepare all required audited financial statements and maintain financial records; (ii) delayed the Qualified Contract Process; and (iii) committed the Partnership to the PILOT Amendment without the Special Limited Partner's Consent, as well as because St. Mary's fails to allege damages and comes to the Court with unclean hands, the Court need not analyze those points because it has concluded at this stage that it remains unclear whether Defendant validly and appropriately exercised its Option.

As to Defendant's second counterclaim, the Court finds that, for the reasons set forth above, Saugatuck is entitled to summary judgment on part of St. Mary's request for a declaratory judgment that the Option price must be allocated to the parties pursuant to Section 9.2.B. As to the other parts of this counterclaim, Defendant is not entitled to a declaratory judgment that the purchase Option supersedes the QC clause, that St, Mary's appraisal must be used to calculate the Option price or that Saugatuck must transfer the Limited Partner Interests to the Partnership because Defendant validly and effectively exercised its Option, as summary judgment as to the effectiveness of St. Mary's exercise of the Option is not appropriate for resolution at this time.

Accordingly, the Court respectfully recommends that Defendant's motion as to its counterclaims be denied, and Plaintiff's partial motion for summary judgment as to St. Mary's counterclaims be granted as to part of Defendant's second counterclaim but denied in all other respects.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that: (i) Defendant's Motion be denied; (ii) Plaintiff's Complaint Motion be granted; and (iii) Plaintiff's Counterclaim Motion be granted in part and denied in part.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below. Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a); *Ferrer v. Woliver*, No. 05-cv-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York
          July 26, 2021

/s/ Steven I. Locke
STEVEN I. LOCKE
United States Magistrate Judge