**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SAUGATUCK, LLC, a Delaware limited liability company, | |
| Plaintiff, | Case No. 2:19-CV-00217 (GRB) (SIL) |
| v. | |
| ST. MARY'S COMMONS ASSOCIATES, L.L.C., a Delaware limited liability company, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR RECONSIDERATION**

**BC DAVENPORT LLC**
David A. Davenport (admitted *pro hac vice*)
Sean M. Zaroogian
105 5th Avenue South, Suite 375
Minneapolis, MN 55401
(612) 445-8010
david@bcdavenport.com
sean@bcdavenport.com

*Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BRIEF SUMMARY OF PROCEDURAL HISTORY ...................................................... 4

ST. MARY'S SPECIFIC REQUEST FOR RECONSIDERATION ................................ 6

STANDARD OF REVIEW AND APPLICABLE LAW ................................................. 7

    I.   Motion to Reconsider .............................................................................................. 7

    II.  The *Erie* Doctrine .................................................................................................. 8

ARGUMENT ..................................................................................................................... 10

    I.   The Hopkins Court Decision .................................................................................. 10

        A.   The Dispute over the Option Price in *Hopkins Court* is Identical to that Here .......... 10

        B.   The Fourth Department Held that the Sale Proceeds Waterfall *Must* Apply to the Determination of the Option Price ........................................................................ 11

    II.  The R&R Contradicts *Hopkins Court* and Misapprehends the "Subject to" Language under Section 9.2.B ........................................................................ 13

    III.  The Record Here Supports the Conclusion Reached in *Hopkins Court* ........... 15

    IV.  Alternatively, the Court Should Find the LPA is Ambiguous ........................... 18

CONCLUSION ................................................................................................................... 19

# TABLE OF AUTHORITIES

Cases

*Analytical Surveys, Inc. v. Tonga Partners, L.P.*,
  684 F.3d 36 (2d Cir. 2012) .......................................................................................... 8

*CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*,
  No. 23018-CA-013886-O, 2020 WL 6537072, *5,
  (Fla. Cir. Ct. Nov. 3, 2020) .................................................................................. 1, 15

*Centerline/Fleet Hous. Partnership, L.P.—Series B v. Hopkins Ct. Apts.*,
  195 A.D.3d 1375 (N.Y. App. Div. 2021),
  *reargument denied*, 198 A.D.3d 1339 (2021) .................................................. *passim*

*Chimart Assocs. v. Paul*,
  66 N.Y.2d 570, 489 N.E.2d 231 (N.Y. 1986) ......................................................... 18

*Cole v. Macklowe*,
  99 A.D.3d 595 (1st Dep't 2012) ............................................................................. 18

*Fabozzi v. Lexington Ins. Co.*,
  601 F.3d 88 (2d Cir. 2010) ....................................................................................... 8

*Gasperini v. Ctr. for Humanities, Inc.*,
  518 U.S. 415 (1996) ................................................................................................. 8

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
  230 F.3d 549 (2d Cir. 2000) ..................................................................................... 8

*In Re Brooklyn Navy Yard Asbestos Litig.*,
  971 F.2d 831 (2d Cir. 1992) ..................................................................................... 9

*Joint Stock Co. "Channel One Russia Worldwide" v. Infomir LLC*,
  No. 16CIV1318GBDBCM, 2020 WL 1480465
  (S.D.N.Y. Mar. 26, 2020) ....................................................................................... 7

*Lopez Espiritu*,
  2020 WL 93891 ........................................................................................................ 8

*Michalski v. Home Depot, Inc.*,
  225 F.3d 113 (2d Cir. 2000) ............................................................................. 9, 13

*Mt. View Coach Lines, Inc. v. Storms*,
  476 N.Y.S.2d 918
  (N.Y. App. Div. 2d Dept. 1984) ........................................................... 9

*Nappy v. Nappy*,
  40 A.D.3d 825 (N.Y.A.D. 2d Dept. 2007)............................................. 18

*New York State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*,
  78 A.D.3d 1566 (N.Y.A.D. 4th Dept. 2010)................................... 14, 15

*O'Neill v. City of Auburn*,
  23 F.3d 685 (2d Cir. 1994)..................................................................... 9

*Quinio v. Aala*,
  344 F. Supp. 3d 464 (E.D.N.Y. 2018) .................................................. 18

*Retained Realty, Inc. v. McCabe*,
  376 F. App'x. 52 (2d Cir. 2010) ............................................................. 8

*Rivera v. United States*,
  994 F. Supp. 406 (E.D.N.Y. 1998),
  *aff'd,* 181 F.3d 83 (2d Cir. 1999) .......................................................... 9

*Roche v. Lorenzo-Roche*,
  149 A.D.3d 1513 (N.Y.A.D. 4th Dept. 2017)....................................... 19

*Salve Regina College v. Russell*,
  499 U.S. 225 (1991).............................................................................. 9

*Sayers v. Rochester Telephone Corp.*,
  7 F.3d 1091 (2d Cir. 1993)................................................................... 18

*Sequa Corp. v. GBJ Corp.*,
  156 F.3d 136 (2d Cir. 1998)................................................................... 8

*Stock v. Mann*,
  255 N.Y. 100, 174 N.E. 76 (N.Y. 1930) ................................................ 7

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
  956 F.2d 1245 (2d Cir. 1992)................................................................. 8

*West v. AT&T*,
  311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940) ................................. 9

Statutes

26 U.S.C. §42(j) ............................................................................................................ 2

28 U.S.C. §1332 ........................................................................................................... 8

Other Authorities

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission (September 2019) ........................................................................................................................ 1

Rules

N.Y. C.P.L.R. §5611 ..................................................................................................... 7

St. Mary's[1] respectfully submits this memorandum of law in support of its Motion to Reconsider this Court's determination that under New York State law, the LPA and Option Agreement are unambiguous in that the price St. Mary's must pay pursuant to the exercise of its Option is determined by reference to the LPA's liquidation provisions and not the express provisions governing the distribution of sale and refinancing proceeds, in direct conflict with New York State's only substantive appellate decision on the identical issue.

## INTRODUCTION

This litigation arises out of a partnership dispute between St. Mary's and Saugatuck. The Partnership owns an affordable senior housing apartment complex in Amherst, New York, which was developed under the Low-Income Housing Tax Credit (LIHTC) program.  R&R at 5. Saugatuck, a wholly owned affiliate of Aggregator Alden Torch Financial ("Alden Torch")[2], acquired ownership and control of the Partnership's original limited partners on the eve of filing this litigation in January 2019.  R&R at 5, n.4.  The original limited partners were passive investors who only contributed capital to the Partnership in exchange for effectively all of the tax credits allocated to the Partnership under the LIHTC program, which provided a built-in return on investment.  In other words, the original limited partners were passive ***tax credit investors***, and were ***not*** real estate investors.  As such, upon the conclusion of the 15-year compliance period

---

[1] Unless provided otherwise, all defined terms have the same meaning as in the Court's July 26, 2021 Report and Recommendation (the "R&R"; DE 136).

[2] Aggregators are entities that "acquir[e] limited partner interests in LIHTC partnerships" and "then attempt to extract value out of such interests that were not intended by the original parties to the partnerships." *CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.,* No. 23018-CA-013886-O, 2020 WL 6537072, *5, ¶33 (Fla. Cir. Ct. Nov. 3, 2020); *id.* at *10, ¶3 (citing cases); *see also Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf.

required under the LIHTC program, at which time the tax credits are no longer at risk of recapture by the IRS (*see* 26 U.S.C. §42(j)), the original limited partners anticipated exiting the Partnership. Alden Torch, however, is attempting to unfairly convert the original tax credit investment into a real estate investment.

St. Mary's, in contrast, has been the Partnership's general partner since 2001 and invested in the real estate, having developed the Property and operated it to comply with the LIHTC program since 2003.  St. Mary's, who is responsible for overseeing the day-to-day operations of the Partnership and the Property, is entitled to (i) the vast majority of the Partnership's residual cash flow, if any, and (ii) the Option, *i.e.*, the right to purchase the limited partner's interests in the Partnership at a contractual purchase price (the "Option Price"), upon the close of the compliance period.  The Option Price is determined based upon what the limited partners are entitled to under a hypothetical sale of the Property at fair market value.

The gravamen of the parties' dispute, and what is directly at issue in this Motion, is whether the Option Price is determined by distributing the sales proceeds from that hypothetical sale (i) pursuant to the LPA's provision expressly governing the application of sales proceeds (the "Sale Proceeds Waterfall") (DE 100, Ex. 2 (LPA) at §9.2.B), as St. Mary's contends, or (ii) as if the Partnership has been dissolved and a liquidation commenced, such that the sale proceeds are distributed pursuant to the LPA's liquidation provisions (the "Liquidation Provisions") (*id.* at §12.4), as Saugatuck asserts.  The R&R, acknowledging that New York State contract law governs its decision, adopted Saugatuck's interpretation (R&R at 20, 26), but failed to consider the unanimous decision by the New York Supreme Court, Appellate Division for the Fourth Department in *Centerline/Fleet Hous. Partnership, L.P.—Series B v. Hopkins Ct. Apts.*, 195 A.D.3d 1375 (N.Y. App. Div. 2021), *reargument denied*, 198 A.D.3d 1339 (2021) (the "Hopkins

Court Decision" or "*Hopkins Court*"), which reached the opposite conclusion and adopted St. Mary's position when addressing essentially identical contract provisions.  R&R at 26-29; *see also* Appendix A.[3]

*Hopkins Court* is an analogous case involving (i) entities affiliated with St. Mary's and Saugatuck, (ii) essentially identical contractual provisions (*see* Appendix A), and (iii) a dispute over the proper manner for calculating the option price.[4]  While the R&R held that "the price Defendant must pay in connection with the exercise of its Option must be calculated using the liquidation waterfall found under Section 12.4 of the LPA," R&R at 26, the Hopkins Court Decision held that "plaintiffs' interpretation of the partnership agreement—that any sale of the project results in an immediate dissolution of the partnership that would, in effect, predate the sale and require section 12.4 (A) to control the distribution of its proceeds—would ***impermissibly*** operate to render portions of the partnership agreement meaningless." *Hopkins Court*, 198 A.D. 1375 (citing cases) (emphasis added).  Thus, the R&R interprets the same contractual language in a manner that the Fourth Department has determined is impermissible under New York State law.

As a result, an obvious tension exists between *Hopkins Court*, on the one hand, and the R&R (as adopted), on the other.  *Compare* R&R at 26-29; *with Hopkins Court*, 195 A.D.3d at 1375.  The result is discordant caselaw between New York State courts and their federal

---

[3] The District Court entered an Order, dated September 28, 2021, adopting the R&R in its entirety ("Order"; DE 143), but further provided: "[a]ssuming that the *Hopkins Court* decision becomes final or a further determination is rendered, though, defendant may request reconsideration from Judge Locke of any issue potentially affected[.]"  Order at 4.  The Hopkins Court Decision has since become final in the Fourth Department, although Saugatuck's affiliates have requested leave to appeal in the New York Court of Appeals.

[4] The partnership agreements in both cases are subject to New York law.  The relevant provisions in the *Hopkins Court* partnership agreement and option agreement (as available on the publicly accessible *Hopkins Court* docket) and the LPA and Option Agreement are compared in the chart included in Appendix A.

compatriots on substantive matters of New York State contract law and interpretation.  In fact, **seven** New York State justices have been presented with this issue and have agreed with the interpretation St. Mary's asserts here.[5]  **None** have ruled to the contrary.  The District Court, recognizing the potential for this conflict, specifically provided for this Motion when adopting the R&R.  *See* Order at 4.  St. Mary's therefore respectfully requests the Court reconsider the portion of the R&R regarding the method for calculating the Option Price and to harmonize the R&R with *Hopkins Court* because (1) the Hopkins Court Decision is the only substantive New York State decision addressing this precise legal issue, (2) the *Erie* doctrine requires application of substantive New York State law, and (3) the failure to do so is reversible error. Alternatively, St. Mary's requests the Court find that the LPA is reasonably susceptible to the *Hopkins Court* interpretation such that an ambiguity related to the applicable waterfall governing the Option Price exists and must be resolved through extrinsic evidence at trial.

**BRIEF SUMMARY OF PROCEDURAL HISTORY[6]**

On December 9, 2020, the parties here cross-moved for summary judgment.  *See* R&R at 1-3; DE 95, 122, 123, 124.

On June 11, 2021, the Hopkins Court Decision was issued, and on June 14, 2021, St. Mary's filed a Notice of Supplemental Authority in this case, alerting the Court to the Hopkins Court Decision.  DE 135.

---

[5] Not only was the Hopkins Court Decision issued by a unanimous five-justice panel, but the original trial judge in that case also ruled in the general partner's favor on this issue. *See* DE 95 (Def's Supp. Mem., 8, 23). So too did the subsequently assigned trial judge who denied the limited partners' Motion to Reargue.  *Hopkins Court*, Index No. 812426/2016, NYSCEF Doc. No. 588 (N.Y. Sup. Ct. May 29, 2020).

[6] For a full recitation of the facts and procedural posture, St. Mary's respectfully refers the Court to the papers submitted in connection with its motion for summary judgment.  *See* DE 95, 123.

On July 26, 2021, the R&R was issued, recommending, *inter alia*, that (1) the relationship between Section 9.2 and Section 12 of the LPA be found unambiguous, and (2) Section 12.4 of the LPA (the Liquidation Provisions) should govern the determination of the Option Price, and not Section 9.2.B of the LPA (the Sale Proceeds Waterfall).  R&R at 26-27, 29.  The R&R did not address the Hopkins Court Decision, which reached the opposite conclusion as to the interaction between Section 9.2.B and Section 12.

On August 9, 2021, St. Mary's filed Objections to the R&R.  DE 137.

On August 11, 2021, the *Hopkins Court* plaintiff (an affiliate of Saugatuck that is also owned and controlled by Alden Torch) filed a Motion for Reargument or, in the alternative, for Leave to Appeal to the New York Court of Appeals (the "Motion for Reargument") based on the R&R.  *Hopkins Court*, CA 20-00299, NYSCEF Doc. No. 28 (N.Y. App. Div. Feb. 20, 2020).

On September 28, 2021, the Order was entered, adopting the R&R in its entirety, but further provided, "[a]ssuming that the *Hopkins Court* decision becomes final or a further determination is rendered, though, defendant may request reconsideration from Judge Locke of any issue potentially affected[.]"  DE 143.

On October 1, 2021, the *Hopkins Court* plaintiff filed a Motion for Leave to Supplement its Motion for Reargument (the "Motion to Supplement") in light of the Order.  *Hopkins Court*, CA 20-00299, NYSCEF Doc. No. 31 (N.Y. App. Div. Oct. 1, 2021).

On October 1, 2021, the Fourth Department denied the Motion for Reargument and its alternative Motion for Leave to Appeal to the New York Court of Appeals.  *Id.*, NYSCEF Doc. No. 32.

On October 18, 2021, the Fourth Department, "upon reading and filing the papers with respect to the motion, and due deliberation having been had thereon," dismissed the Motion to Supplement as moot.  *Id.*, NYSCEF Doc. No. 34.

 On November 2, 2021, the plaintiff in *Hopkins Court* moved the New York Court of Appeals for leave to appeal directly thereto (the "Motion for Leave").  As of the time of filing this Motion, the Motion for Leave is fully briefed and the parties are awaiting a decision from the New York Court of Appeals.

On November 29, 2021, St. Mary's submitted a letter motion to the Court requesting to file a motion to stay proceedings until the New York Court of Appeals resolved the Motion for Leave so that this Motion could follow.  DE 145 (St. Mary's alternatively requested certification for interlocutory appeal to the Second Circuit).  That letter motion was denied.

On November 30, 2021, the parties filed pre-trial submissions in this case.  DE 147.  Trial has not yet been scheduled, but a pre-trial hearing is set for January 14, 2022.[7]

### ST. MARY'S SPECIFIC REQUEST FOR RECONSIDERATION

St. Mary's respectfully requests the Court reconsider the portion of the R&R specifically relating to the calculation of the Option Price (R&R at §III.B.2, pp. 26-28).  In particular, St. Mary's moves the Court to recognize *Hopkins Court* as the authoritative New York State case on the discrete but salient issue governing how to calculate the Option Price under New York State law, and find that the Sale Proceeds Waterfall applies, not the Liquidation Provisions. Alternatively, St. Mary's requests the Court reconsider the R&R's conclusion that the relationship between Section 9.2 and Section 12.4 of the LPA for purposes of determining the Option Price is

---

[7] St. Mary's had intended to wait for the Court of Appeals to issue a ruling on the Motion to Leave before filing this Motion, but has filed the Motion given the forthcoming pre-trial hearing.

not ambiguous given the reasonable interpretation set forth by St. Mary's, as adopted by at least

seven justices in the New York State courts.

## STANDARD OF REVIEW AND APPLICABLE LAW

### I.     <u>Motion to Reconsider</u>

This Motion is made pursuant to the Court's Order adopting the R&R, which specifically

provided:

> [t]he parties' filings establish that the *Hopkins Court* decision does not represent a final decision as it is currently subject to a motion for reconsideration by the Fourth Department and application for leave to appeal to the New York Court of Appeals. DE 139-141. In fact, one would expect that the litigants in that case will likely rely upon Judge Locke's thoughtful decision during the ensuing litigation. ***Assuming that the Hopkins Court decision becomes final or a further determination is rendered, though, defendant may request reconsideration*** from Judge Locke of any issue potentially affected issue.

DE 143 at 4 (emphasis added); *see also Joint Stock Co. "Channel One Russia Worldwide" v.*

*Infomir LLC*, No. 16CIV1318GBDBCM, 2020 WL 1480465, *2, at n.2 (S.D.N.Y. Mar. 26, 2020)

(noting a "motion for reconsideration [can] be made to magistrate judges" since "nothing in the

text of Local Rule 6.3 suggests that it is inapplicable to orders issued by magistrate judges").

Although Saugatuck's affiliate in *Hopkins Court* is making a long-shot attempt to secure

another appeal before the New York Court of Appeals, the Hopkins Court Decision is now a final

decision in the Fourth Department because upon the Fourth Department denying the Motion for

Reargument and finding the Motion to Supplement moot upon review, there were no further

matters for the Fourth Department to consider.  *See* N.Y. C.P.L.R. §5611 ("When appellate

division order deemed final"); *Stock v. Mann*, 255 N.Y. 100, 103, 174 N.E. 76, 76 (N.Y. 1930)

(appellate division order on issue of law that leaves no option for further consideration is a final

order).

The present Motion is thus ripe for review.  Accordingly,

[a]s to the standard of review [a] Magistrate . . . app[ies] to [a] motion for reconsideration, "[i]t . . . is not a vehicle for relitigating old issues . . . or otherwise taking a second bite at the apple." *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) . . . (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).  "Rather, the standard . . . is strict, and reconsideration will generally be denied ***unless the moving party can point to controlling decisions or data that the court overlooked***." *Id.*

*Lopez Espiritu*, 2020 WL 93891 at *4 (emphasis added); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citations omitted).  This Motion is proper because, in applying New York State law to the contract dispute here, the R&R did not consider the controlling New York State appellate decision on the exact issue, *i.e.*, the Hopkins Court Decision.

## II.   The *Erie* Doctrine

Because this Court's subject matter jurisdiction is based upon diversity of citizenship (28 U.S.C. §1332), the *Erie* doctrine is invoked.  "Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Retained Realty, Inc. v. McCabe*, 376 F. App'x. 52, 55 (2d Cir. 2010) (summary order) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)).  The R&R correctly recognized that New York State law governs issues of contract interpretation in this case.   R&R at 20.[8]   Axiomatically, "[t]he holdings of New York's highest court, which it has never repudiated, presumptively control [such matters of contract interpretation.]" *Fabozzi v. Lexington Ins. Co.*, 601 F.3d 88, 91-92 (2d Cir. 2010).  Where, on a substantive matter, the highest state court "has not ruled on the precise issue," it becomes the federal court's responsibility "to predict how the state's highest court would

---

[8] This is consistent with the LPA's and Option Agreement's terms.  *See* DE 100 at Ex. 2 (LPA) at § 14.1; DE 101 at Ex. 3 (Option Agreement) at Art. X(f); *see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000).

[so] rule . . . ." *See Rivera v. United States*, 994 F. Supp. 406, 408 (E.D.N.Y. 1998), *aff'd,* 181 F.3d 83 (2d Cir. 1999) (citing *O'Neill v. City of Auburn*, 23 F.3d 685, 689 (2d Cir. 1994)).

"The conjectural inquiry to be conducted by a federal court in such situations requires an examination of the state's lower court case law." *Id.* (quoting *In Re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 850 (2d Cir. 1992) ("[W]here the high court has not spoken, the best indicators of how it would decide are often the decisions of lower [New York] courts.")).  Under this analysis,

> the decisions of New York State's Appellate Division are helpful indicators.  *See In re Brooklyn Navy Yard Asbestos Litig.*[, 971 F.2d at 850].  ***The holding of "an intermediate appellate state court*** *. . . is a datum* for ascertaining state law ***which is not to be disregarded*** by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

*Michalski v. Home Depot, Inc.*, 225 F.3d 113, 116 (2d Cir. 2000) (emphasis added) (quoting *West v. AT&T*, 311 U.S. 223, 237 (1940)).  Moreover, when an Appellate Division of the New York Supreme Court rules on an issue that other Appellate Divisions have not yet ruled, as is the case with *Hopkins Court* (which the Fourth Department decided *unanimously*), that decision is entitled to deference throughout New York State, and therefore in the federal courts as well.  *See id*; *see also Mt. View Coach Lines, Inc. v. Storms*, 476 N.Y.S.2d 918, 920 (N.Y. App. Div. 1984) ("trial courts in this department [are] to follow precedents set by the Appellate Division of another department until the Court of Appeals or this court pronounces a contrary rule").

Further, on appeal of a trial court decision as to the interpretation of state law, the Court of Appeals will review the decision *de novo*.  *Salve Regina College v. Russell*, 499 U.S. 225, 231 (1991) (*Salve*) (reversing and remanding where the Second Circuit Court of Appeals upheld the trial court's misapplication of substantive Rhode Island state contract law and rules of contract

interpretation).  "[A]n appropriately respectful application of *de novo* review should encourage a district court to explicate with care the basis for its legal conclusions."  *Id.* at 233.

## ARGUMENT

I.   **The Hopkins Court Decision**

A.   **The Dispute over the Option Price in *Hopkins Court* is Identical to that Here**

*Hopkins Court* is a lawsuit between affiliates of St. Mary's and Saugatuck in another LIHTC partnership in which Alden Torch acquired ownership and control of the limited partner interests years after the original terms were agreed to.  Among the disputes at issue in *Hopkins Court* is the proper method for calculating the price of a nearly identical option as the Option here. *Hopkins Court*, 195 A.D.3d at 1375.  Indeed, the relevant comparators are nearly indistinguishable (*see* Appendix A)—for example:

1. It is "undisputed that, by exercising the option, the price [the general partner] would pay [the limited partners] is equal to the amount plaintiffs would receive if the project was sold at fair market value (hypothetical sale)" (*compare Hopkins Court*, 195 A.D.3d at 1375 *with* R&R at 8-10);

2. The *Hopkins Court* partnership agreement defines a "Sale or Refinancing Transaction" to "include, inter alia, a sale of the project" (*compare id. with* R&R at 12-14, 28);

3. Section 9.2(B) of the *Hopkins Court* partnership agreement "set[] forth the process for distributing the proceeds of [a Sale or Refinancing Transaction]" (*compare id. with* R&R at 12-14);

4. Section 9.2(B) of the *Hopkins Court* partnership agreement is expressly "'[s]ubject to the provisions of' section 12.4" (*compare id. with* R&R at 12-14, 28);

5. Section 12.1 of the *Hopkins Court* partnership agreement likewise provides that "the partnership 'shall be dissolved upon the happening of,' inter alia, the sale of the project" (*compare id. with* R&R at 14-15, 28); and

6. Section 12.4(A) of the *Hopkins Court* partnership agreement details the distribution of liquidation proceeds (*compare id. with* R&R at 15).[9]

_____

[9] Appendix A, attached hereto, compares the specific contractual language for, *inter alia*, (i) the options, (ii) the definition of a "Sale or Refinancing Transaction," and (iii) Sections 9.2(B), 12.1, and 12.4(A) in the *Hopkins Court* partnership agreement and the LPA.  It is clear that the

The general partner in *Hopkins Court* moved for summary judgment as a matter of law on the issue of whether the sale proceeds waterfall is the operative provision for calculating the option price (as the affiliates of St. Mary's argued), rather than the liquidation provisions (as the affiliates of Saugatuck claimed). That aspect of the motion was inadvertently overlooked by the trial court initially, but following a motion for reargument, the trial court "declar[ed] that the partnership agreement unambiguously requires that section 9.2 (B), not section 12.4, applie[s] to determine the option price." *Hopkins Court*, 195 A.D.2d at 1376; *see also Hopkins Court*, Index No. 812426/2016, NYSCEF Doc. No. 541 at 3 (N.Y. Sup. Ct. Jan. 7, 2020) (after determining "the Court overlooked and did not decide" the issue on the general partners' prior motion, the trial court held, "the Option Agreement and Partnership Agreement are unambiguous that Section 9.2.B of the Partnership Agreement, not Section 12.4, applies to the hypothetical sale used to determine the option price under the terms of the Option Agreement").

That trial court decision was then appealed to the Fourth Department by Saugatuck's affiliates in *Hopkins Court*, and further subject to a Motion to Reargue in the trial court before a second trial court justice. The latter motion was denied. *Hopkins Court*, Index No. 812426/2016, NYSCEF Doc. No. 588 (N.Y. Sup. Ct. May 29, 2020).

**B.    The Fourth Department Held that the Sale Proceeds Waterfall *Must* Apply to the Determination of the Option Price**

Finding the same position that St. Mary's has taken here for calculating the Option Price is "the only reasonable interpretation of the partnership agreement," the Fourth Department held, in relevant part:

> It is undisputed that, by exercising the purchase option, the price HCA [the optionee] would pay plaintiffs for their interest is equal to the amount plaintiffs

---

agreements at issue in both cases are nearly identical, which is unsurprising given they were negotiated and agreed upon by the same original parties, which did not include Alden Torch.

would receive if the project was sold at fair market value (hypothetical sale). We agree with defendants that section 9.2 of the partnership agreement applies to the sale proceeds of the project *__regardless__ of whether they are the result of a direct purchase by HCA __or__ a hypothetical sale price calculation for redemption purchases*. We further agree with defendants that **any dissolution, governed by section 12, must occur *after distribution of the sale proceeds under section 9.2 (B)***. The partnership agreement defines a "Sale or Refinancing Transaction" to include, *inter alia*, a sale of the project, and section 9.2 (B) sets forth the process for distributing the proceeds of such a transaction. ***The fact that section 9.2 (B) is made expressly "[s]ubject to the provisions of" section 12.4 simply means that the project could be sold during the dissolution process and provides in that event for the distribution of the proceeds pursuant to section 12.4 (A)***. Section 12.1 . . . does provide that the partnership "shall be dissolved upon the happening of," *inter alia*, the sale of the project. But, in that event, the dissolution does not occur until after the sale. The fact that a sale of the project triggers a dissolution, and thereafter a liquidation, does not mean that the sale and its proceeds are automatically included in the subsequent liquidation.

*Hopkins Court*, 195 A.D.2d at 1375 (all emphasis added).

As such, the Hopkins Court Decision concludes, as a matter of New York State law, that the proceeds from a sale of the LIHTC property **cannot** be treated as *de facto* liquidation proceeds because the liquidation provisions under Section 12.4 of the *Hopkins Court* partnership agreement apply **only after** the LIHTC property is sold.  In that scenario, once the property is sold, **then** the partnership is dissolved, **after which** a Liquidating Agent is appointed and the Partnership's remaining assets are liquidated.  The ***proceeds of such liquidation*** would then be distributed in accordance with Section 12.4.

The Hopkins Court Decision further holds that the argument made by Saugatuck's affiliates "that any sale of the project results in an immediate dissolution of the partnership that would, in effect, predate the sale and require section 12.4 (A) to control the distribution of its proceeds— would **impermissibly** operate to render portions of the partnership agreement meaningless." *Id.* at 1375 (citing cases) (emphasis added).  This is because the function of the contrary interpretation would result in the liquidation provisions **always** applying upon a sale of the LIHTC property, and

12

the sales proceeds waterfall under section 9.2 could then ***never*** apply to a sale of the property despite that "the partnership agreement defines a 'Sale or Refinancing Transaction' to include, *inter alia*, a sale of the project . . . ." *Id.*

## II.     The R&R Contradicts *Hopkins Court* and Misapprehends the "Subject to" Language under Section 9.2.B

The R&R correctly recognizes that New York State contract law governs the interpretation of the LPA and Option Agreement.  R&R at 10, 20.  However, the R&R fails to acknowledge, let alone consider, the Hopkins Court Decision, the only New York State appellate decision on point. *Michalski*, 225 F.3d at 116.[10]  As a result, in direct conflict with *Hopkins Court*, the R&R concluded that the Option Price should be calculated based on a hypothetical *liquidation* of the Partnership pursuant to Section 12 of the LPA, *i.e.*, that sale proceeds must be distributed under the LPA's Liquidation Provisions as "proceeds of such liquidation," which arise only after the Partnership has been dissolved, which triggers the appointment of a Liquidating Agent and the sale of the Partnership's remaining assets ***at that time***.  DE 100 at Ex. 2 (LPA) at Art. 12.  The R&R found that because a sale of the Property is an event that *causes* a dissolution that would *trigger* a liquidation under the LPA, the dissolution and liquidation somehow predates the sale, which therefore requires the Liquidation Provisions under Section 12.4 to apply to the sale proceeds. R&R at 26-28; DE 100 at Ex. 2 (LPA) at §12.1.D, §12.2, §12.4.  The R&R reasons that a different interpretation would ignore the preamble to Section 9 of the LPA, which notes that it is applied "[s]ubject to the provisions of Sections 9.2.D and 12.4 . . . ."  R&R at 29.

However, *Hopkins Court* refutes this conclusion.  In particular, Section 9.2 is "subject to" Section 12.4 when the sale of the Property occurs ***after*** a dissolution ***as part of the liquidation***

---

[10] Further, the Hopkins Court Decision reflects the conclusions of at least ***seven*** New York State justices.

*process*. *Hopkins Court*, 195 A.D.2d at 1375; *see also* DE 100 at Ex. 2 (LPA) at §12.1 (identifying other causes of dissolution that do not require a sale of the Property to occur first, which would nonetheless trigger a liquidation and subsequent sale of the Property pursuant to that liquidation). As described in the Hopkins Court Decision:

> The fact that section 9.2 (B) is made expressly "***[s]ubject to*** the provisions of" section 12.4 simply means that the project ***could be sold during the dissolution process*** and provides in that event for the distribution of the proceeds pursuant to section 12.4 (A). Section 12.1 of the partnership agreement does provide that the partnership "shall be dissolved upon the happening of," *inter alia*, the sale of the project. But, in that event, the dissolution does not occur until after the sale. The fact that a sale of the project triggers a dissolution, and thereafter a liquidation, does not mean that the sale and its proceeds are automatically included in the subsequent liquidation.

*Id.* at 1377 (emphases added). The Hopkins Court Decision maintains the full effect of all provisions, while the R&R would mean that proceeds from a sale of the Property could ***never*** be distributed under Section 9.2.B, although Section 9.2.B expressly applies to "Sale or Refinancing Transaction Proceeds," which are expressly defined to include proceeds from a sale of the Property. *New York State Thruway Auth. v. KTA-Tator Eng'g Servs., P.C.*, 78 A.D.3d 1566, 1567 (N.Y.A.D. 4th Dept. 2010) ("It is well settled that a contract must be read as a whole to give effect and meaning to every term"); *see also* DE 100 at Ex. 2 (LPA) at §9.2.B, Art. I at p.12 (definition of "Sale or Refinancing Transaction").

    In an attempt to avoid rendering portions of the Sale Proceeds Waterfall meaningless, the R&R concluded that because the Sale Proceeds Waterfall could apply to *some* transactions (other than a sale of the Property), the provision is not superfluous. R&R at 28-29. But this ignores that the Sale Proceeds Waterfall ***explicitly*** applies to a sale of the Property. *See* DE 100 at Ex. 2 (LPA) at 12 (definitions), §9.2.B. Thus, ***all*** provisions are ***not*** given ***full*** effect as required by New York

14

State contract law, since under the R&R, the Sale Proceeds Waterfall would ***never*** apply to proceeds from a sale of the Property.  *See New York State Thruway Auth.*, 78 A.D.3d at 1567.

Respectfully, the Court should reconsider the R&R in light of *Hopkins Court* and amend it to conclude that Section 9.2.B of the LPA governs the calculation of the Option Price.  This would be the correct interpretation and would avoid the misapplication of substantive New York State contract law, which would otherwise violate the *Erie* doctrine and its progeny, creating reversible error reviewed *de novo* on appeal.

**III.    <u>The Record Here Supports the Conclusion Reached in *Hopkins Court*</u>**

In 2013, Hunt Capital Partners ("Hunt")—a court confirmed Aggregator[11]—acquired control of the Partnership's limited partner interests.  DE 95-2 and 116-1 (LR 56.1 Statement of Facts/Response), ¶48.  Then, in 2015, Alden Torch, who owns Saugatuck (*See* DE 105, Ex. 7 to Davenport SJ Decl. (org. chart)), spun off from Hunt, assumed control of the Partnership's limited partner interests, and adopted Hunt's Aggregator business practices.  DE 95-2 and 116-1 (LR 56.1 Statement of Facts/Response), ¶49; *see also* DE 115, Ex. 66 to Davenport SJ Decl. (Blake Depo.) at 47:9-49:5 (describing the spin off as "effectively a name change" because "[n]othing really changed in terms of employment or job responsibilities or roles within Alden Torch," which had previously been "Hunt's affordable housing platform").

After taking control of the Partnership's limited partner interests, Alden Torch, on ***two separate occasions***, provided valuations of the limited partner interests to Bank of America ("BOA"), the underlying tax credit investor that actually contributed the capital to the Partnership (DE 95-2 and 116-1 (LR 56.1 Statement of Facts/Response), ¶14), using the same methodology as

---

[11] *See CED Capital Holdings 200 EB, L.L.C. v. CTCW Berkshire Club, L.L.C.*, No. 23018-CA-013886-O, 2020 WL 6537072, *5, ¶¶32-34 (Fla. Cir. Ct. Nov. 3, 2020).

adopted in *Hopkins Court*.  For instance, when Alden Torch sought consent from BOA to exercise the Qualified Contract right, it relied upon a "Sale Proceeds Analysis" to show what the limited partners would be allocated for their limited partner interests from proceeds received if the Property was sold at fair market value or the significantly higher Qualified Contract price.  DE 105, Ex. 11 to Davenport SJ Decl. at SAUGATUCK00002015.  In both instances, the Sale Proceeds Analysis applied the Sale Proceeds Waterfall, ***not the Liquidation Provisions***, to value what the limited partners would receive under a sale transaction (which is what the Option Price is based upon, *i.e.*, a hypothetical sale).  *Id.*; *see also id.* at SAUGATUCK00002010 (explicitly stating that the "LP receives 25% of residual proceeds").  In other words, when Alden Torch sought consent from BOA to exercise the Qualified Contract right, it justified its request by showing the difference in what the limited partners would receive under the two sale scenarios (*i.e.*, via the Qualified Contract price or fair market value), indisputably acknowledging that the distribution of sale proceeds under either would be done according to the Sale Proceeds Waterfall and its 75/25 split in favor of St. Mary's (*see* DE 100, Ex. 2 (LPA) at §9.2.B(ix)).

Thereafter, when Alden Torch sought to (and did) acquire BOA's 99.99% interest in the Partnership's investor limited partner immediately prior to initiating this litigation, it relied exclusively upon a Sale Proceeds Analysis applying Section 9.2.B (not Section 12.4); exactly how the Option Price is supposed to be calculated according to *Hopkins Court*.  DE 111, Ex. 44 to Davenport SJ Decl. at SAUGATUCK00016128.  That Sale Proceeds Analysis was first used to obtain approval from Alden Torch's internal Capital Transactions Committee to purchase BOA's interests.  *Id.* at SAUGATUCK00016121.  Approval was received and two options were then presented to BOA, although the Sale Proceeds Analysis itself was withheld.  *See* DE 109, Ex. 30 to Davenport SJ Decl.

The first option offered BOA a $60,000 "priority distribution equal to 20% *of the LP interest price*." *See* DE 111, Ex. 44 to Davenport SJ Decl. at SAUGATUCK00016121 (OPTION A). The "LP interest" price was calculated to be $300,000. *Id.* This $300,000 is derived from applying the Sale Proceeds Waterfall to a $5,120,000 appraisal of the fair market value for the Property that *St. Mary's* provided Alden Torch. *Id.* at SAUGATUCK000016128 (*calculating the investor limited partner's interest in the Partnership as worth $316,865*); *see also* DE 115, Ex. 66 to Davenport SJ Decl. (Blake Depo.) at 217:23-218:14 (acknowledging no liquidation analysis was included). This method for valuing the limited partner interests in the Partnership is *exactly* how *Hopkins Court* determined the limited partner interests should be valued under the Option Price, which is what St. Mary's advocates for here. In fact, Alden Torch preferred, and attempted to force on BOA, this first option (likely because it limited any downside for Alden Torch in pursuing this litigation). *See* DE 109, Ex. 33 to Davenport SJ Decl.[12]

While Alden Torch clearly relied on the application of the Sale Proceeds Waterfall to proceeds received from a hypothetical sale of the Property for purposes of receiving consent to exercise the Qualified Contract right and then to acquire BOA's 99.99% interest in the Partnership's investor limited partner, it now argues such is improper for St Mary's acquisition of the limited partner interests under the Option because the Liquidation Provisions must be applied. But, as the New York State courts have held in *Hopkins Court*, and as Alden Torch has itself acknowledged through its conduct, the Sale Proceeds Waterfall, and not the Liquidation Provisions, should be applied sale proceeds received for the Property. For these additional reasons,

---

[12] The second option was for a fixed $200,000 payment with no contingent interest in this litigation. DE 111, Ex. 44 to Davenport SJ Decl. at SAUGATUCK00016121 (OPTION B).

the Court should reconsider the R&R's conclusion as to the proper method for calculating the Option Price.

**IV.**   **Alternatively, the Court Should Find the LPA is Ambiguous**

St. Mary's alternatively requests the Court reconsider the R&R's finding that the interplay between the Option Agreement and the LPA for purposes of determining the Option Price is not ambiguous.   R&R at 26.   Under New York State law, the "'primary objective' in contract interpretation is to 'give effect to the intent of the contracting parties as revealed by the language of the agreement at issue.'" *Quinio v. Aala*, 344 F. Supp. 3d 464, 471 (E.D.N.Y. 2018) (quoting *Sayers v. Rochester Telephone Corp.*, 7 F.3d 1091, 1094 (2d Cir. 1993)); s*ee also Cole v. Macklowe*, 99 A.D.3d 595, 596 (1st Dep't 2012) (New York State courts recognize the "well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties.").   "An agreement is ambiguous when 'the agreement on its face is reasonably susceptible of more than one interpretation.'" *Nappy v. Nappy*, 40 A.D.3d 825, 826 (N.Y.A.D. 2d Dept. 2007) (quoting *Chimart Assocs. v. Paul*, 66 N.Y.2d 570, 573, 489 N.E.2d 231, 233 (N.Y. 1986)).   The Court must thus consider whether the manner for calculating the Option Price under the LPA is reasonably susceptible to St. Mary's interpretation as set forth above. *Chimart Assocs.*, 66 N.Y.2d at 573.

Given that the Hopkins Court Decision embraces the equivalent interpretation of the Option Price that St. Mary's offers here, it is self-evident that the LPA and Option Agreement are reasonably susceptible to St. Mary's interpretation.   **Seven** New York State justices, including five appellate justices, agree with St. Mary's that the calculation of the Option Price under effectively identical provisions should be based upon a hypothetical sale of the Property with sale proceeds allocated according to the Sale Proceeds Waterfall.   None disagree.   Thus, if the Court still finds Saugatuck's interpretation of the Option Price—requiring sale proceeds be distributed under the

18

Liquidation Provisions—reasonable (in conflict with the holding in *Hopkins Court*), then a trial would be needed to resolve the resulting ambiguity. *See Roche v. Lorenzo-Roche*, 149 A.D.3d 1513, 1514 (N.Y.A.D. 4th Dept. 2017) ("Where an agreement is ambiguous . . . the parties may submit to the court extrinsic evidence in support of their respective interpretations").

## CONCLUSION

St. Mary's respectfully requests the Court reconsider the R&R in light of the Hopkins Court Decision and harmonize the R&R therewith or, in the alternative, find that the manner for calculating the Option Price is susceptible to more than one interpretation and thus a trial is necessary to resolve the ambiguity.

Dated: January 4, 2022                     Respectfully submitted,

                                           **BC DAVENPORT, LLC**


                                           */s/ David A. Davenport*
                                           David A. Davenport (*pro hac vice*)
                                           Sean M. Zaroogian
                                           105 5th Avenue South, Suite 375
                                           Minneapolis, MN 55401
                                           (612) 445-8010
                                           david@bcdavenport.com
                                           sean@bcdavenport.com

                                           ***Attorneys for Defendant***