UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SAUGATUCK, LLC, *a Delaware limited
liability company*,

                                   Plaintiff,

        -against-

ST. MARY'S COMMONS ASSOCIATES,
L.L.C., *a Delaware limited liability company*,

                                   Defendant.
-----------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
19-cv-217 (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

The following constitutes the Court's Fed. R. Civ. P. 52 Findings of Fact and Conclusions of Law in this diversity-declaratory judgment/breach of contract action brought pursuant to New York law after a bench trial conducted on July 10, 11, 12 and 13, 2023.

**FINDINGS OF FACT**

Plaintiff Saugatuck, LLC ("Saugatuck" or "Plaintiff") and Defendant St. Mary's Commons Associates, L.L.C. ("St. Mary's" or "Defendant") are the parties-in-interest to the St. Mary's Commons Apartments, L.P. (the "Partnership"), Stipulation of Facts ("SOF"), § VI, ¶¶ 1-2, DE [200], which operates an apartment complex in Williamsville, New York with 101 units. Trial Transcript ("Tr.") 687. Saugatuck is the successor-in-interest to the Partnership's original Investment Limited Partner, RCC Credit Facility, LLC and Special Limited Partner, Related Direct SLP LLC,

having acquired those interests in 2013. Tr. 44.[1] Defendant St. Mary's is the original general partner. *Id.* Notably, the Partnership is not a party to this litigation.

The parties' relationship is governed by two agreements central to their dispute, the Amended and Restated Agreement of Limited Partnership, dated May 22, 2003 (the "LPA"), Joint Exhibit ("Jt. Ex.") 2, and the Option Agreement, also dated May 22, 2023, Jt. Ex. 3 (together the "Agreements"). *See* SOF ¶¶ 3-5, 8-10. These Agreements were negotiated by Thomas Granville, principal of Whitney Capital Company, LLC, which operates St. Mary's, and Eric Trucksess of RCC Credit Facility LLC, one of Plaintiff's predecessors-in-interest, with whom Granville had an ongoing working relationship. Tr.  437, 459-66, 477; *see* Tr 516-17, 694, Defendant Exhibit ("D. Ex.") 400 (Granville and Trucksess negotiated and signed the letter of intent).[2] Granville also signed the LPA on behalf St. Mary's, Tr. 693; *see* Jt. Ex. 2, and the Option Agreement on behalf of St. Mary's and the Partnership.  *See* Jt. Ex. 3. According to the LPA, the general partner had a fiduciary duty to the Partnership and Limited Partner.  Tr. 697.

Neither Plaintiff, nor any affiliated entity played a role in the formation of the Partnership or negotiation of the Agreements, and any conclusions Plaintiff inferred concerning the negotiating parties' intent when executing these Agreements come from the language of the Agreements themselves. Tr. 95, 104-05. Further, Saugatuck never had any communications with the entities or individuals that negotiated the

---

[1] Plaintiff's acquisition of this interest was obtained through a series of changing intermediaries.  *See* Tr. 84-94, 242, (identifying these entities) 242 (Saugatuck obtained its interest from Centerline Fleet Partnership Series B).
[2] Neither side called Trucksess to testify.

Agreements about their intent at the time they were executed.  Tr. 136.  That being said, some type of due diligence was performed by the entity affiliated with Saugatuck at the time it acquired its interest in the Partnership, though Plaintiff's representative witness, Christopher Blake, was unable to offer any details in this regard, including whether the contract provisions at issue here were considered during the due diligence process.  Tr. 84-87.

In any event, in accordance with the LPA, the Partnership owns and operates the St. Mary's Commons Apartments complex in Williamsville, New York (the "Apartments" or the "Property").  SOF ¶ 6, LPA ¶ 2.4.  The Partnership has been operated as a low-income housing tax credit ("LIHTC") partnership under Section 42 of the Internal Revenue Code since its inception.  SOF ¶ 11; *see* LPA ¶ 2.4.  As a participant in the LIHTC program, the Partnership was entitled to take advantage of certain tax credits, provided that compliance with specific rent and tenant income restrictions continued to be maintained.  Tr. 35; *see* Jill Khadduri, *et. al.*, *What Happens to Low-Income Tax Credit Properties at Year 15 and Beyond?,* U.S. DEP'T OF HOUSING & URBAN DEV. 2 (2012); *see also* Tr. 34-35, 356, 646 ("It was all about tax credits"), 647.  Here the Total Credit Amount, as memorialized in the LPA, was $9,050,000.  LPA Art. 1.  Although the LIHTC program was designed at the federal level, it is administered at the state level in New York by New York State Homes and Community Renewal ("NYSHCR").  Tr. 35, 261-63, 457-58, 463-65, 473-74.

Typically, the low-income housing at issue is owned by a limited partnership, with a limited partner investing the majority of the capital, commonly 99 percent or

more, in return for the tax credits and other benefits.  Tr. 36.  The general partner contributes a small amount of funds and manages the property in exchange for fees. Tr. 36.

Further relevant here, as part of the investment and administration of the Apartments, the Partnership also executed a Regulatory Agreement dated May 22, 2003, with the New York State Housing Finance Agency, which is part of NYSHCR. Tr. 262, 273-74; *see* Jt. Ex. 5 ("Reg. Agr.").  The Regulatory Agreement provides for, among other things, a 15-year "Compliance Period," during which low-income housing restrictions must be observed, followed by a 15-year "Extended Use Period," during which compliance with various restrictions is similarly required.  *See* Reg. Agr. §§ 3.1, 3.2; Tr. 36-37, 267-68, 272, 479.

The tax credits are typically issued over a ten-year period and can be recaptured if a property violates certain affordability restrictions over the Compliance Period.  26 U.S.C. § 42(i); Tr. 36, 267-68, 273, 356, 479.

There are typically two scenarios however, when LITHC restrictions can be lifted:  (1) foreclosure; and (2) the qualified contract ("QC") process, the latter of which is at issue here.  *See* Tr. 38.[3]  In a QC process, the partnership approaches the state agency and files a preliminary application so that the state can confirm the property's eligibility.  Once that is done, there is a formal application process.  Tr. 39.  If the formal application is approved, the state has one year to locate a buyer.  Tr. 39-40.  If

---

[3] There was also testimony that there are three ways to exit a partnership in this context:  a forced sale, an option exercise, or invocation of QC rights.  *See* Tr. 649-51.  The choice of formulation is not relevant to the dispute before the Court.  It is the QC rights that are at issue regardless of this articulation.

a buyer is located, that buyer purchases the property subject to the LIHTC affordability requirements for the Extended Use Period. Tr. 40. If no buyer is found, then the restrictions are phased out over a three-year period, which would generally result in an increase in market value because the apartment units can be leased at higher rents, thereby generating higher revenues. Tr. 40-41, 268-70, 363-64; *see* Reg. Agr. 3.2(b); *see also* Tr. 650-51, 673-74.

With this background in mind, the following terms of the LPA, governing the QC process for the Partnership, and the Option Agreement, granting St. Mary's the right to acquire the Property in certain circumstances (the "Option"), are relevant to the parties' dispute. According to the LPA,

(i)    Notwithstanding any provision of this Agreement to the contrary, the Special Limited Partner [Plaintiff], shall have the right at any time after the fourteenth year of the Compliance Period (A) to require, by written notice to the General Partner [Defendant], that the General Partner *promptly* submit a written request to the Credit Agency [NYSHCR] pursuant to [Internal Revenue] Code Section 42(h)(6)(I) that the Credit Agency endeavor to locate within one year from the date of such written request a buyer who will continue to operate the Property as a qualified low-income building at a purchase price that is not less than the debt encumbering the Property plus the Partnership's equity interest in the Property (adjusted for cost-of-living increases as permitted by Code Section 42(h)(6)(G)) and (B) in the event the Credit Agency locates such a buyer, to compel the General Partner to accept such buyer's offer to purchase the Property.

(ii)    Subject to Section 5.4(B)(i) hereof [above] and notwithstanding any other provision of this Agreement to the contrary, the Special Limited Partner shall have the right at any time after the end of the Compliance Period to require, by written notice to the General Partner (the **"Required Sale Notice"**), that the General Partner promptly use its best efforts to obtain a buyer for the Apartment Complex on the most favorable terms then obtainable. The General Partner shall submit the terms of any proposed sale to the Special Limited Partner for its approval as provided in Section 5.4.A hereof. If the General Partner shall fail to so obtain a buyer for the

> Apartment Complex within six months of the Required Sale Notice or if the Special Limited Partner in its sole discretion shall withhold its consent to any proposed sale to such buyer, then the Special Limited Partner shall have the right at any time thereafter to obtain a buyer for the Apartment Complex on terms acceptable to the Special Limited Partner (but not less favorable to the Partnership than any proposed sale previously rejected by the Special Limited Partner).  In the event that the Special Limited Partner so obtains a buyer, it shall notify the General Partner in writing with respect to the terms and conditions of the proposed sale and the General Partner shall cause the Partnership promptly to sell the Apartment Complex to such buyer.

LPA Art. 5.4.B(i) (the qualified contract provision) (emphasis added), (ii) (forced sale provision); *see* Reg. Arg. § 3.2(b) (recognizing Qualified Contract right); *see also* Tr. 357-58, 497-98, 530.  The right to seek this sale is referred to as the "Qualified Contract Right."  According to the LPA, the QC Right can be invoked after the 14th year of the 15-year Compliance Period.  LPA § 5.4(i); Tr. 713-14.  It is then for New York State to determine when the one-year clock to obtain a qualified purchaser starts.  Tr. 130.   It is up to the Special Limited Partner—Plaintiff here—to exercise the QC Right, and the General Partner has to submit the application.  Tr. 714.  There is nothing in the LPA permitting the General Partner to refuse to submit or delay the QC process.  Tr. 714-15.  Once invoked, the QC Right is irrevocable for one year.  Jt. Ex. 44.  As a practical matter, for the reasons set forth above, the QC Price, which is calculated using a formula, is higher than the fair market value of a property.  Tr. 311.  The invocation of the QC Right, of course, does not guarantee a sale.  Tr. 920.

Significantly, although Defendant attempted to negotiate the Qualified Contract provision out of the LPA, the Limited Partner refused.  Tr. 497, 531, 720-21 (Granville wanted these terms removed because he did not want the Limited Partner

6

to have the right), 724-25 (Q . . . Related [the Limited Partner] was pretty adamant about keeping that in.  Is that right?  A  Yes."), 725 ("I perhaps didn't push back as hard as I should have. . . .").

Although Defendant offered testimony that the QC Right had no impact on the value of on LIHTC investment, *see* Tr. 651-52, the Court rejects this testimony, concluding that if the right had no value, the Limited Partner during the negotiations would not have rejected St. Mary's attempt to remove it from the LPA.

Similarly, Defendant attempts to buttress its position with testimony that the Option right was addressed in the letter of intent executed prior to the LPA, thereby demonstrating its superiority to the QC Right, while the QC Right is not.  *See* Tr. 525. This distinction is irrelevant.  The Qualified Contract Right in the LPA is what Plaintiff is attempting to enforce.  Moreover, the LPA specifically provides that it supersedes all prior agreements, which would include the prior letter of intent.  *See* LPA § 14.9.

In addition, Defendant went out of its way to highlight that as time went on, it became New York policy to require a waiver of the QC Right for new projects.  *See* Tr. 303-04.  This shift only supports Plaintiff's position that the right existed in the context of the Property here at the time the Agreements were executed.

Consistent with this conclusion, in a subsequent limited partnership agreement for a different property known as Westview Apartments, where Granville also represented the general partner, the language governing the QC Right states expressly that this right is "[s]ubject to the General Partner's option to purchase the

property at the end of the Compliance Period," *i.e.*, the Option.   Tr. 540.   This language is absent from the LPA.   Tr. 540.   Moreover, on at least one occasion involving still a different property, Granville exercised the QC Right, demonstrating that it had value.   Tr. 751.

In any event, as a result of the Limited Partner's unwillingness to drop the QC Right, Defendant focused on negotiating the Option Agreement to allow for St. Mary's to purchase the Property, all the while assuming that the Limited Partner would not invoke its QC Right because, in Granville's opinion, to do so would jeopardize future LIHTC deals with New York State and its policy to avoid losing affordable housing. Tr. 498, 725.   Moreover, according to St. Mary's, because the QC process takes time to get everything filed, and the marketing process takes a year, the General Partner could invoke the option in the meantime, in effect superseding the limited partner's QC rights, despite that neither agreement expressly addresses this scenario.   Tr. 503.[4]

As to the Option Agreement, the Partnership granted Defendant an option to purchase the Property (referred to in the Option Agreement as the "Project") for a two-year period,

> following the last day of the Compliance Period ("**Commencement Date**") and shall expire at midnight of the day that is two years following the Commencement Date; <u>provided however</u>, the Option granted hereunder shall terminate if (i) [Defendant] withdraws (without Consent of [Plaintiff]) or is removed as a general partner of [the Partnership], or (ii) Defendant does not

---

[4] In reaching this conclusion about the General Partner's intent in executing the LPA and Option Agreement, the Court rejects as hearsay all statements attributed to Eric Trucksess and his counsel, who negotiated the Agreements on behalf of the limited partner. *See* Tr. 511-15.   Moreover, the Court rejects Plaintiff's post-trial attempt to submit the Trucksess deposition transcript which was not admitted into evidence at trial. *See* DE [222-3].

close on its acquisition of title for the [Property] as, if and when required to do
so in accordance with the terms and conditions of this Agreement.

Option Agreement Art. II (emphasis in original).   The Option Agreement was
executed by Defendant and the Partnership, with Granville executing the agreement
for both sides, and then signed as "APPROVED and ACCEPTED" by the then investor
limited partner and special limited partner, Plaintiff's predecessors-in-interest.   *See*
Option Agreement.   To the extent that the Special Limited Partner played a role with
respect to the Option Agreement, which includes indicating approval, it acted "on
behalf of" the Partnership.   Option Agreement § 4.2.

The purchase price provided for in the Option Agreement was the Property's
fair market value, arrived at through an appraisal process.   Option Agreement Art.
IV; Tr. 527-29.   Notably, there is no language in the Option Agreement limiting its
exercise by invocation of the QC Right.   *See* Tr. 530.   According to its terms, the Option
can be exercised after the 15th year of the Compliance Period, a year after the
Qualified Contract Right can be invoked.   Tr. 714, 753-54.   The Option Agreement is
recorded as an encumbrance on the title of the Property.   Tr. 914-15.

With these parameters serving as guideposts, Saugatuck exercised its QC
Right by letter dated January 10, 2018.   *See* Tr. 575-76, 757-59; Jt. Ex. 15.   St. Mary's
submitted the preliminary application to NYSHCR on February 6, 2018.   Tr. 282,
576; *see* Jt. Ex. 16.   NYSHCR responded with approval three days later, directing that
the Partnership submit a formal application, which it did on September 4, 2018.   *See*
Tr. 285-86, 583; Jt. Exs. 18, 31 (correspondence between parties including copy of the
notice from NYSHCR misdated 2017 rather than 2018), 42, 46; Plaintiff's Exhibit

9

("Pl. Ex.") 204 (Qualified Contact Application).   In terms of compiling a final application, a team needed to be assembled, including a capital needs consultant to determine what physical work the Property required, if any, an accountant, an appraiser, and an environmental consultant, and a market study needed to be conducted.  Tr. 315-16, 319-20; Jt. Exs. 16; Pl. Ex. 204.

During the time period between when the preliminary and final applications were submitted, there was an ongoing exchange between the parties during which Plaintiff claims that Defendant was slow rolling the process in order to better position itself to assert the Option.  *See* Tr. 765-82.  For example, in February and March 2018, St. Mary's contacted Saugatuck to obtain authorization for expenses that do not require approvals, both as a matter of contract, and based on a prior exercise of a QC Right between the same parties on a different property known as Hopkins Court not at issue here.  *See* Tr. 56-66, 767-70; Jt. Exs. 19 & 22.  Then Defendant's principal, Granville, delayed two months from March to May 2018 to first contact, and then eventually retain, GAR Associates to conduct an appraisal and market study, and then even longer to provide GAR Associates with information it requested to complete the work.  Tr. 771-75; Jt. Ex. 25, 26, 33.  There was also a similar delay in getting property condition and Phase I environmental reports done.  Tr. 775-80; Jt. Exs. 24, 27.  And all of this is in contrast to how quickly Granville moved to get an appraisal completed for the purpose of Defendant exercising its Option.  *See* Tr. 799-803; Jt. Exs. 57, 64, 71 (it took a month for option-related appraisal, as opposed to the five months it took for the same company to do the qualified-contract-related appraisal).

While this was occurring, on a parallel, but related track, on July 25, 2018, St. Mary's sent Saugatuck a letter stating that it wanted to negotiate a purchase of the Property prior to its Option maturing on January 1, 2019. *See* Tr. 66-67; Jt. Ex. 36. The language in this letter succinctly depicts the issue at the heart of this litigation. Here, Granville states, "St. Mary's has an option to redeem the limited partner's interests. . . . Since it was the intent of the [original] partners to provide the General Partner this right, the Option takes precedence over any other notice" – including the QC notice. Jt. Ex. 36; *see* Tr. 835-36; Jt. Ex. 100 (the Qualified Contract Right is subordinate to the Option right). Plaintiff disagrees—with testimony from its representative Blake that, "I don't believe there is anything in the partnership documents that says our [the limited partners'] rights are subordinate to the general partner's or that their rights cancel ours." Tr. 67, 101 ("We're just saying that our [QC] right needs to run its course because it was exercised first"), 756 (there is nothing in the Option Agreement that says the Option right is superior to the Qualified Contract Right).[5] Then, consistent with the Option, by letter dated November 29, 2018—again before the Option period commenced—Defendant proposed using GAR Associates to conduct the audit required to exercise the Option. *See* Tr. 187, 603-04; Jt. Ex. 52. Saugatuck refused, reasoning that the Option could not be exercised while the QC Right was being processed. Tr. 188, 194, 604. Then in 2020 Saugatuck proposed another firm, Novogradac, to do an appraisal, which it did,

---

[5] The tension between these terms was highlighted by other testimony during which Blake admitted that, "Neither right is defined as subordinate," Tr. 102, and Granville conceded that he never asked to have language about the Option right superseding the Qualified Contract Right added to the LPA. Tr. 726.

valuing the Property with restricted rent for affordable housing at $3.7 million, and $12.7 million with market rents being charged.  Tr. 189-93, 222; D. Ex. 448A.  In September 2019, GAR gave a value of $4,875,000 for restricted use for the same appraisal.  Tr. 193; Jt. Ex. 70.[6]

Further complicating matters, while St. Mary's was angling to exercise its Option as quickly as possible, NYSHCR rejected the Partnership's September 4, 2018 QC application because it failed to include 15 years of audited financial statements, a requirement of which neither side was aware.  Tr. 69-71, 286-88, 584, 786; Jt. Exs. 43, 44, 46; *see* Jt. Ex. 51.  St. Mary's could not provide 15 years of audited financial statements at the time of the QC application however, because it did not have audited financial statements for 2003.  Tr. 585-86.   Although yearly audited financial statements were required by the language of the Regulatory Agreement, *see* Reg. Agr. § 6.1.f, as NYSHCR's Director of Financial Operations, Robert Landy testified, the agency did not typically have projects submit audited financial statements while they were under construction prior to occupancy, as was the case in 2003, because such statements "are not telling the agency much. . . ."  Tr. 276-77, 301.  Consistent with this testimony, the documents accompanying the QC application actually require audited financial statements for the Compliance Period, which here began in 2004, with occupancy, not when construction began in 2003, and in fact the rejection correspondence from NYSHCR specifies that the 15th year would be the year ending

---

[6] GAR previously valued the Property at $5,120,000 in July 2018.  Tr. 594-95; Jt. Ex. 34.  Another appraisal firm, Newmark Knight Frank, assigned a value of $4,700,000 in September 2019.  Tr. 595-96; Jt. Ex. 95.

December 31, 2018.  *See* Tr 585; Jt. Exs. 43, 44.  And further consistent with all of this, Granville testified that NYSHCR verbally waived the Regulatory Agreement audited-financial-statement requirement for 2003, although there is no documentary evidence in this regard.  Tr. 789.  Based on the totality of this evidence, especially where Plaintiff was able to conduct due diligence prior to acquiring the Limited Partner and Special Limited Partner rights here, and which presumably would have uncovered the absence of the 2003 audited financial statements if it was sufficiently important to Plaintiff, the Court concludes that St. Mary's was not obligated to obtain or maintain 2003 audited financial statements prior to submitting the QC application.  Tr. 297.[7]

After the rejection of the QC application, as noted above, by letter dated November 29, 2018, Defendant suggested that GAR Associates act as the mutually agreed upon appraiser for the purposes of St. Mary's exercising its Option, which it did, on January 1, 2019 and offered to close "right away."  Tr. 527, 529,794-95; Jt. Ex. 52; Pl. Ex. 205.

---

[7] The Court finds that Plaintiff's expert testimony on this point, namely that the general partner is required to maintain audited financial records for all years of a project, regardless of the date of first occupancy, and that he was surprised that NYSCHR disagrees, *see* Tr. 372-75, 391, not particularly probing or helpful.  The issue is whether St. Mary's complied with New York State's requirement when it failed to compile an audited financial statement for 2003, and, as set forth above, the Court concludes that it did, given NYSHCR practice in this regard.  Moreover, the Court notes that Defendant credibly challenged much of Plaintiff's expert testimony such that the Court is reluctant to rely on it for addressing any issue in dispute.  *See* Tr. 493-95 (addressing erroneous factual statements made by Plaintiff's expert).  Finally, to the extent that a failure to comply with an audited-financial-statement requirement for 2003 may constitute a breach of contract when it occurred, the Court is skeptical of an attempt state a claim on this basis 15 years later, when the Complaint was filed.  *See Morrow v. Brighthouse Life Ins. Co. of NY,* 200 A.D.3d 1622, 161 N.Y.S.3d 604, 607 (4th Dep't 2021) (noting that the statute of limitations for breach of contract claims is six years and dismissing claim based on breach occurring in 2006).

St. Mary's eventually obtained audited financial statements for 2018 in March 2019, and they were compiled and submitted to NYSHCR on April 16, 2019.  Tr. 587-89, 811; Jt. Ex. 76.  Nevertheless, the QC process was further delayed because, as set forth in its September 2018 correspondence, the State also required "a revised qualified contract calculation," which St. Mary's did not submit at the same time as the 2018 audited financial statements.  *See* Tr. 292-94, 325, 592, 815; Jt. Exs. 44, 82; Pl. Ex. 212 (April 25, 2019 letter from NYSHCR).  This in turn required a new appraisal of the Property.  Tr. 177, 325.  In fact, this revised calculation was not submitted until October 29, 2019, despite Plaintiff's September 2018 request that it be done.  Tr. 78, 294, 592-93, 813-15, 833-34; Jt. Exs. 76, 99, 100.  Although Defendant argues that this delay was caused by the need for revised reports because they were more than a year old, *see* Jt. Ex. 82, St. Mary's concedes that had the full Qualified Contract application been submitted on April 16, 2019 with the 15 years of audited financial statements, they would have been less than a year old at that time, and therefore acceptable to NYSCHR, and there would have been no need for further appraisals or reports.  *See* Tr. 818-19; Jt. Ex. 82.  And St. Mary's further admits that, had the Qualified Contract application been fully submitted by April 2019, when the 15th year of audited financial statements had been obtained, and NYSHCR would have given approval, then the Qualified Contract period would have run before Defendant's Option expired because the exercise right lasted until the end of 2020.  Tr. 844-45.  Moreover, nothing prevented St. Mary's from making an offer at the QC price.  Tr. 845.  Based on all of the above, the Court concludes that St. Mary's

14

intentionally delayed the QC process in order to obtain what it hoped would be a tactical advantage in this litigation and the execution of its Option right.

Ultimately, with this delay, the revised calculation required a new set of reports, a process that took another six months. Tr. 325-26. It then took NYSHCR until March 2020 to approve the application and the one-year marketing process began at that time. Tr. 326, 593. The Qualified Contract price was $14,162,341 million with the Qualified Contract period commencing on March 2, 2020, Tr. 837-38; Pl. Ex. 224. So in sum it took St. Mary's 22 months from Saugatuck's initial exercise of its QC Right to get the final QC application submitted. Tr. 78-79.

No offers at the QC price were received by NYSHCR. Tr. 839, 937. Three lower offers were made however, including one from Plaintiff, that would have kept the affordability restrictions in place. Tr. 839-40. The general partner declined them all. Tr. 840-42; Jt. Exs. 121-22.

Relevant to Defendant's counterclaim for breach of contract damages, on February 19, 2021, St. Mary's proposed in writing to the limited partner that the debt obligation on the Property of $4,405,000 be refinanced, from the current interest rate of 4.06 percent to 2.58 percent. Tr. 609-10; D. Ex. 461. The purpose of the refinance was two-fold—first to lower the payments, and second to avoid the risk of interest rates increasing as the loan approached maturity in April 2023. Tr. 609-10. Saugatuck did not respond. Tr. 610-11. Ultimately, without Plaintiff's consent, the loan had to be refinanced on January 12, 2023 at an interest rate of 5.21 percent, which according to Defendant, damaged it in the amount of $808,000. *See* Tr. 611-

12; D. Ex. 467 (email between the parties outlining Defendant's alleged damages); *see also* Tr. 850-51 (reviewing these figures with a slightly different amount for financing—$808,088).   In addition, Defendant claims that it was damaged in an additional amount of $334,460 in delayed construction costs, which had gone up 20 percent during this period.   Tr. 614; D. Ex. 467.   St. Mary's came to this calculation by comparing the bids in earlier years with those at the time of the correspondence between the parties on the subject.   Tr. 614.   Finally, St. Mary's claims that $43,344.25 had to be spent on roof repairs that could have been avoided because the roof should have been replaced at an earlier date in 2021 had Plaintiff consented.   Tr. 615-17; D. Exs. 462, 467.

With regard to Defendant's damages claims however, there is a lack of supporting documentation or other corroborating evidence.   Rather, St. Mary's simply relies on its own self-serving correspondence and tables.   *See*, *e.g.*, Tr. 627-35 (explaining the calculation) 870 (referring only to Granville's own analysis); D. Ex. 465 (tables compiled by Granville).   In addition, as to the damages claim based on the difference in interest rates between when Defendant first raised the issue of refinancing to Plaintiff in 2021, at which time Saugatuck refused to consent, and the date of the actual refinancing in 2023, Defendant was free to refinance at any time during those two years without Plaintiff's consent, but it failed to do so.   *See* Tr. 607-08 (Granville testifying that consent was not required after the compliance period ended), 866; D. Ex. 464 (letter from Granville stating that St. Mary's did not need consent to refinance).   Although Granville attempted to explain the delay as part of

an effort to avoid a dispute, Tr. 608, 865, this explanation is undermined by the fact that consent was still not given at the time of the actual refinancing in 2023. Accordingly, the ultimate fault for the delay rests with Defendant.

As to damages claimed for delayed construction costs and roof repairs, as the Court noted at trial, the numbers seemed particular, rather than being rounded, implying that they must have been based on something. Tr. 975. Yet no supporting documentation was supplied, either during discovery or at trial. *See* Tr. 892 (Granville has no supporting documentation but offered to "put something together and submit it"). Moreover, the amounts claimed were effectively attacked on cross-examination demonstrating that Defendant's damages calculations were not credible. *See*, *e.g.*, Tr. 877-82 (undermining damages calculation attributable to delay in debt refinancing), 897-908; D. Ex. 470 (demonstrating that Plaintiff approved Defendant's estimate for roof replacement within three weeks and then the job ran into problems with a permit and the Amherst Town Commission through no fault of Plaintiff). The Court is unwilling to accept Defendant's argument that it is entitled to over $1 million in damages simply on its word, without any corroborating evidence. In short, and has stated below, Defendant has failed to carry its burden to establish that it suffered damages as the result of Plaintiff's purportedly unlawful conduct.

**CONCLUSIONS OF LAW**

Having found the facts above based on the credible evidence, the Court now evaluates Saugatuck's claim for a declaratory judgment that St. Mary's may not exercise its purchase option while the QC process is ongoing on the one hand, and St.

17

Mary's counterclaims for breach of contract based on Plaintiff's failure to perform under the Option Agreement, and declaratory judgment as to each party's respective contractual rights under the Agreements on the other.  For the reasons set forth below, and in the context of the facts as presented in this case only, the Court concludes St. Mary's must let the QC process run its course, including the phasing out of affordable housing restrictions, without regard to the Option, and that Defendant's counterclaims fail on their merits.

All of the remaining claims turn on the Court's construction of the Agreements. Consistent with the Agreements' terms, New York law applies.  *See* LPA § 14.1, Option Agreement Art X(f); *Keybank Nat'l Ass'n v. Nour Limo, Inc.*, 345 F.R.D. 555, 562 (E.D.N.Y. 2024) ("'New York law is clear in cases involving a contract with an express choice-of-law provision:  Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.'") (quoting *Hartford File Ins. Co. v. Orient Overseas Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)).  Under New York law, a written contract ordinarily "should as a rule be enforced according to its terms." *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 285, 197 N.Y.S. 3d 719, 725 (2023) (internal quotation marks omitted).  Thus, "words and phrases are given their plain meaning" such that an agreement is "construed so as to give full meaning and effect to all of its provisions." *Red Tree Investments, LLC v. Petroleos de Venezuela, S.A.,* 82 F.4th 161, 175-76 (2d Cir. 2023) (citing *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990), *appeal denied*, 77 N.Y.2d

807, 569 N.Y.S.2d 611 (1991)) (internal quotation marks omitted).  In this regard, "[t]he primary objective in contract interpretation is to give effect to the intent of the contracting parties as revealed by the language of the agreement at issue." *Jujamcyn Theaters LLC v. Fed. Ins. Co.,* 659 F. Supp. 3d 372, 380 (S.D.N.Y. 2023) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993)) (internal quotation marks omitted).

Accordingly, "it is well settled that extrinsic and *parol* evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face." *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 816 (2d Cir. 2014) (quoting *W.W.W. Assocs. Inc. v. Giancontieri*, 77 N.Y.2d 157, 163, 565 N.Y.S.2d 440, 443 (1990) ("Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing") (collecting cases)).  An agreement's language is unambiguous "'if it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Cisco Sys., Inc. v. Synamedia Ltd.*, 557 F. Supp. 3d 464, 472 (S.D.N.Y. 2021) (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 294-95 (2d Cir. 2015)).

Conversely, if an agreement's terms are ambiguous, courts may consider "[e]xtrinsic evidence of the parties' intent" during the formation of the contract.  *Long Island Minimally Invasive Surgery, P.C. v. MultiPlan, Inc.*, 228 A.D.3d 638, 640, 212 N.Y.S.3d 701, 704 (2d Dep't 2024) (internal quotation marks and citation omitted);

*see Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 396 (2d Cir. 2023) ("[I]f the contract is ambiguous, then relevant extrinsic evidence should be admitted and considered by the factfinder to resolve the ambiguity."). A contract is ambiguous "if the language is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 12 (2d Cir. 2019) (internal citations and quotation marks omitted); *see Quinio v. Aala*, 344 F. Supp. 3d 464, 471 (E.D.N.Y. 2018) ("Contractual language is ambiguous if it susceptible to more than one reasonable interpretation") (citing *Garza v. Marine Transport Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988)).

"Whether . . . a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162, 565 N.Y.S.2d at 443); *see Sayers*, 7 F.3d at 1094 ("Ascertaining whether . . . a writing is ambiguous is a question of law for the trial court") (internal citations omitted). "When making [the] threshold determination [of whether a contract is ambiguous], the court must read the disputed provision within the context of the entire agreement and must safeguard against adopting an interpretation that renders another provision superfluous." *Quinio*, 344 F. Supp. 3d at 471 (citing *Sayers*, 7 F.3d at 1095). "If the court determines that the provision is ambiguous, it must then determine whether there is extrinsic evidence regarding the parties' intent." *Quinio*, 344 F. Supp. 3d at 471 (citing *Gallien v. Connecticut General Life Ins. Co.*, 49 F.3d 878, 884 (2d Cir. 1995)). Thus, "[w]hen a contract is ambiguous and there is relevant extrinsic

evidence as to the parties' intent, the proper interpretation of the disputed language becomes a question of fact for the factfinder." *Nasdaq, Inc. v. Exch. Traded Managers Grp., LLC*, 431 F. Supp. 3d 176, 227–28 (S.D.N.Y. 2019) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992)).

Applying these standards, in earlier proceedings the Court concluded that the Agreements were sufficiently ambiguous as to whether the Option can be invoked once the QC process has begun, and in effect supersedes the QC Right, and that a trial was necessary to take evidence as to the intent of the parties at the time of execution. DEs [42, 136]. The Court, now having accepted this evidence, resolves the parties' competing claims for a declaratory judgment, and Defendant's breach of contract cause of action, and concludes that the QC process must be permitted to run its course prior to the invocation of the Defendant's Option right being asserted.

There are a number of pieces of evidence that support this conclusion. Initially, there are the terms of the LPA and Option Agreement, though insufficient to carry the day, which indicate an intention for the QC Right, if immediately invoked, to run its course prior to the Option right. The LPA provides that the QC Right may be invoked after the 14th year of the Compliance Period, and the General Partner—here St. Mary's—must act promptly in submitting the appropriate request to NYSHCR. LPA § 5.4(i). Moreover, once approved, NYSHCR has a one-year marketing period to find a buyer for the Property subject to low-income restrictions before those restrictions can be lifted in the event no buyer is found. Yet the Option period does not commence until after the 15th year of the Compliance Period concludes—a full

21

year after the QC Right may be, and was, properly invoked here.  While the Court acknowledges the lag between the initial invocation of the QC Right, the filing of the final application, and NYSHCR approval for sale, the most logical way to read these two terms together in light of the trial evidence is that the QC Right, if immediately invoked, was intended to run its course.  This conclusion is buttressed by the language in the LPA requiring the General Partner to act "promptly" in this regard, implicitly recognizing that there could be an incentive for the General Partner to drag its feet given its Option rights.[8]

Defendant's various arguments that the QC Right is essentially valueless, and therefore meaningless, are both illogical and counter to the facts.  If the QC Right was without value, then the Limited Partner would not have insisted it remain in the LPA, despite Granville's request that it be removed.  And equally significant, if the the QC Right were intended to be superseded by the Option right, the Court concludes that appropriate language demonstrating this intent would have been included in the LPA, the same way it was when the same parties who negotiated the LPA here negotiated the Westview Apartments agreement, including a provision that the QC Right there was "[s]ubject to the General Partner's option to purchase the property at the end of the Compliance Period."  Tr. 540.  *See Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560, 992 N.Y.S.2d 687, 694 (2014); *Sterling Inv. Servs., Inc.*

---

[8] In reaching this conclusion, the Court rejects Plaintiff's argument that the Option Agreement's silence on this issue indicates that the QC Right supersedes the Option.  The silence of both Agreements on the topic of which purchase right prevails creates the ambiguity that required a trial on the merits.  *See* Plaintiff's Post-Trial Brief and Proposed Findings of Fact and Conclusions of Law, DE [222] at 17-18.

*v. 1155 Nobo Assocs.*, LLC, 30 A.D.3d 579, 579, 818 N.Y.S.2d 513, 516 (2d Dep't 2006) ("Under accepted canons of construction, when certain language is omitted from a provision but placed in other provisions, it must be assumed that the omission was intentional."). Finally on this point, the Court is unable to reconcile Defendant's position that the QC Right was of no value and not to be exercised on the one hand, with the fact that Granville has exercised the QC Right in other contexts. Tr. 931-34.[9]

In any event, further support is found in the fact that, as Granville testified, over time New York State began requiring that the QC Right be waived. This means that the State considers the right a valid threat to affordable housing, which if appropriately invoked, could lead to a diminishment of the low-income housing stock, exactly what would happen here if the Property's rents were brought to market levels and tenants could be found. In short, New York modifying its regulations establishes that the State acknowledges that QC Rights are generally enforceable.

Moreover, Granville's testimony that he concluded that the Limited Partner would not invoke the QC Right in any event for fear of jeopardizing future LIHTC projects in New York also supports Plaintiff's position. It is a recognition that although St. Mary's attempt to remove the QC language failed, Granville was willing to count on the regulatory environment, rather than LPA's terms, to keep the Limited

---

[9] To the extent that Defendant relies on the testimony of Granville's partner Garry Munson to reach the opposite conclusion, Munson had no personal knowledge or recollection of the contract negotiations relevant to the Agreements, and therefore his testimony is rejected. *See Nycal Corp. v. Inoco LP*, 988 F. Supp. 296, 303 n.42 (S.D.N.Y. 1997) (rejecting testimony concerning contracts negotiations where witness did not have personal knowledge of the negotiations); *see also Novartis Pharma AG v. Incyte Corp.*, No. 1:20-CV-400-GHW, 2024 WL 3608338, at *13 (S.D.N.Y. July 29, 2024) (same).

Partner from acting counter to St. Mary's interests, which turned out to be a miscalculation.

Lastly, there is Granville's implicit recognition that a first request to invoke the QC Right precludes the subsequent exercise of the Option in an internal email in which he concedes that NYSHCR's characterization of the QC application as "on hold" rather than a rejection was not "helpful" to St. Mary's position. *See* Jt. Ex. 83; *see also* Pl. Ex. 217 (Granville email challenging NYSHCR's characterization). This statement is a recognition that a first invoked QC Right precludes a subsequent Option exercise here.

Recognizing the application of the QC Right here does not end the inquiry however. As set forth above, the LPA requires the General Partner to act "promptly" in executing its responsibilities with respect to invocation of the QC Right. St. Mary's did not act promptly here in breach of its LPA obligations, dragging its feet at every opportunity to better position itself to exercise its Option. While the Court again acknowledges that there is a necessary lag between when the QC Right is initially invoked, and when a final application can be filed, the credible evidence establishes that even allowing for this lapse of time, Defendant was intentionally slowing the process in order to work around the otherwise lawfully invoked QC Right. *See* Tr. 57-62, 767-70; Jt. Exs. 19, 22 (St. Mary's sending correspondence to Saugatuck for approvals it did not need), Tr. 771-75; Jt. Exs. 25, 26, 33 (Granville waiting two months to hire the necessary appraiser, and then even longer to supply the appraiser with the information to complete the tasks it was assigned); Tr. 775-80; Jt. Exs. 24,

24

27 (similar problems getting property condition and Phase I environmental reports done), 292-94, 325, 592, 815, 818-19; Jt. Ex. 82; Pl. Ex. 212 (rejecting QC application once 2018 audited financial statements were supplied in 2019 because St. Mary's failed to provide other information requested six months earlier, and this delay had a ripple effect because earlier work had to be redone given that the calculations at issue were more than a year old). And as Defendant admits, had all of this work been promptly done and submitted, its Option right would have still existed because it lasted until the end of 2020. Tr. 844-45.[10]

These delays stand in stark contrast to how quickly Granville acted to get an appraisal done when it was for St. Mary's benefit in exercising the Option. *See* Tr. 799-803; Jt. Exs. 57, 64, 71 (one month to get the Option-related appraisal as opposed to five months for the QC appraisal). And this delay was in conjunction with St. Mary's positioning itself to exercise the Option before it even matured. *See* Tr. 66-67, 187, 528, 547-52, 835-36; Jt. Exs. 36, 52.

Based on the foregoing, the Court concludes that Plaintiff's QC Right was enforceable and validly invoked, and that Defendant breached the LPA § 5.4(i) when it failed to act promptly in support the QC process and in order to better position itself to assert its Option. As a result, the QC process must be permitted to run its course, including the lifting of affordability restrictions if NYSHCR concludes that the one-

---

[10] Because the delay in 2019 due to Defendant's willful failure to compile the necessary documents requested in late 2018 only further delayed the QC process—St. Mary's argument that the initial early-2018 delay is moot due to there being no 2003 audited financial statement, is rejected. *See* Defendant's Post-Trial Brief and Proposed Findings of Fact and Conclusions of Law at 9 n.12.

year marketing period has properly run without a suitable purchaser being located.[11][12]

This being determined with respect to the parties' competing declaratory judgment claims, the Court turns to Defendant's breach of contract counterclaim. St. Mary's breach of contract cause of action fails for more than one reason.

Initially, the Option Agreement is between St. Mary's and the Partnership, yet the Partnership is not a party to this case. The Option is to purchase the Property, which is held by the Partnership, not the limited partners. And while it is true that the Investor Limited Partner and Special Limited Partner indicated that they "ACCEPTED AND APPROVED" the Option Agreement, the Special Limited Partner was acting on behalf of the Partnership at that time. As a result, the claim is brought against the wrong party and fails on its merits. *See Lifeline Funding, LLC v. Ripka*, 114 A.D.3d 507, 507, 980 N.Y.S.2d 416, 417 (1st Dep't 2014) ("A cause of action

---

[11] This conclusion implicitly rejects Defendant's breach of contract claim for specific performance of the Option. But even if it does not, Plaintiff properly invokes the unclean hands doctrine. Specific performance is an equitable remedy. *See Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. 1-2007 v. Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484 495 (S.D.N.Y. 2018). As such, it requires the application to be made with clean hands. *Pecorella v. Greater Buffalo Press, Inc.*, 107 A.D.2d 1064, 1065, 486 N.Y.S.2d 562, 563 (4th Dep't 1985). Accordingly, unclean hands prevent equitable relief, which here is established by St. Mary's intentionally delaying the QC process. *See City of New York v. Fedex Ground Package System, Inc.*, 314 F.R.D. 348, 356-57 (S.D.N.Y. 2016) ("[U]nclean hands prohibits equitable relief to a party that has acted fraudulently or deceitfully to gain an unfair advantage.") (applying New York law). As a result, specific performance is unavailable. *See Senior Hous. Assistance Grp. v. AMTAX Holdings 260, LLC*, C17-1115 RSM, 2019 WL 1417299, *12 (W.D. Wash. Mar. 29, 2019) (barring general partner from equitable relief due to unclean hands). Moreover, Defendant's delay also demonstrates a likely breach of the duty of good faith and fair dealing with respect to its obligations under the LPA. *See Provident Healthcare Partners, LLC v. American Veterinary Supply Corp.*, 2007 WL 120059, at *3 (S.D.N.Y. Jan. 17, 2007) (concluding plaintiff stated a claim for breach of the implied covenant of good faith and fair dealing based on defendant's delay).
[12] In reaching this conclusion the Court is not holding that the QC Right necessarily supersedes the Option right in every context—just those present in this case. Indeed, the Court can imagine a fact pattern, *e.g.*, where the limited partners act to delay or prevent exercise of the Option, or a change in regulatory environment, where the alteration in state or federal policy restricts use of the QC Right, and compels the opposite outcome.

against a partnership for breach of contract does not lie against the individual partners absent an allegation that the partnership is insolvent or otherwise unable to pay its obligations").

Moreover, consistent with the analysis above, even if Plaintiff was properly sued for breach of the Option Agreement, there is no liability, as Saugatuck did not violate the Agreement's terms.   Plaintiff validly exercised the QC Right, which Defendant then failed to promptly shuttle through the NYSHCR application process in violation of the LPA in order to better position itself to exercise the Option.   Under these facts, Saugatuck would be relieved of its obligations under the Option Agreement to participate in the Option process.   *See Bear, Stearns Funding, Inc. v. Interface Grp.-Nevada, Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005) ("A fundamental principle of contract law provides that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party.").[13]

But even if the Partnership had been included as a party, and Plaintiff had otherwise breached the Option Agreement, Defendant's damages claim would still fail due to a lack of credible evidence.   As set forth above, St. Mary's claims damages

---

[13] In so concluding, the Court acknowledges that the LPA and the Option Agreement are ostensibly two separate contracts.   Although the parties previously disagreed as to whether the LPA and the Option Agreement were to be read together as a single agreement, *see* DE [181] at 4 n. 3, the Court now holds that they are to be construed as one writing.   The Court previously reached this conclusion, *see* DE [42] at 6 n. 4, noting that "instruments executed at the same time, by the same parties, for the same purpose, and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument." *BWA Corp., v. Alltrans Exp. U.S.A., Inc.,* 112 A.D.2d 8550, 852, 493 N.Y.S.2d 1, 3 (1st Dep't 1985).   Moreover, this conclusion is supported by Granville's testimony regarding the importance of the Option Agreement to the overall transaction. Tr. 496-98, 507, 531; *see* 15 Williston on Contracts § 45:10 (4th ed.) (noting separate writings can be "construed as a single contract if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken").

based on an increase in refinancing cost due to a change in interest rates, increase construction costs due to delays and costs of certain roof repairs. The Court concludes however, that the delays leading to increased costs were Defendant's fault. Although the parties have an acrimonious relationship, there was nothing preventing St. Mary's from acting expeditiously with respect to refinancing. As to the actual costs for delayed construction and repairs, Defendant's evidence consists of self-serving testimony without corroboration that was effectively and entirely undermined during cross-examination to the point where the Court is unwilling to credit any of it. *See* Tr. 876-82 (undermining damages calculation as to alleged debt-refinancing calculations), 897-908; D. Ex. 470 (noting that Plaintiff approved roof replacement within three weeks and then the job ran into problems due to a local permit issue that was no fault of Plaintiff), 892, 975 (noting that a detailed damages figure was offered as opposed to a round number yet no supporting documentation was provided, but Defendant offering to submit something). For all of these reasons, Defendant's breach of contract claim fails.[14]

---

[14] In reaching this conclusion, the Court notes that Plaintiff moved separately at the Court's direction to dismiss St. Mary's counterclaim due to a failure to submit sufficient evidence of damages, and because the trial testimony on damages was based on improper expert testimony given by a lay witness–Granville. *See* DE [219]. The Court denies the motion as moot to the extent it seeks relief as a matter of law. Rather, as set forth herein, the Court reject's St. Mary's counterclaim on the facts because Defendant failed to carry its burden of proof on damages. In reaching this conclusion, the Court makes two additional points: (1) as to the correspondence Granville forwarded during the period of time that parties were in litigation in this case, these documents, even if they were properly admitted as business records—are so self-serving as to be unworthy of credit, especially in light of Granville's other shaky testimony and lack of corroboration; and (2) Granville's testimony on damages was sufficiently confusing in getting to its conclusion, that it would have benefited from use of an expert in any event. *See*, *e.g.*, Tr. 873-75 (relying on a table the witness compiled with no underlying documentation that is incomplete and would require the Court to conduct the arithmetic to reach the conclusion Defendant argues for), 877-82 (testimony on cross-examination undermining damages calculation based on refinancing).

**CONCLUSION**

For the foregoing reasons, the Court issues a declaratory judgment in favor of Plaintiff and against Defendant that Plaintiff's Qualified Contract Right be permitted to run its course at NYSHCR, including the lifting of low-income and related restrictions, if the marketing period has run with no suitable purchaser being located. This Court issues this judgment based on both the language of the Agreements as supported by the credible evidence and Defendant's breach of the LPA by failing to act "promptly," as required by the LPA.  Further, the Court rejects Defendant's breach of contract claim in its entirely for a failure to include the Partnership as a party, failure to establish a breach, and because of a failure to carry its burden with respect to establishing damages.

SO ORDERED.

Dated:      Central Islip, New York
            September 5, 2024

                                    s/ Steven I. Locke
                                    STEVEN I. LOCKE
                                    United States Magistrate Judge